```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION


 3


 4   UNITED STATES OF AMERICA,-    Docket No. 3:13-CR-550
                               -
 5       Plaintiff,            -    Toledo, Ohio
                               -    May 15, 2014
 6           v.                -    Trial - Volume 8
                               -
 7   BRADFORD L. HUEBNER,      -
     et al.,                   -
 8                             -
         Defendants.           -
 9   ------------------------------

10                          VOLUME 8
                        TRANSCRIPT OF TRIAL
11           BEFORE THE HONORABLE JACK ZOUHARY
          UNITED STATES DISTRICT JUDGE, AND A JURY.
12
     APPEARANCES:
13
     For the Plaintiffs:   United States Attorneys' Office
14                         By:  Gene Crawford
                           Four SeaGate, Suite 308
15                         Toledo, OH 43604
                           (419) 259-6376
16
                           United States Attorney's Office
17                         By:  Matthew W. Shepherd
                           Suite 400
18                         801 Superior Avenue, W
                           Cleveland, OH 44113
19                         (216) 622-3859

20   For the Defendant:    Kerger & Hartman
     Huebner               By:  Richard M. Kerger
21                              Stephen D. Hartman
                           Suite 100
22                         33 South Michigan Street
                           Toledo, OH 43604
23                         (419) 255-5990

24


25
```

```
 1   For the Defendant:    Connelly, Jackson & Collier
     Emmenecker            By:  Reginald S. Jackson, Jr.
 2                               Adam S. Nightingale
                           Suite 2300
 3                         405 Madison Avenue
                           Toledo, OH 43604
 4                         (419) 243-2100

 5
     For the Defendant:    Boss & Vitou
 6   Teadt                 By:  Charles M. Boss
                           111 West Dudley Street
 7                         Maumee, OH 43537
                           (419) 893-5555
 8
                           Melissa L. Dybala
 9                         Suite 800
                           316 North Michigan Street
10                         Toledo, OH 43604
                           (419) 241-2300
11
     Court Reporter:       Tracy L. Spore, RMR, CRR
12                         1716 Spielbusch Avenue
                           Toledo, Ohio 43604
13                         (419) 213-5520

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by mechanical stenography,
25   transcript produced by notereading.
```

|   |   |
|---|---|
| | 1 |
| | 2 |
| 00:01:21 | 3 |
| 00:01:22 | 4 |
| 00:01:28 | 5 |
| 00:01:36 | 6 |
| 00:01:39 | 7 |
| 00:01:41 | 8 |
| 00:01:45 | 9 |
| 00:01:53 | 10 |
| 00:01:56 | 11 |
| 00:01:57 | 12 |
| 00:02:00 | 13 |
| 00:02:01 | 14 |
| 00:02:03 | 15 |
| 00:02:06 | 16 |
| 00:02:08 | 17 |
| 00:02:10 | 18 |
| 00:02:12 | 19 |
| 00:02:15 | 20 |
| 00:02:18 | 21 |
| 00:02:19 | 22 |
| 00:02:21 | 23 |
| 00:02:21 | 24 |
| 00:02:21 | 25 |

(Reconvened at 8:48 a.m.)

(The witness was sworn by the Court.)

(Jury enters the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  Hopefully you handled the rain.  As a preliminary matter, you may note that Mr. Shepherd is not here today on behalf of the government, and that is for reasons beyond his control.  It is not because of his lack of interest in this trial, believe me.  And, of course, he's not here with my approval; let's just put it that way.

When we left yesterday, we were listening to a tape.

MR. KERGER:  Your Honor, last night I listened to the rest of the tape.  I don't think it adds anything that the jury hasn't already heard, so we're going to stop there.

THE COURT:  Very good.  And the defendants are prepared to call their next witness, who is in the witness stand and has been sworn.  And counsel, you may inquire.

MR. BOSS:  Thank you, judge.

- - -

RICHARD GREEN, DIRECT EXAMINATION

BY MR. BOSS:

00:02:21  1      Q.   Could you please tell the ladies and gentlemen
00:02:23  2   your name.
00:02:24  3      A.   Richard Green.
00:02:25  4      Q.   And, Mr. Green, what do you do for a living?
00:02:27  5      A.   I'm a computer forensic expert.
00:02:30  6      Q.   Were you hired by myself in order to assist us in
00:02:33  7   doing some work?
00:02:34  8      A.   Yes, I was.
00:02:35  9      Q.   And can you tell us, where do you live?
00:02:39  10     A.   I live in St. Pete, Florida.
00:02:41  11     Q.   And did you previously reside in the Toledo, Ohio
00:02:44  12   area?
00:02:45  13     A.   Yes, I did.
00:02:46  14     Q.   How long ago was that?
00:02:47  15     A.   About seven years.
00:02:50  16     Q.   I understand that you have had some education,
00:02:53  17   training, and experience to be qualified as an expert in
00:02:57  18   computer forensic work; is that correct?
00:02:59  19     A.   That is.
00:03:01  20     Q.   And I know that you gave me your resumé.  I'd
00:03:08  21   like to just ask you a couple questions.  Can you tell
00:03:10  22   us about your educational background, please.
00:03:12  23     A.   Certainly.  I've taken about 16 classes
00:03:19  24   specifically in the computer forensic field.  Prior to
00:03:25  25   that my experience comes from 20-some years as an IT

00:03:32  1    technician followed by seven years hands-on computer

00:03:36  2    forensic training and cases.

00:03:39  3        Q.   And do you currently own a business, and what is

00:03:42  4    that?

00:03:43  5        A.   The name of the company is United States

00:03:45  6    Forensics.

00:03:46  7        Q.   And United States Forensics, I take it that you

00:03:50  8    examine computer data and provide reports and

00:03:54  9    information?

00:03:55  10       A.   Yes, we do.

00:03:56  11       Q.   And can you tell me whether you've been

00:03:58  12   previously qualified as an expert to testify in court?

00:04:01  13       A.   Yes, I have.

00:04:02  14       Q.   And can you tell us, was that in the states of

00:04:05  15   Florida, Michigan, and Ohio?

00:04:06  16       A.   That is correct.

00:04:07  17       Q.   Have you also been qualified and appointed as an

00:04:10  18   expert in federal court?

00:04:11  19       A.   Yes.

00:04:12  20       Q.   And can you tell me whether you've worked both

00:04:15  21   for the defense as well as for law enforcement?

00:04:17  22       A.   I have.

00:04:18  23              THE COURT:  One second, please.

00:04:51  24              (Discussion had off the record.)

00:04:52  25              THE COURT:  I'm sorry.  Go ahead.

00:04:55   1   BY MR. BOSS:

00:04:55   2       Q.  Mr. Green, do you belong to any associations of

00:04:58   3   computer forensic examiners?

00:05:00   4       A.  Yes.  There's an International Society of

00:05:02   5   Computer Forensic Examiners is the primary one.  There's

00:05:09   6   the National Private Investigation chapter down in

00:05:17   7   Florida.

00:05:18   8       Q.  And have you been certified as a computer

00:05:23   9   forensic examiner?

00:05:24  10       A.  Yes, through the international site.  They have a

00:05:28  11   CCD certification.

00:05:29  12           MR. BOSS:  Your Honor, I'd ask that the

00:05:30  13   witness be qualified as an expert.

00:05:33  14           THE COURT:  Any objection?

00:05:34  15           MR. CRAWFORD:  No, Your Honor.

00:05:35  16   BY MR. NIGHTINGALE:

00:05:36  17       Q.  Mr. Green, did you receive computer data -- I

00:05:42  18   know that the prosecuting attorney spoke with the jury

00:05:44  19   yesterday about the way that when the search was

00:05:48  20   conducted of the BH Group offices, that the search team

00:05:54  21   had a computer forensic expert, and that expert got what

00:05:59  22   are called mirror images, I think it is, of the hard

00:06:02  23   drives.  Are you familiar with that process?

00:06:04  24       A.  Yes.

00:06:05  25       Q.  And when those mirror images are obtained from

00:06:09  1  the computer server, are you forensically -- are we able

00:06:13  2  to make clones or copies of those so more than one

00:06:16  3  agency can examine them?

00:06:17  4      A.  Yes, we are.  The images are called a bit stream

00:06:24  5  image.  It's slightly different from a mirror image, but

00:06:28  6  essentially it's an exact duplicate of the hard drives

00:06:31  7  that would have been in the computers on location when

00:06:34  8  they made those images.  And the "images" is just a

00:06:39  9  forensic term that we use to designate it's an exact

00:06:43  10  copy of that computer hard drive.

00:06:46  11      Q.  And did I provide you the copy of that bit stream

00:06:51  12  image that was given to us by the government?

00:06:53  13      A.  Yes, you did.

00:06:54  14      Q.  You have done an analysis of that?

00:06:56  15      A.  Yes, I have.

00:06:57  16      Q.  And did I ask you to recreate the information

00:07:03  17  from Mr. Teadt's computer?

00:07:04  18      A.  Yes, you have.

00:07:05  19      Q.  And did you do so?

00:07:07  20      A.  I did.

00:07:08  21      Q.  And I understand that you were here and heard Mr.

00:07:12  22  Massi testify previously, the government's computer

00:07:15  23  expert; is that correct?

00:07:16  24      A.  That is.

00:07:17  25      Q.  And did you find his testimony reliable?

00:07:21  1      A.  Yes.

00:07:23  2      Q.  And you heard him testify about what forensic

00:07:26  3  computer program he used in order to extract

00:07:29  4  information; is that correct?

00:07:30  5      A.  I did.

00:07:31  6      Q.  And did you use that same computer program in

00:07:34  7  order to extract information that you then looked at and

00:07:40  8  had analyzed?

00:07:41  9      A.  Yes, I did.

00:07:41  10     Q.  And what's the name of that program; do you

00:07:53  11 remember?

00:07:53  12     A.  There's Internet Evidence Finder, and there was a

00:07:57  13 second program he used called X-Ways Forensics.  Both of

00:08:02  14 those tools I'm very familiar with.

00:08:05  15     Q.  And did I ask you to perform an analysis of the

00:08:10  16 cube 14, Mr. Teadt's, computer using the Internet

00:08:15  17 Evidence Finder?

00:08:16  18     A.  Yes, you did.  Yes, you did.

00:08:19  19     Q.  And when we heard the testimony of Mr. Massi,

00:08:25  20 they provided to us his memorandum of transmittal of

00:08:30  21 evidence.  And I'll set that up here on our screen.

00:08:42  22          MR. BOSS do I have to put some button?

00:08:45  23 Thank you so much.

00:08:47  24 BY MR. BOSS:

00:08:47  25     Q.  Mr. Green, were you provided Mr. Massi's

| | | |
|---|---|---|
| 00:08:50 | 1 | memorandum of transmittal of digital evidence? |
| 00:08:52 | 2 | A.  Yes, I was. |
| 00:08:54 | 3 | Q.  And on the second page of that -- by the way, on |
| 00:08:57 | 4 | the first page it talks about the various computers that |
| 00:09:00 | 5 | were submitted for analysis; is that correct? |
| 00:09:04 | 6 | A.  Yes. |
| 00:09:04 | 7 | Q.  Among them is the one that was for cube 14; is |
| 00:09:11 | 8 | that correct? |
| 00:09:11 | 9 | A.  Correct. |
| 00:09:12 | 10 | Q.  And then on the second page Mr. Massi provided us |
| 00:09:17 | 11 | the key words that were used in his analysis; is that |
| 00:09:22 | 12 | correct? |
| 00:09:22 | 13 | A.  Yes, sir. |
| 00:09:24 | 14 | Q.  Let's see if I can figure out what button to push |
| 00:09:30 | 15 | to zoom in here a little bit. |
| 00:09:32 | 16 | Are you able to read that that I've put the |
| 00:09:36 | 17 | little bit of highlighting next to? |
| 00:09:39 | 18 | A.  I am. |
| 00:09:39 | 19 | Q.  And could you read for the record, the key words |
| 00:09:42 | 20 | used for this case included what, please? |
| 00:09:44 | 21 | A.  Dinar, Iraqi, Iraq, currency, exchange, fraud, |
| 00:09:50 | 22 | illegal, hedge fund, hedge, Rudolph, Coenen, scam, and |
| 00:09:58 | 23 | Rudy. |
| 00:10:01 | 24 | Q.  Did you use those same search terms and put them |
| 00:10:05 | 25 | into the Internet Evidence Finder program? |

00:10:11   1      A.   Yes, I did.

00:10:13   2      Q.   And that program, when it provides you the search

00:10:18   3   results, can you describe for the jury what that seems

00:10:20   4   like or looks like when you get it back, that initial

00:10:23   5   report?

00:10:23   6      A.   Sure.   It puts it in a database format, then

00:10:26   7   gives you different categories.   When the program runs,

00:10:31   8   it takes a look at that image file, and it runs a search

00:10:35   9   of all the data on it, including deleted and partial

00:10:39  10   data on there as well.   And then it will put it in

00:10:42  11   categories for us such as internet history, search

00:10:45  12   terms, cookies.   It even does things like web chats,

00:10:51  13   Facebook history.   As Mr. Massi said, many hundreds of

00:10:55  14   different artifacts.

00:10:57  15      Q.   If we were to look at it on what I'll call a

00:11:01  16   spreadsheet, it has a whole bunch of columns of

00:11:04  17   different information; is that correct?

00:11:06  18      A.   That's correct.

00:11:06  19      Q.   And did I ask you to reduce that to simple -- to

00:11:17  20   chronological order for us?

00:11:19  21      A.   Yes.

00:11:19  22      Q.   In fact, the two exhibits, the screen shots that

00:11:22  23   were given by the government through Mr. Massi, which

00:11:26  24   would have been Exhibit 293 and 296, both of which

00:11:32  25   pertain to Mr. Teadt's computer, those screen shots

00:11:36  1   were -- let me --

00:11:40  2        Ms. Dybala, could you pull up 293, please.

00:11:48  3        When I talk about the number of -- and you can,

00:11:51  4   if you want to, I think that your screen up there is

00:11:55  5   sensitive, so you can mark it if you want.  But at any

00:12:01  6   rate, when I ask you, for instance, about columns, I'm

00:12:08  7   referring to the various categories of search term

00:12:11  8   results; is that correct?  Or there are a whole bunch of

00:12:15  9   these; isn't that true?

00:12:16  10   A.   Yeah, there's many columns on this.  And, in

00:12:19  11  fact, with the spreadsheet, those columns can be

00:12:24  12  expanded so you can see more information than was

00:12:27  13  actually shown.

00:12:29  14   Q.   Is that what the slide bar at the bottom is

00:12:32  15  about?

00:12:33  16   A.   No.  There can be more information to the right

00:12:35  17  of what you're seeing, which the slide bar would show

00:12:38  18  you; but the individual columns, column F or G, those

00:12:46  19  can be slid open if the screen shot is not showing you

00:12:49  20  the full record.  Under URL, if you look towards the

00:12:52  21  bottom of the Bing, it looks like it's cutting off part

00:12:56  22  of it.  So there would have been more information to the

00:12:58  23  right of that.

00:13:01  24   Q.   I didn't ask you to reproduce the whole from left

00:13:04  25  to right on the spreadsheet; instead, I asked you to put

00:13:07   1    these matters in chronological order; is that correct?

00:13:10   2        A.   That's correct.

00:13:10   3        Q.   Instead of doing just a small shot of just a

00:13:14   4    portion, I asked you to give us the entire report?

00:13:18   5        A.   Correct.

00:13:21   6             MR. BOSS:   You can take that off, Melissa.

00:13:23   7    Thank you.

00:13:38   8    BY MR. BOSS:

00:13:38   9        Q.   I've provided you previously with a copy of

00:13:40   10   Exhibit 749; is that correct?

00:13:46   11       A.   The which?

00:13:46   12       Q.   The IEF timeline summary for cube 14?

00:13:50   13       A.   Yes.

00:13:51   14       Q.   Mr. Green, the first column is simply the date.

00:14:11   15   Would that be the date that the search term or the

00:14:16   16   search was run and it came back giving us what we call a

00:14:19   17   hit?

00:14:21   18       A.   Well, that's correct.  When we run the search

00:14:27   19   terms, it will go through all the data and give us what

00:14:30   20   we call hits.  And then it says what date that hit

00:14:36   21   occurred, when the site would have been visited.

00:14:38   22       Q.   So probably what date the computer was used in

00:14:41   23   order to obtain a search that was in that group of words

00:14:45   24   that Mr. Massi searched through, and you did too?

00:14:48   25       A.   Yeah.  Well, this is more than just the search

00:14:53  1   terms.  They could have just gone to a website without

00:14:55  2   searching for it.  Let's say it was a favorite website

00:15:00  3   and maybe something they checked in on daily or

00:15:02  4   whatever.  So it wasn't necessarily put into Google as

00:15:07  5   a search term.  But this is all of the data that the

00:15:11  6   Internet Evidence Finder produced with running the same

00:15:14  7   search terms that Mr. Massi did.

00:15:15  8       Q.  So it wouldn't necessarily have been the search

00:15:18  9   itself, but instead it might have been contained in the

00:15:21  10  e-mail or the web response?

00:15:23  11      A.  Right.  The way the program works is it can do

00:15:27  12  the search for all the artifacts.  Now, on the

00:15:30  13  spreadsheet you saw, which was actually a snapshot or a

00:15:34  14  screen shot of a partial spreadsheet, then it showed

00:15:39  15  maybe 25, 30 records.  That actual full spreadsheet

00:15:44  16  would contain thousands of records.  So it was a very

00:15:47  17  small fragment of what the actual spreadsheet was.  And

00:15:51  18  in that case it was a spreadsheet of just one of the

00:15:54  19  categories that the program produced.  So it may produce

00:15:59  20  ten, 15, 20 categories.  So one of the functions that we

00:16:05  21  can do on this program is we can take all of those hits,

00:16:09  22  all of those categories, and put them into what we call

00:16:12  23  a timeline function, and then export that to a

00:16:15  24  spreadsheet or a PDF file, which is the process we used

00:16:20  25  here.  Now, in that, when we run the search hit,

00:16:26  1    sometimes you get what I'll call a false positive.

00:16:29  2        Q.  I beg your pardon?

00:16:30  3        A.  The Internet Evidence Provider also ran what I'll

00:16:34  4    call a false positive.  It may have hit on a search

00:16:37  5    term, but in some cases it wasn't actually going down to

00:16:41  6    a website; it may have processed data from a local file

00:16:47  7    on the company's server, or perhaps on an e-mail hit,

00:16:52  8    things of that nature.

00:16:54  9        Q.  So when Mr. Massi -- you heard his testimony?

00:16:57  10       A.  Yes.

00:16:58  11       Q.  And when he was explaining to us that it wasn't

00:17:00  12   perfectly reliable when it talked about the number of

00:17:03  13   visits, is that what he's referring to?

00:17:07  14       A.  Well, he was -- I don't believe he was

00:17:11  15   specifically speaking of that.

00:17:12  16       Q.  Okay.

00:17:13  17       A.  He was talking about a different function.

00:17:15  18       Q.  Okay.  No problem.

00:17:16  19            Let's talk about that next column that we've

00:17:19  20   given there, "Website."  What is that, if you would

00:17:22  21   please?

00:17:26  22            MR. BOSS:  Melissa, can you expand that a

00:17:29  23   little bit to the bottom so we can see an example of

00:17:32  24   what a couple of the websites are.

00:17:37  25   BY MR. BOSS:

00:17:38  1      Q.   Under "Website" I see that first one for

00:17:40  2   September 17, 2009.  It says Google.com.  What was that

00:17:48  3   about?

00:17:48  4      A.   In this particular one this was a search that was

00:17:51  5   run on Google which would have been positive for one of

00:17:55  6   the search terms Mr. Massi used.  Now, what we're

00:17:57  7   showing here is just the main domain name, not the full

00:18:02  8   code of what the program would have come up with, which

00:18:05  9   most of it would not have -- it would have just been

00:18:08  10  more confusing than anything else.  So all of the

00:18:15  11  websites, the main domain names, put in the simplest

00:18:21  12  terms without all of the extra stuff which may show you

00:18:25  13  what page in the domain they may have visited, or there

00:18:28  14  are just a bunch of other coding that you would see in

00:18:31  15  there too.

00:18:31  16     Q.   Thank you.  Now, the next column over it says

00:18:34  17  "Exhibit Number," "Check Number," "Amount" and

00:18:36  18  "Purpose."  Did you have any input into that at all?

00:18:39  19     A.   No, I did not.

00:18:40  20     Q.   So the only portion that is part of your duties

00:18:44  21  have to do with those first two columns of date and

00:18:46  22  website; is that correct?

00:18:48  23     A.   That is correct.

00:18:49  24     Q.   And with regard to that, does Exhibit 749,

00:18:53  25  this -- I think it's titled at the top "IEF Timeline

00:18:58  1  Summary, Cube 14," does that accurately reflect the

00:19:05  2  search results that you obtained when you ran that same

00:19:07  3  search placed in chronological order for cube 14 on that

00:19:12  4  computer?

00:19:12  5     A.  Yes, it does.

00:19:19  6     Q.  In your expert opinion are the results presented

00:19:23  7  in that exhibit, the first two columns, an accurate

00:19:27  8  representation of the Cube 14 web search results of the

00:19:31  9  search terms presented?

00:19:32  10    A.  Yes, it is.

00:19:35  11        MR. BOSS:  Thank you.  I have no further

00:19:37  12  questions right now.

00:19:44  13                    -  -  -

00:19:44  14        RICHARD GREEN, CROSS-EXAMINATION

00:19:49  15  BY MR. HARTMAN:

00:19:49  16    Q.  Good morning, Mr. Green.

00:20:01  17    A.  Good morning.

00:20:01  18    Q.  I'm Steve Hartman; I represent Brad Huebner.  We

00:20:05  19  have spoken before, correct?

00:20:07  20    A.  Yes, sir.

00:20:08  21    Q.  I'm going to try not to ask you any of the

00:20:11  22  questions that Mr. Boss covered so we don't have to

00:20:15  23  duplicate things.  If I do a little bit, I apologize.

00:20:22  24        You recall Agent Massi testifying yesterday, and

00:20:26  25  you were in court when he did, correct?

00:20:28  1        A.   Yes, sir.

00:20:29  2        Q.   And you would say that the testimony he gave

00:20:33  3   about what he did was generally accurate, the things

00:20:36  4   that he did?

00:20:37  5        A.   Yes.

00:20:42  6        Q.   Was it when -- when they showed a snapshot of a

00:20:51  7   database that was in a spreadsheet, which of the

00:20:56  8   programs was used to get that information?

00:20:59  9        A.   That was -- Internet Evidence Finder would have

00:21:05  10  generated the spreadsheet.  And what you were looking at

00:21:07  11  was a screen shot of that spreadsheet that was then

00:21:11  12  saved as Adobe PDF file.

00:21:14  13       Q.   And that's not a proprietary government program,

00:21:18  14  correct?

00:21:19  15       A.   No.   Internet Evidence Finder is commercially

00:21:22  16  available.

00:21:22  17       Q.   And you have it?

00:21:23  18       A.   I do.

00:21:23  19       Q.   You use it?

00:21:24  20       A.   All the time.

00:21:25  21       Q.   And you're very familiar with it, right?

00:21:27  22       A.   Yes, sir.

00:21:28  23       Q.   Now, you did some analysis on some of the hard

00:21:35  24  drives that -- the images of the drives that you

00:21:39  25  received connected to this case; is that correct?

00:21:41   1    A.   Yes.

00:21:51   2    Q.   Could you pull up 7.

00:21:54   3         This is a sketch of the BH Group offices that was

00:21:56   4    made at the time the search was done.  And you also did

00:22:01   5    some analysis on the hard drives that the government

00:22:07   6    said came from cube 13, correct?

00:22:09   7    A.   Correct.

00:22:10   8    Q.   And just to refresh the jury's recollection, that

00:22:14   9    was the one that was identified with my client, Mr.

00:22:17  10    Huebner?

00:22:17  11    A.   Yeah, I believe that's correct.

00:22:24  12    Q.   Now, what analysis did you do with the images

00:22:30  13    that you got from cube 13?

00:22:34  14    A.   Ran with Internet Evidence Finder the search

00:22:40  15    terms and produced those databases.  Also with the

00:22:45  16    X-Ways Forensics we processed e-mails that were found on

00:22:51  17    there into a format that could be easily exported.

00:23:03  18    Q.   So you then, in terms of the Internet Evidence

00:23:06  19    Finder, you put all the results in chronological order,

00:23:09  20    and you put those into a spreadsheet as well, correct?

00:23:12  21    A.   That is correct.

00:23:13  22    Q.   So because of your working with the same

00:23:18  23    material, the same program and the same key words, you

00:23:22  24    would have come up with exactly the same database that

00:23:25  25    Agent Massi came up with, right?

00:23:28  1    A.  My version of the program was a little bit newer

00:23:32  2  than his, so essentially they're going to be very, very

00:23:36  3  similar, but as the program is constantly updated to be

00:23:42  4  able to process different web browsers and artifacts, so

00:23:48  5  the results would have been slightly different only

00:23:50  6  because of a slightly newer version of the program,

00:23:54  7  which I believe he had used the current version at the

00:23:56  8  time that he ran them, just that I had the evidence a

00:23:59  9  little bit later.

00:24:01  10    Q.  Okay.  And Agent Massi testified when they put up

00:24:08  11  the snapshot of Mr. -- of cube 13's internet activity,

00:24:17  12  that was a very, very small portion of the database that

00:24:22  13  you ended up with, correct?

00:24:24  14    A.  I believe we saw two of the exhibits.  I'm not

00:24:28  15  sure if they were both from --

00:24:30  16    Q.  I'll show you, just to refresh, so you're aware.

00:24:35  17  Now, this is Exhibit 295.  This is just a portion of the

00:24:40  18  internet activity on the computers, the computer in cube

00:24:45  19  13, correct?

00:24:48  20    A.  I believe that Mr. Massi couldn't tell us for

00:24:50  21  sure which cube that had come from.

00:24:54  22    Q.  Well, I think -- I think he couldn't tell us

00:24:57  23  which drive.  There were two drives from cube 13, and he

00:25:01  24  couldn't tell which drive, but he definitely said they

00:25:05  25  came from cube 13, I recall.

00:25:06   1      A.   Okay.  I'll assume that is correct.

00:25:08   2      Q.   And the user name on these is BHuebner, if you

00:25:12   3  look on there, correct?

00:25:13   4      A.   Correct.

00:25:18   5      Q.   So when you created that website, you -- I asked

00:25:23   6  you to look at a few things, correct?

00:25:26   7      A.   Yes.

00:25:27   8      Q.   And at what point in time did searches and

00:25:35   9  website information regarding the Iraqi dinar, business

00:25:40  10  in Iraq, foreign currency, those kind of things begin to

00:25:45  11  appear frequently on the computer from cube 13?

00:25:48  12      A.   It was around the beginning of 2009.

00:25:51  13      Q.   From 2009?

00:25:53  14      A.   I believe so.

00:25:54  15      Q.   If I said November of 2009, would that sound

00:25:57  16  right?

00:26:00  17      A.   That would approximately be right.

00:26:03  18      Q.   I'm not looking for an exact date, just

00:26:06  19  generally.

00:26:06  20      A.   Yeah, it was generally over in the 2009, 2010,

00:26:11  21  2011 areas.

00:26:13  22      Q.   Okay.  So between November of 2009 and July 27 of

00:26:23  23  2007 [sic] when you created that database of those URLs,

00:26:29  24  there were nearly 7,000 of them, correct?

00:26:32  25              MR. BOSS:  Mr. Hartman, did you mean 2007?

00:26:41  1          MR. KERGER:  You said 2009 to 2007.

00:26:43  2    BY MR. HARTMAN:

00:26:44  3      Q.  I apologize.  From 2009 to July 27, 2011.

00:26:49  4      A.  Okay.  I was going to say, I didn't have a very

00:26:49  5    smart answer for what you had said before.

00:26:54  6          Yeah, in that time period there were thousands of

00:26:57  7    hits.

00:27:01  8      Q.  And so in that year and a half, the user of that

00:27:05  9    computer visited websites and did searches resulting in

00:27:13  10   7,000 specific URLs that you were able to find on the

00:27:19  11   computer?

00:27:20  12     A.  Well, just to make a little point of

00:27:24  13   clarification, when it comes up with a hit -- and I

00:27:30  14   believe we just had that one up for Realscam -- it

00:27:33  15   listed, maybe, 20 hits for that Realscam.  That was most

00:27:38  16   likely during one single visit.  So there could be 7,000

00:27:43  17   ones there, but they wouldn't all be unique visits, but

00:27:46  18   they would all be some unique element at that specific

00:27:51  19   date and time from that website.

00:27:52  20     Q.  I was just going to go there next.  Some of

00:27:56  21   those, when they show the same root website, whether

00:28:00  22   it's DinarVets.com or whatever, if there are a bunch of

00:28:07  23   different URLs on the same day, that would suggest that

00:28:10  24   whoever was using that looked at a lot of different

00:28:13  25   pages on that site, right?

00:28:15   1      A.   It could be pages, or it could be different

00:28:17   2   elements on that site.

00:28:20   3           Another way you can get that -- if you've used

00:28:23   4   Google before, it has predictive results.  And so as you

00:28:28   5   start to type something, it starts to give you result

00:28:32   6   hits.  So if you were, for example, typing "dinar trade

00:28:36   7   value," as you were typing that, by the time you got

00:28:40   8   done typing that whole search term, it may have produced

00:28:44   9   20 or 30 of those hits from the Internet Evidence

00:28:48  10   Finder.  So it's a little misleading as far as the scope

00:28:54  11   or the number of pages that may have been visited or the

00:28:57  12   number of search terms that may have been put in.

00:29:02  13      Q.   Now, many of the searches that were done and the

00:29:08  14   websites that were visited over that time had to do with

00:29:14  15   the dinar and Iraqi news and financial news and those

00:29:19  16   kind of things, right?

00:29:20  17      A.   That would be correct.  The search terms were

00:29:24  18   specific to that type of information that would have

00:29:29  19   been excluded, non-dinar or anything outside of those

00:29:36  20   search terms.

00:29:40  21      Q.   And isn't it true that there were multiple

00:29:44  22   sites --

00:29:46  23           MR. CRAWFORD:  Objection.  Leading.

00:29:49  24   BY MR. HARTMAN:

00:29:50  25      Q.   Did you find sites that seemed to be about the

| | | |
|---|---|---|
| 00:29:54 | 1 | dinar in particular, such as Dinar Trade or Dinar Banker |
| 00:30:00 | 2 | and those kind of things? |
| 00:30:01 | 3 | A.  That is correct. |
| 00:30:01 | 4 | Q.  And how would you describe the amount of activity |
| 00:30:05 | 5 | on those sites from 2009 to 2011, just generally? |
| 00:30:12 | 6 | A.  I would say many of those sites were consistent |
| 00:30:15 | 7 | over the period of time.  It seemed like there were |
| 00:30:19 | 8 | sites maybe they were referring back to on a consistent |
| 00:30:22 | 9 | basis. |
| 00:30:24 | 10 | Q.  Would you describe it as a lot of activity on |
| 00:30:27 | 11 | those sites, some of those sites? |
| 00:30:30 | 12 | A.  It's hard to quantify that as "a lot."  I would |
| 00:30:35 | 13 | say a significant amount. |
| 00:30:37 | 14 | Q.  There were also -- the results also produced |
| 00:30:43 | 15 | other URLs for much more well-known websites such as USA |
| 00:30:53 | 16 | Today, correct? |
| 00:30:57 | 17 | A.  Correct.  I didn't do a whole lot of analysis of |
| 00:31:02 | 18 | the specific sites. |
| 00:31:04 | 19 | Q.  Right.  But you looked over the websites that |
| 00:31:06 | 20 | showed up just generally to see what they were, right? |
| 00:31:09 | 21 | A.  In general. |
| 00:31:10 | 22 | Q.  And the New York Times showed up? |
| 00:31:16 | 23 | A.  I don't -- I'm sorry; I don't recall that |
| 00:31:20 | 24 | specific website. |
| 00:31:21 | 25 | Q.  Okay. |

00:31:22  1      A.   It very well could have been.

00:31:25  2      Q.   Did you see USA Today, MSNBC?

00:31:33  3      A.   Yeah, NBC, and there were some links to that to a

00:31:40  4  photo -- a photo set that they had related to dinars.

00:31:46  5      Q.   I'm not trying to get at exactly what was looked

00:31:49  6  at.  I'm just saying that a lot of the sites were

00:31:52  7  mainstream news sites, correct?

00:31:54  8      A.   That's correct.

00:31:59  9           MR. HARTMAN:  I have no further questions.

00:32:02  10  Thank you, Mr. Green.

00:32:04  11           MR. CRAWFORD:  No questions, Your Honor.

00:32:06  12           MR. BOSS:  Mr. Green, I think you're free to

00:32:08  13  go.

00:32:08  14           THE WITNESS:  Thank you very much.

00:32:14  15           THE COURT:  You may step down.

00:32:16  16           THE WITNESS:  Thank you.

00:32:19  17           MR. BOSS:  We call Marty Torgler.

00:32:27  18           (The witness was sworn by the Court.)

00:33:01  19                        - - -

00:33:01  20           MARTIN TORGLER, DIRECT EXAMINATION

00:33:02  21  BY MR. BOSS:

00:33:02  22      Q.   Good morning.

00:33:09  23      A.   Good morning.

00:33:10  24      Q.   Please pull forward a little bit and use that

00:33:15  25  microphone; it helps us a great deal.

00:33:17   1          Would you tell the jury, the ladies and
00:33:20   2   gentlemen, what your name is?
00:33:21   3      A.   My name is Martin Torgler.
00:33:23   4      Q.   And, Mr. Torgler, I understand that you are now
00:33:26   5   retired; is that correct?
00:33:28   6      A.   That's correct.
00:33:28   7      Q.   What are you retired from?
00:33:30   8      A.   I retired from the FBI.
00:33:32   9      Q.   How long were you in the FBI?
00:33:34  10      A.   Thirty years.
00:33:35  11      Q.   What did you do there?
00:33:37  12      A.   I was a Special Agent, and I ended up my career
00:33:41  13   in Detroit.  My last half of my career I worked
00:33:45  14   political and public corruption in Detroit.
00:33:49  15      Q.   Interesting.  And are you actively working these
00:33:52  16   days, or are you retired?
00:33:53  17      A.   No, I'm working as director of corporate security
00:33:57  18   for a company in Troy, Michigan.
00:33:59  19      Q.   And what is that company?
00:34:00  20      A.   Combine International.
00:34:02  21      Q.   What do you do for them?
00:34:04  22      A.   I take care of all their security work
00:34:08  23   property-wise, physical security of plants, our
00:34:15  24   intellectual security, and we have operations around the
00:34:18  25   country.

00:34:19　1　　Q.　Thank you.　Mr. Torgler, I understand that you

00:34:22　2　are personally acquainted with Michael Teadt, a

00:34:25　3　defendant in this case?

00:34:26　4　　A.　Yes, I am.

00:34:27　5　　Q.　Can you tell us how you came to know Mike Teadt?

00:34:29　6　　A.　Well, years ago we went to Sunday school

00:34:32　7　together.　We continued on through catechism class, and

00:34:37　8　we ended up both going to Miami University.

00:34:40　9　　Q.　And have you -- you've known him since grade

00:34:45　10　school?

00:34:45　11　　A.　Yes.

00:34:46　12　　Q.　And over that period of time -- and you went to

00:34:51　13　Miami University together.　Have you stayed in touch

00:34:54　14　with him?

00:34:54　15　　A.　Occasionally I would see him at reunions at

00:35:00　16　Miami, I think was one, when he was with his wife, and

00:35:06　17　I.　Later a couple years ago I was traveling with the

00:35:09　18　company I work for now, and I ran into his wife at the

00:35:12　19　airport where she was employed, Detroit Metro Airport.

00:35:16　20　　Q.　I see.　Do you know Mike's reputation in the

00:35:23　21　community?

00:35:24　22　　A.　I always knew him to be of high character, good

00:35:28　23　moral person, I think caring and trustworthy.　I thought

00:35:35　24　highly of him.

00:35:36　25　　Q.　Can you tell me whether in recent times you had

00:35:45  1   any involvement -- we're here about this BH Group

00:35:49  2   matter.  Did you receive a phone call from Mike about

00:35:51  3   anything on that?

00:35:52  4       A.  Yes, I did.

00:35:53  5       Q.  Can you tell the jury about that, please.

00:35:55  6       A.  Well, I can't recall; I think I was in my office,

00:36:00  7   maybe I was home, but anyhow, it was in July, 2011.  I

00:36:04  8   believe it was the 22nd, a Friday.  And Mike called me

00:36:09  9   regarding a situation that he was concerned about.

00:36:14  10          He asked me if I remembered Brad Huebner.

00:36:18  11          I said:  Yes, I did.

00:36:19  12          And he went on to explain that he knew Brad and

00:36:23  13  had an office in Brad's building, and he hung around

00:36:27  14  there when he was in town.  I believe he worked in New

00:36:33  15  Jersey and travelled, so forth.  And then he went on to

00:36:37  16  explain the situation with an investment business that

00:36:41  17  Brad had.

00:36:43  18      Q.  And did he express concern of some sort?

00:36:47  19      A.  Yes, he --

00:36:49  20          MR. CRAWFORD:  Objection, Your Honor.  Calls

00:36:50  21  for hearsay.

00:36:51  22          THE COURT:  Sustained.

00:36:53  23  BY MR. BOSS:

00:36:54  24      Q.  Can you tell me what impression was created in

00:36:56  25  your mind regarding the information provided by Mike

| | | |
|---|---|---|
| 00:37:02 | 1 | Teadt on that phone call to you? |
| 00:37:04 | 2 | A.  It appeared to do me that he was concerned that |
| 00:37:07 | 3 | Brad had gotten into -- |
| 00:37:09 | 4 | MR. CRAWFORD:  Objection, Your Honor. |
| 00:37:10 | 5 | Again, calls for hearsay. |
| 00:37:13 | 6 | THE COURT:  I'll sustain that.  In order to |
| 00:37:16 | 7 | express that opinion, there would have to be more |
| 00:37:19 | 8 | foundation.  This is a phone call, as I understand it, |
| 00:37:21 | 9 | not a face-to-face meeting.  Is that right? |
| 00:37:24 | 10 | MR. BOSS:  Yes, sir. |
| 00:37:24 | 11 | BY MR. BOSS: |
| 00:37:24 | 12 | Q.  Are you familiar with Michael Teadt's voice? |
| 00:37:26 | 13 | A.  Yes, I am. |
| 00:37:27 | 14 | Q.  Did you recognize it on the phone? |
| 00:37:28 | 15 | A.  Yes, I did. |
| 00:37:29 | 16 | Q.  Is it a rather distinct voice? |
| 00:37:32 | 17 | A.  Yes. |
| 00:37:33 | 18 | THE COURT:  I didn't mean by that -- I |
| 00:37:36 | 19 | apologize. |
| 00:37:37 | 20 | BY MR. BOSS: |
| 00:37:38 | 21 | Q.  As a result of the phone call, what did you do? |
| 00:37:39 | 22 | A.  I told Mike that based on what you're telling me, |
| 00:37:44 | 23 | you need to tell Brad he needs to get into the FBI |
| 00:37:47 | 24 | office in Toledo and express this honestly, tell |
| 00:37:52 | 25 | everything he knows to an agent in the FBI office. |

00:37:58  1      Q.  Did you give him contact information regarding

00:38:00  2  anybody?

00:38:01  3      A.  I said at the moment all the people I knew in the

00:38:05  4  FBI in Toledo were retired, but I would get him the name

00:38:08  5  of a supervisor that he could go tell what was going on.

00:38:14  6      Q.  And did you do so?

00:38:15  7      A.  Yes, I did.

00:38:16  8      Q.  And did you then -- did you do it right then on

00:38:19  9  that same call, or did you call Mike back?

00:38:22  10     A.  I think -- that was a Friday.  I think on Monday

00:38:25  11  I actually gave Brad the name of the individual to go

00:38:28  12  see in Toledo.

00:38:29  13     Q.  And a phone number for him to contact somebody?

00:38:32  14     A.  I believe so.

00:38:38  15          MR. BOSS:  One moment, please.

00:39:00  16          (Discussion had off the record.)

00:39:01  17          MR. BOSS:  No further questions.  Thank you.

00:39:07  18                        - - -

00:39:07  19          MARTIN TORGLER, CROSS-EXAMINATION

00:39:09  20  BY MR. KERGER:

00:39:09  21     Q.  Mr. Torgler, I'm Rick Kerger on behalf of Brad

00:39:13  22  Huebner.  You said you knew Brad before this call?

00:39:15  23     A.  Yes.

00:39:15  24     Q.  How did you know him?

00:39:17  25     A.  He also went to Miami for a year, I believe.

00:39:20  1      Q.  SO you sort of overlapped a year?

00:39:24  2      A.  Yes.

00:39:24  3      Q.  And when Brad called you, he expressed concern?

00:39:29  4      A.  Yes, he did.

00:39:30  5      Q.  And you told him to call who?

00:39:32  6      A.  I eventually gave him the name of Tom Pearson in

00:39:37  7  the Toledo office.

00:39:38  8      Q.  Tom is one of the local resident FBI agents here?

00:39:41  9      A.  Yes.

00:39:42  10          MR. KERGER:  That's all I have.  Thank you

00:39:44  11  very much.

00:39:44  12          Excuse me one moment.

00:39:46  13          (Discussion had off the record.)

00:39:56  14          MR. KERGER:  That's all.  Thank you.

00:39:58  15                      - - -

00:39:58  16          MARTIN TORGLER, CROSS-EXAMINATION

00:40:00  17  BY MR. CRAWFORD:

00:40:00  18      Q.  Mr. Torgler, you said you understood Mr. Teadt to

00:40:18  19  be of high character, an upstanding citizen?

00:40:20  20      A.  Yes.

00:40:21  21      Q.  Are you familiar with his employment with S.S.

00:40:24  22  White out of New Jersey?

00:40:25  23      A.  No, I'm not.

00:40:26  24      Q.  Are you familiar with his application to the Wood

00:40:29  25  County Job & Family Services for Project HIRE?

00:40:32  1       A.   No, I'm not.

00:40:33  2       Q.   Okay.   You said that you told Mr. Teadt that he

00:40:37  3   should advise Brad Huebner to go to the FBI and tell

00:40:40  4   them honestly and everything that he knew?

00:40:43  5       A.   Yes.

00:40:44  6       Q.   Okay.   And in your experience as an FBI agent, if

00:40:48  7   someone comes in for a complaint or a proffer and only

00:40:53  8   tells you half the story, that raises your suspicion

00:40:55  9   about whether or not they're being truthful; is that

00:40:58  10  true?

00:40:58  11                  MR. KERGER:   Objection, Your Honor.

00:41:01  12                  THE COURT:   Grounds?

00:41:02  13                  MR. KERGER:   Basis.

00:41:04  14                  THE COURT:   Basis?   Well, you might want to

00:41:06  15  establish with this witness a foundation for that

00:41:09  16  question.   I'll sustain the objection.

00:41:10  17  BY MR. CRAWFORD:

00:41:10  18      Q.   You're a long-time agent?

00:41:12  19      A.   Yes.

00:41:12  20      Q.   Why would you advise someone to tell honestly and

00:41:17  21  truthfully everything they know?

00:41:18  22      A.   Well, when I tell people to go talk to law

00:41:22  23  enforcement, whether it be the FBI or the police

00:41:24  24  department, which I have on many times, I say:   Honesty

00:41:28  25  is the best policy, and you should be honest with them;

00:41:31  1   don't tell them something that's not true.

00:41:33  2       Q.  And as a former agent, when you were an FBI agent

00:41:37  3   working, why was it important for you to know whether or

00:41:40  4   not someone you were interviewing was telling you

00:41:42  5   everything they knew?

00:41:44  6       A.  Because I was eventually going to take action on

00:41:47  7   that information.

00:41:49  8       Q.  And if someone didn't tell you everything, and

00:41:54  9   you found out later they were being untruthful, that

00:41:57  10  would raise your suspicions about whether they were

00:42:00  11  being truthful in maybe their involvement in what you

00:42:02  12  were investigating; is that true?

00:42:05  13      A.  Sure.

00:42:06  14          MR. CRAWFORD:  I have no other questions,

00:42:07  15  Your Honor.

00:42:07  16          MR. BOSS:  No further questions.  Thank you.

00:42:14  17          THE COURT:  You may step down.

00:42:18  18          MR. JACKSON:  We'd call Flint Heidlebaugh.

00:42:49  19          Flint Heidlebaugh.

00:43:02  20          (The witness was sworn by the Court.)

00:43:18  21                           - - -

00:43:18  22        FLINT HEIDLEBAUGH, DIRECT EXAMINATION

00:43:19  23  BY MR. KERGER:

00:43:19  24      Q.  Sir, tell the jury who you are.

00:43:21  25      A.  Flint Heidlebaugh.

00:43:22  1     Q.  Will you spell your last name for the court

00:43:25  2  reporter.

00:43:25  3     A.  H-e-i-d-l-e-b-a-u-g-h.

00:43:29  4     Q.  Where do you live?

00:43:30  5     A.  I live in Findlay, Ohio.

00:43:32  6     Q.  What do you do there?

00:43:33  7     A.  I'm a CPA.

00:43:34  8     Q.  Are you recently retired?

00:43:36  9     A.  I recently -- in December I sold my practice but

00:43:38  10  continued on with the purchasing firm.

00:43:41  11     Q.  How long you have been a CPA?

00:43:43  12     A.  Since 1981.

00:43:46  13     Q.  Now, we're here about dinar.  When did you become

00:43:50  14  aware of Iraqi dinar as a possible investment?

00:43:54  15     A.  I believe it was three or four years ago.

00:43:56  16     Q.  How did you become aware?

00:43:57  17     A.  Searching around the internet and doing some

00:44:02  18  research on my own.

00:44:03  19     Q.  Why were you doing the research?

00:44:05  20     A.  I had heard about this investment, speculative

00:44:10  21  investment opportunity, and decided to do some looking

00:44:16  22  on my own.

00:44:16  23     Q.  When you went on the internet, you saw both pros

00:44:20  24  and cons of the investment?

00:44:21  25     A.  Yes, I did.

00:44:22  1        Q.  You decided what?

00:44:23  2        A.  I decided to make a small purchase.

00:44:25  3        Q.  Did you do that?

00:44:26  4        A.  Yes, I did.

00:44:27  5        Q.  From whom did you purchase?

00:44:29  6        A.  I purchased it from the BH Group.

00:44:31  7        Q.  How did you find out about the BH Group?

00:44:34  8        A.  Again, looking around on the internet trying to

00:44:39  9   find somebody in the Findlay, Ohio area, but no one in

00:44:43  10  Findlay at that time was selling dinar.

00:44:45  11       Q.  You paid for your dinar and got your dinar?

00:44:46  12       A.  Yes, I did.

00:44:47  13       Q.  Do you still own them?

00:44:48  14       A.  Yes, I do.

00:44:49  15       Q.  Did you get involved in the hedge fund?

00:44:52  16       A.  I made a purchase in the hedge fund.

00:44:55  17       Q.  Do you still own that?

00:44:58  18       A.  Yeah.  It's not worth anything, but yeah.

00:45:01  19       Q.  And did you understand when you paid your $750 it

00:45:04  20  was nonrefundable?

00:45:06  21       A.  Yes, I did.

00:45:26  22       Q.  When you were looking around, did you happen to

00:45:28  23  run into a reference of Executive Order 13303?

00:45:33  24       A.  Yes, I did.

00:45:34  25       Q.  Did you read it?

00:45:35  1      A.   If I recall, I read most of it.  I can't say I

00:45:38  2   read every single word.

00:45:39  3      Q.   And you went ahead and invested?

00:45:41  4      A.   Yes, I did.

00:45:42  5           MR. KERGER:  That's all I have, sir.  Thank

00:45:44  6   you very much.

00:45:47  7           MR. BOSS:  No questions.

00:45:49  8           MR. NIGHTINGALE:  No, Your Honor.

00:45:50  9           THE COURT:  Any cross?

00:45:51  10          MR. CRAWFORD:  No questions.

00:45:53  11          MR. KERGER:  You're free to go.

00:45:56  12          Your Honor, defendant calls Brad Huebner to

00:45:59  13  the stand.

00:46:01  14          MR. CRAWFORD:  Your Honor, if we could have

00:46:02  15  a sidebar for a second.

00:46:17  16          (Whereupon the following discussion was had

00:46:30  17  at the bench outside the hearing of the jury:)

00:46:30  18          THE COURT:  Mr. Huebner, I want to discuss

00:46:34  19  with you you're about to give testimony in this case,

00:46:38  20  and I want to make sure you understand that as a

00:46:40  21  defendant in a criminal case, you have the right not to

00:46:43  22  testify in this case.  And if you do not testify, I will

00:46:48  23  instruct the jury they cannot hold that against you.

00:46:52  24  Specifically, I will instruct them that they cannot

00:46:56  25  infer your guilt or find you guilty because you did not

| | | |
|---|---|---|
| 00:46:59 | 1 | testify.  Do you understand that? |
| 00:47:02 | 2 | DEFENDANT HUEBNER:  I do. |
| 00:47:03 | 3 | THE COURT:  You've had conversation with |
| 00:47:05 | 4 | your counsel about whether or not to testify, and it is |
| 00:47:07 | 5 | your decision to testify in this trial; is that correct? |
| 00:47:11 | 6 | DEFENDANT HUEBNER:  That's true. |
| 00:47:11 | 7 | THE COURT:  Do you have any questions of me? |
| 00:47:14 | 8 | DEFENDANT HUEBNER:  No. |
| 00:47:15 | 9 | THE COURT:  Okay.  Thank you all. |
| 00:47:17 | 10 | (End of sidebar discussion.) |
| 00:47:35 | 11 | (The defendant is sworn by the Court.) |
| 00:47:47 | 12 | - - - |
| 00:47:47 | 13 | BRADFORD HUEBNER, DIRECT EXAMINATION |
| 00:47:49 | 14 | BY MR. KERGER: |
| 00:47:49 | 15 | Q.  You are Brad Huebner? |
| 00:47:51 | 16 | A.  I am Brad Huebner. |
| 00:47:51 | 17 | Q.  Where do you live? |
| 00:47:52 | 18 | A.  I live at 2936 Pembroke, Ottawa Hills, Ohio. |
| 00:47:56 | 19 | Q.  You grew up in Toledo? |
| 00:47:57 | 20 | A.  All my life. |
| 00:47:58 | 21 | Q.  How long has the Huebner family been in Toledo? |
| 00:48:01 | 22 | A.  Four generations. |
| 00:48:04 | 23 | Q.  Been involved in business in Toledo? |
| 00:48:06 | 24 | A.  Yes.  My great-grandfather was a master brewer |
| 00:48:10 | 25 | from Germany, came over and started the Huebner Brewery, |

00:48:14  1    which in those days was the largest brewery in

00:48:17  2    northwestern Ohio, comparable to, say, like a Budweiser

00:48:21  3    at the time.

00:48:22  4        Q.   And the family continued the business in this

00:48:25  5    area?

00:48:26  6        A.   Yes.  My grandfather then bought the Hardy

00:48:29  7    Dishner Company, at the time was servicing the lake

00:48:33  8    freighters with their needs for different supplies.

00:48:36  9        Q.   Where did you go to school?  High school.

00:48:42  10       A.   I'd -- what about my father?

00:48:47  11       Q.   Tell me about your father?

00:48:48  12       A.   Yeah, my father then joined Hardy Dishner and

00:48:52  13   diversified the business into industrial supplies, like

00:48:57  14   pipe valves and fittings.  Then when I came back, I

00:49:01  15   joined the firm.  But quite honestly, the real

00:49:05  16   entrepreneur in my family is my mother.  Seventy-two

00:49:11  17   years ago she started her own business, which obviously

00:49:14  18   at the time was very unusual.  She was a nursery school

00:49:19  19   teacher, had two generations of Toledoans in a school

00:49:23  20   called Gateway Nursery School.  Her second career was at

00:49:27  21   the Toledo Museum as a docent for 25 years.  Her third

00:49:32  22   career has been in starting a family art museum at the

00:49:38  23   Toledo Botanical Gardens, which is the Blair Museum of

00:49:42  24   Lithophanes.

00:49:45  25                  THE COURT:  Can I ask you to take that

00:49:47  1    microphone and -- it's not picking you up.  Get closer,

00:49:52  2    or you can push it to the left or right or up or down.

00:49:58  3              THE WITNESS:  Is this better?

00:49:59  4        Q.  You went to high school?

00:50:00  5        A.  I went to Whitmer High School.

00:50:02  6        Q.  Play sports?

00:50:04  7        A.  I did.  I played basketball, baseball, but

00:50:08  8    football was my main sport.

00:50:10  9        Q.  In terms of honors in high school --

00:50:14  10       A.  My biggest honor was being elected co-captain of

00:50:17  11   the team my senior year.  I was then first team

00:50:19  12   all-league, all-district, then had a state-wide honors.

00:50:24  13       Q.  Go on to college?

00:50:26  14       A.  Well, also at Whitmer I'd just like to mention

00:50:32  15   that probably one of the biggest honors I've ever had

00:50:37  16   was being inducted into the Whitmer Hall of Fame.

00:50:40  17            Then I went on to college.

00:50:42  18       Q.  Where?

00:50:43  19       A.  I had many opportunities presented to me to go to

00:50:50  20   college, but I was impressed with a young coach out of

00:50:56  21   Miami, Ohio that sat in my living room and told me what

00:50:59  22   a great opportunity I would get from him.  And that

00:51:02  23   turned out to be Bo Schembechler.

00:51:05  24       Q.  Did you go to Miami?

00:51:06  25       A.  I did.

00:51:06    1      Q.   Did you play for Bo?

00:51:08    2      A.   I did.  I played my freshman year.  And after

00:51:11    3   that I actually returned to the University of Toledo,

00:51:16    4   and I red shirted a year, and then I played linebacker

00:51:21    5   on the first championship football team for the

00:51:25    6   Mid-American Conference for the University of Toledo.

00:51:29    7      Q.   What courses, or what was your major?

00:51:31    8      A.   I was a business administration major, and I

00:51:34    9   graduated with a BBA degree with a 3 point average.

00:51:37   10      Q.   What year was that?

00:51:38   11      A.   It was in 1969.

00:51:41   12      Q.   When you were in the University of Toledo, did

00:51:45   13   you become involved with the ROTC?

00:51:47   14      A.   Yes.  When I transferred back from Miami of Ohio,

00:51:50   15   I was out of school.  They were on trimesters; the

00:51:54   16   University of Toledo was on semesters.  And in those

00:51:56   17   days if you were out of school for more than four

00:51:58   18   months, the draft board would nab you and basically put

00:52:01   19   you in the military.  So I joined -- I made a

00:52:05   20   commitment, a two-year commitment to the Army ROTC.

00:52:09   21      Q.   Did you fulfill that commitment?

00:52:11   22      A.   I did.  I spent two years at -- when I was at the

00:52:19   23   University of Toledo, our colonel really liked the

00:52:26   24   football players there, and he gave me probably some of

00:52:29   25   the most prophetic words of my life that probably saved

00:52:33  1    my life, and he told me if I finished first or second in

00:52:38  2    my platoon at the summer camp, that we were called

00:52:42  3    90-day wonders, becoming a lieutenant, that I would be

00:52:47  4    able to actually choose the branch of the military I

00:52:50  5    would go into; or otherwise, I would get three choices,

00:52:53  6    and that would be infantry, artillery, or combat, the

00:53:00  7    three combat branches of the U.S. Army.  And so that was

00:53:04  8    a little bit of an incentive.

00:53:06  9         I finished second in my platoon next to a West

00:53:10  10   Point gentleman, and I received a distinguished military

00:53:16  11   graduate, one of three out of the core of cadets of 125.

00:53:21  12   Q.   Did you go into the military after you graduated?

00:53:23  13   A.   I did.

00:53:24  14   Q.   Where did you go?

00:53:25  15   A.   I was first to sign to Boise, Idaho running an

00:53:30  16   induction station in Boise.

00:53:33  17   Q.   Where did you go after that?

00:53:34  18   A.   I got a phone call from Washington D.C. alerting

00:53:40  19   me that I was going to be going to Vietnam and that I

00:53:43  20   was going into a very elite group, and I had to have

00:53:47  21   extensive background checks, and then I had to go to the

00:53:50  22   Pentagon to receive other specialized training.

00:53:53  23   Q.   What did you do in Vietnam?

00:53:55  24   A.   I was part of a group of officers, and we handled

00:54:01  25   all of the top secret information for all of the armed

| | | |
|---|---|---|
| 00:54:04 | 1 | forces. |
| 00:54:05 | 2 | Q.  Did you travel? |
| 00:54:07 | 3 | A.  Every day I was on a mission, whether it was on a |
| 00:54:11 | 4 | truck or all types of aircraft, whether it be |
| 00:54:16 | 5 | helicopters or C-130, C-123s, landing on boats in the |
| 00:54:23 | 6 | Mekong River, landing on aircraft carriers out in the |
| 00:54:27 | 7 | Gulf of Tonkin.  But every day travelled on missions |
| 00:54:31 | 8 | watching and couriering top secret information for the |
| 00:54:34 | 9 | four different corps in Vietnam. |
| 00:54:39 | 10 | Q.  Ultimately your service ended? |
| 00:54:41 | 11 | A.  Yes, it did. |
| 00:54:43 | 12 | Q.  You were discharged honorably? |
| 00:54:47 | 13 | A.  I was honorably discharged. |
| 00:54:48 | 14 | Q.  Where did you go? |
| 00:54:49 | 15 | A.  I came back to Toledo, Ohio.  In those days you |
| 00:54:53 | 16 | didn't get a parade when you came home; you didn't even |
| 00:54:56 | 17 | tell anybody you were in the service.  But I then joined |
| 00:55:00 | 18 | my family business that I had worked at every summer |
| 00:55:03 | 19 | while growing up as a full time employee. |
| 00:55:08 | 20 | Q.  What did you do when it started? |
| 00:55:10 | 21 | A.  Well, since I had every job pretty much in the |
| 00:55:13 | 22 | company, I started at a management team, and my father |
| 00:55:19 | 23 | had enough confidence that he gave me enough rope to |
| 00:55:24 | 24 | start making some changes.  The company had gotten |
| 00:55:28 | 25 | older, and they were all my dad's people, and it needed |

00:55:34   1    an infusion of youth into the company.

00:55:37   2        Q.  Did you make that happen?

00:55:38   3        A.  I did.  I put a tremendous team of people

00:55:41   4    together.  And over the next 20 years we grew that

00:55:45   5    company from $2 million to approximately $100 million.

00:55:49   6    And the ironic part about it was that in that time

00:55:55   7    northwest Ohio was losing a tremendous amount of

00:55:59   8    industry.  So we had to be very creative on growing the

00:56:03   9    business in a geographic area that was basically dying

00:56:09  10    industrially.  And fortunately my team was very

00:56:16  11    creative, and we really had a large part of our growth

00:56:23  12    helping to build all the Japanese automobile plants that

00:56:29  13    happened back in the -- I believe that was the '70s and

00:56:33  14    '80s, starting with Honda in Ohio.  And each of the

00:56:37  15    Japanese car companies picked a different state so they

00:56:40  16    could get two senators, a congressman.  And Nissan took

00:56:45  17    Tennessee; Ohio took Honda; Michigan got Mazda; Toyota

00:56:51  18    to went to Kentucky, and Mitsubishi went to Indiana.

00:56:55  19    And they all used the I-75 corridor as their

00:56:58  20    distribution channel.

00:57:00  21        Q.  Did you come up with an approach to try to help

00:57:03  22    get the auto industry --

00:57:03  23            THE COURT:  I'm sorry; I couldn't hear the

00:57:09  24    question.

00:57:09  25            MR. CRAWFORD:  I'm going to object to

00:57:11   1    relevancy to things that happened decades before

00:57:14   2    anything in this case.

00:57:16   3              MR. KERGER:  Your Honor, he's on trial for a

00:57:17   4    serious matter.

00:57:19   5              THE COURT:  I allow the question.

00:57:27   6              I'll ask you to repeat The question, please.

00:57:31   7              MR. KERGER:  I'll do my best.

00:57:31   8    BY MR. KERGER:

00:57:54   9       Q.  You came up with different ways to approach the

00:57:58  10    auto industry to try to get Hardy Dishner more of that

00:58:01  11    business?

00:58:01  12       A.  That's correct.

00:58:03  13       Q.  What did you do?

00:58:03  14       A.  We opened branches in Lima, Ohio; in Cincinnati,

00:58:07  15    Ohio; expanding in the Ohio markets.  And then I created

00:58:13  16    the first steel service center in the United States for

00:58:18  17    tubular products.  And in the distribution business when

00:58:22  18    you're dealing with commodities it's a very

00:58:24  19    price-sensitive issue.  And when you're able to

00:58:28  20    customize a piece of steel, for example, and put value

00:58:33  21    added on, you can increase your profit margins.  And we

00:58:40  22    were recognized nationally quite a bit for that.  And it

00:58:45  23    ultimately led to our ability to grow a business in the

00:58:49  24    declining area and be extremely profitable.

00:58:53  25              MR. KERGER:  Could I have Exhibit 603,

00:58:55   1   please.

00:58:58   2   BY MR. KERGER:

00:58:58   3       Q.   Tell us what that is.

00:58:59   4       A.   This is -- I was a charter member of the National

00:59:02   5   Association of Steel Pipe Distributors.  This contained

00:59:10   6   the oil country tubular products people and the line

00:59:14   7   pipe people.  I was with line pipe.  This happens to be

00:59:18   8   a convention.

00:59:19   9       Q.   Go to the second page, please.  Is that you?

00:59:38  10       A.   It looks like me.

00:59:39  11       Q.   And why did they have you?

00:59:44  12       A.   I was asked to speak and go over what I was

00:59:48  13   working on with the steel distribution center, and it

00:59:51  14   was basically called diversification and add valorem,

00:59:56  15   meaning value added.

01:00:08  16              MR. KERGER:  604, please.

01:00:11  17       Q.   Is that you on the cover?

01:00:12  18       A.   That's me.

01:00:13  19       Q.   Do you know why you were featured on the cover?

01:00:15  20       A.   This is the magazine for the American Supply

01:00:19  21   Association, which is the largest trade group in the

01:00:22  22   United States containing all of the plumbing houses,

01:00:28  23   air-conditioning and pipe valve and air-conditioning

01:00:31  24   fitters.  Once a year they give the front cover to the

01:00:34  25   industrial piping -- this is actually the second time we

01:00:38  1   were given that opportunity in a four-year span, and it

01:00:42  2   was all about focusing on the steel evolution of our

01:00:47  3   steel service center.

01:00:49  4       Q.   About what year was this?

01:00:51  5       A.   This is about 1988.

01:00:55  6       Q.   Did the Hardy Dishner company have to close?

01:01:00  7       A.   In 1988 I was -- for four years I was the

01:01:05  8   chairman of the Industrial Piping Division and led that

01:01:10  9   national organization.

01:01:12  10      Q.   And then did there come a time when Hardy Dishner

01:01:15  11  had a problem with its bank?

01:01:17  12      A.   Yes, it did.  It was about 1991.  The bank that

01:01:20  13  my family had been with for three generations, Toledo

01:01:23  14  Trust, basically went bankrupt.  And their assets were

01:01:29  15  sold to a bank called Society, which later was acquired

01:01:33  16  by Key Bank.

01:01:34  17      Q.   What happened to your loan?

01:01:37  18      A.   They called our loan.

01:01:39  19      Q.   Were you in default?

01:01:40  20      A.   No, we weren't in default, but they just called

01:01:43  21  our loan.

01:01:44  22      Q.   They didn't want to give you any more money?

01:01:46  23      A.   They wanted to get rid of the previous loans.

01:01:50  24      Q.   Could you find financing elsewhere?

01:01:54  25      A.   I did temporarily for a couple years, and then a

01:01:58  1    severe recession hit, and it was a loan where I had to

01:02:04  2    sign personal guarantees on everything.  And my

01:02:10  3    attorneys advised me not to go forward and sign new loan

01:02:17  4    documents because they knew the loan would be foreclosed

01:02:20  5    very soon after by the bank.

01:02:23  6        Q.  And the business closed?

01:02:24  7        A.  Yes.  I closed the business.  But more

01:02:26  8    importantly I was proud that I was able to get all my

01:02:29  9    employees jobs, because we had great employees.

01:02:33  10        Q.  Did you have a job?

01:02:34  11        A.  No.

01:02:35  12        Q.  What did you do?

01:02:36  13        A.  I had a pity party for a weekend.  And then

01:02:42  14    reality set in, and it was the first time I'd been

01:02:45  15    unemployed in my life.

01:02:46  16        Q.  Did you have a wife and family?

01:02:48  17        A.  Yes.

01:02:48  18        Q.  So what did you do?

01:02:50  19        A.  I started exploring all my opportunities at that

01:02:55  20    time.  I was 43 years old at the time.

01:02:58  21        Q.  You told me demographics were important to you.

01:03:01  22    Can you tell the jury why?

01:03:02  23        A.  I studied demographics because demographics is

01:03:06  24    the movement of people.  And if you know where people

01:03:10  25    are going to go, then you know where to invest.  An

01:03:15  1    example would be I did not buy real estate in Toledo,
01:03:21  2    Ohio because people were leaving Toledo, Ohio.  I bought
01:03:24  3    real estate in Tennessee because the demographic showed
01:03:29  4    movements of people moving to the mid south and the
01:03:31  5    south.  I bought real estate in Idaho, which was a very
01:03:35  6    hot area in the United States.  So if you know where
01:03:38  7    people are going to go, you can basically then plan your
01:03:43  8    business around at least a positive environment.
01:03:48  9        Q.  At this time you were looking for a job did you
01:03:53  10   become familiar with what's called multilevel marketing?
01:03:56  11       A.  I did.
01:03:57  12       Q.  We've heard that term a lot, but I'm not sure it
01:03:59  13   was explained exactly.  What is it?  What is multilevel
01:04:03  14   marketing?
01:04:04  15       A.  To me multilevel marketing or network marketing
01:04:07  16   is the purest form of capitalism.  I had just come out
01:04:12  17   of a business environment where I had millions and
01:04:15  18   millions of dollars on the line between plant equipment,
01:04:20  19   inventory, payroll.  The faster I grew my business, the
01:04:24  20   more I became a bank having to offer credit to my
01:04:28  21   employ -- or to my customers.  Very risky.  When I
01:04:36  22   first got in touch with network marketing, network
01:04:40  23   marketing allows you to have a business without all of
01:04:44  24   the risks of a traditional business.  And with what I
01:04:47  25   had just gone through, I found it extremely interesting,

01:04:51  1   and so I looked further into that.

01:04:54  2       Q.  Did you find an opportunity?

01:04:58  3       A.  I did.  I found a company called Nu Skin, N-u

01:05:04  4   S-k-i-n, International; that was out of Provo, Utah.

01:05:10  5       Q.  What did it sell?

01:05:11  6       A.  It sold skin care and hair care products.

01:05:14  7       Q.  Did you join?

01:05:15  8       A.  I did.  And so I went from pipe valves and

01:05:19  9   fittings to skin care and hair care.  It was a stretch,

01:05:23  10  but it was an amazing company.  And these two gals

01:05:29  11  started a business out of their garage, and we ended up

01:05:33  12  taking them to the New York Stock Exchange.

01:05:35  13      Q.  Were you successful in the business?

01:05:37  14      A.  I was.

01:05:40  15      Q.  Now, at some point you wound up in Japan.  How

01:05:43  16  did that come about?

01:05:44  17      A.  About two months after I had committed to Nu

01:05:51  18  Skin, I was looking at 20/20 one night, Hugh Downs and

01:05:55  19  Barbara Walters, and I was all excited because my upline

01:05:59  20  told me Nu Skin was going to be on television.  That

01:06:02  21  excitement turned into very dismay because the Attorney

01:06:05  22  General from the State of Michigan was on with two

01:06:08  23  attorneys from Nu Skin.  And I'll never forget that.  It

01:06:14  24  also happens that Michigan is the domicile for Amway

01:06:18  25  Corporation.  And Nu Skin was absolutely gaining a lot

1557

01:06:23   1   of ground on Amway at the time.  And here you go again,

01:06:29   2   politics.  And I remember the Attorney General holding

01:06:34   3   up our pay plan, and it had the various steps, and said:

01:06:38   4   See, ladies and gentlemen, this is a pyramid scheme.

01:06:40   5   It's the same type of compensation plan that Amway had,

01:06:44   6   but visually it really harpooned Nu Skin in the United

01:06:51   7   States.

01:06:51   8       But they had just gone on to their first venues

01:06:59   9   of international marketing, and they had opened up in

01:07:04  10   Hong Kong and Taiwan.

01:07:08  11   Q.  Ultimately this same company, Nu Skin, got

01:07:10  12   registered on the New York Stock Exchange of the United

01:07:14  13   States?

01:07:14  14   A.  That's correct.  And I was -- I had a lot of

01:07:17  15   experience dealing internationally buying steel all over

01:07:20  16   the world.  And I had a lot of contacts in Asia.  I knew

01:07:25  17   the work ethic of the Asians, and I really was excited

01:07:29  18   to try and build internationally because the United

01:07:33  19   States market had taken a severe hit.

01:07:36  20   Q.  Did you get that chance?

01:07:37  21   A.  I did.  I actually found a young man here in

01:07:43  22   Toledo.  He was a Chinese man, and I literally took him

01:07:47  23   into my home.  And my wife wasn't real pleased about

01:07:51  24   that.  He would be cooking in his wok in our kitchen.

01:07:57  25   And I got him clothing and everything and sent him out

01:08:00  1    to the island of Guam where we were allowed to market to

01:08:05  2    the Japanese until we opened the country of Japan.  And

01:08:09  3    he spoke fluent Chinese and Japanese.

01:08:13  4         Q.  Is Guam part of Japan?  Why would the Japanese --

01:08:19  5         A.  Guam is actually a territory of the United States

01:08:24  6    of America.  And it is a huge resort for Japanese

01:08:31  7    tourists.

01:08:32  8         Q.  And how did you get your product to those

01:08:36  9    tourists?

01:08:37  10        A.  I eventually went out to Guam, which I can tell

01:08:40  11   you is on the other side of the world.  It takes a full

01:08:43  12   day to get there by plane.  And I went there.  I looked

01:08:48  13   in the phone book for tour companies.  I had an idea.

01:08:52  14   I'll never forget, there was a guy by the name of Bruce

01:08:56  15   Klopenberg [phonetically], a German.  I just called him

01:08:59  16   up and said:  Here's a German from the mainland; can I

01:09:02  17   come and talk to you?  He said, Sure.   I told him my

01:09:05  18   idea.  It turned out that his best friend was a Japanese

01:09:08  19   gentleman, Oni Ason [phonetically], who had the largest

01:09:12  20   Japanese tour company.  And my idea turned out to be a

01:09:16  21   real winner because the American product was about a

01:09:21  22   third of the cost of the Japanese product.  Everything

01:09:25  23   in Japan is two to three times more expensive.  And the

01:09:30  24   way the U.S. Postal System works is if you can get -- we

01:09:38  25   can get product all the way out in the Pacific from Utah

1559

01:09:41   1   as if it was only going to the last zone in California.

01:09:45   2   So I literally could get all the product that was a

01:09:48   3   third of the price of the Japanese product all the way

01:09:51   4   out to the Pacific.  And so we started introducing it on

01:09:56   5   all the tour busses to the Japanese.

01:09:58   6       Q.  So you did that ultimately on the mainland of

01:10:02   7   Japan?

01:10:02   8       A.  It was so successful in Guam, I took that program

01:10:06   9   to Saipan, which is a U.S. commonwealth that is only

01:10:10   10   about a 45-minute flight from Guam.  Then I took it back

01:10:13   11   to Hawaii where a lot of the Japanese tourists went.

01:10:18   12       Q.  Do you speak Japanese?

01:10:19   13       A.  Just a few words.

01:10:21   14       Q.  Do you speak any language other than English?

01:10:24   15       A.  No.

01:10:25   16       Q.  Did you expand into Japan?

01:10:26   17       A.  I then went and moved to Tokyo.  That will take

01:10:30   18   your breath away with the prices there.  And I actually

01:10:33   19   commuted from Tokyo to Toledo for seven years, spending

01:10:38   20   two months at a time in Japan, and one month back here.

01:10:43   21       Q.  You were successful?

01:10:44   22       A.  Yes, I was.

01:10:45   23       Q.  Did there come a time when you had to leave Nu

01:10:49   24   Skin.

01:10:49   25       A.  I was so successful with my project that the

01:10:52  1  Japanese country manager went to Nu Skin because all the
01:10:58  2  blue diamond, the leaders of Japan, which was the same
01:11:02  3  rink I was at, were very upset because all of their
01:11:06  4  customers were buying their Nu Skin products when they
01:11:09  5  went on vacation in Saipan, Guam, and Hawaii, which was
01:11:13  6  from me, instead of buying the Japanese product, which
01:11:15  7  is three times more expensive.
01:11:18  8      Q.  So what happened?
01:11:18  9      A.  Well, there wasn't much of a question for
01:11:21  10  Nu Skin.  Brad or Japan?  And the Japanese market
01:11:26  11  became our first billion-dollar market.  They cut my
01:11:29  12  program off so that I couldn't use my marketing label
01:11:33  13  that we had to have.  And that really upset me after I'd
01:11:38  14  spent seven years developing it.
01:11:40  15      Q.  So you had to stop?
01:11:41  16      A.  Well, I came back, and I was still getting some
01:11:44  17  residual income.  But that ripped my heart out,
01:11:49  18  basically.
01:11:49  19      Q.  What did you do then?
01:11:51  20      A.  I came back to the United States.  And over the
01:11:54  21  last 30 years I had started buying real estate when I
01:11:58  22  was 21 years old in Boise, Idaho.  And then I had
01:12:02  23  started buying real estate in Tennessee.  I was
01:12:05  24  positioning myself, my company, to be able to market to
01:12:10  25  General Motors because they were moving their Saturn

01:12:13  1   plant, and I was going to acquire a firm up in Detroit.

01:12:18  2   And I had branched throughout Ohio.  So we would have

01:12:21  3   been one of the only firms to go to General Motors and

01:12:23  4   be able to take care of all their plants in those three

01:12:26  5   states.

01:12:28  6        Q.   Did you get into real estate then?

01:12:31  7        A.   I did.

01:12:32  8        Q.   Development?

01:12:33  9        A.   I did.

01:12:33  10       Q.   Did that go reasonably well?

01:12:35  11       A.   It went very well.

01:12:37  12       Q.   Did you have a deal in Tennessee with the Frist

01:12:39  13   family?

01:12:40  14       A.   Senator William Frist was from Tennessee, but his

01:12:43  15   family is most well-known as the owners and founders of

01:12:47  16   Hospital Corp. of America.

01:12:49  17       Q.   What's that?

01:12:50  18       A.   Pardon me?

01:12:52  19       Q.   That is that?

01:12:52  20       A.   Hospital Corp. of America, I believe, is probably

01:12:55  21   the first or second largest health care organization in

01:12:58  22   the United States with hospitals, health care.

01:13:03  23       Q.   You sold some of your real estate in Tennessee to

01:13:05  24   them?

01:13:06  25       A.   I sold 65 acres of real estate to them.  And then

01:13:09  1   I bought off of I-40.

01:13:15  2      Q.  You also continued to do some multilevel

01:13:20  3   marketing?

01:13:22  4      A.  I did.  With my commitment to Asia, I got known

01:13:26  5   in the industry as Mr. Asia because I was one of the

01:13:29  6   only Americans that actually went and committed and

01:13:31  7   stayed in Asia.  And so all these companies had seen the

01:13:37  8   success that Amway and now Nu Skin had in these

01:13:42  9   international markets.  And they all wanted entry into

01:13:46  10  those markets.  So whenever a company wanted to go to

01:13:49  11  the Asian market, I always got the phone call.

01:13:55  12     Q.  There came a time when the real estate business

01:13:59  13  went away.  Do you recall when that was?

01:14:02  14     A.  I'll never forget it.  At the end of 2007, 2008,

01:14:10  15  the real estate market in the United States absolutely

01:14:14  16  tanked.  The banks were again a huge problem.  And real

01:14:20  17  estate, which had really been carrying our economy in

01:14:24  18  the United States as we lost our industrial

01:14:27  19  manufacturing base, it had been growing artificially

01:14:30  20  because of the superficial demand on the increase of

01:14:34  21  real estate.  And when that went, the reality of our

01:14:40  22  true economy set in.

01:14:43  23     Q.  So in 2008 what did do you?

01:14:46  24     A.  Well, you know, it's kind of like the same

01:14:50  25  experience with H & D, pity party for a weekend, then

01:14:54  1   you start looking at:  Okay, what do I do next?  I

01:14:58  2   looked -- my youngest daughter at the time, we wanted to

01:15:03  3   do something together.  I looked at the opportunities,

01:15:08  4   studying demographics again.  The baby boomers, if you

01:15:12  5   follow them -- Lee Iacocca was brilliant with that

01:15:16  6   concept.  And I looked at what I thought would be wealth

01:15:24  7   industries.  One of them was basically the energy

01:15:28  8   industry.  That's about the time that everybody started

01:15:30  9   talking about solar and wind and all that.  I also was

01:15:36  10  looking at the insurance industry.  And the other was

01:15:43  11  health care, with the aging of the boomers.   I

01:15:46  12  ultimately decided to go into the energy industry, and I

01:15:50  13  opened up a company called Energy Saver Advisors.

01:15:56  14      Q.  We're going to talk about that in just a second.

01:15:58  15  But as a business did you feel you had to have an

01:16:03  16  office?

01:16:03  17      A.  Yes, I did.

01:16:04  18      Q.  Did you find one?

01:16:05  19      A.  My daughter and I were looking at different

01:16:09  20  offices, and a friend of ours, who is a local attorney,

01:16:13  21  had a building on St. Clair Street, and there was a

01:16:15  22  couple small offices there.  And we were looking at

01:16:19  23  that.  And that day we went out in front of the

01:16:21  24  building, and we looked across the street, and there was

01:16:24  25  a real estate sign that was kind of sagging in the

01:16:26  1    second floor of the building above Fricker's.  And I

01:16:31  2    looked at it and I go:  That has to be looking out onto

01:16:35  3    Fifth Third Field.  So I called the company, which was

01:16:40  4    DiSalle Real Estate, and they said that they had just

01:16:43  5    lost the listing and to call this other company; I can't

01:16:49  6    remember which one it was now.  But anyway, my best

01:16:52  7    friend's son was an agent for that.  I called him, and I

01:16:55  8    said:  Marcus, get the keys for this and come over and

01:17:00  9    show me this piece.  And when I -- when my daughter and

01:17:06  10   I went into that building, I couldn't believe what I

01:17:09  11   saw, because we were inside Fifth Third Field looking

01:17:13  12   out right onto the ballpark.  And I learned that there

01:17:18  13   is only two baseball stadiums in the United States that

01:17:21  14   do that; one is Toledo Mud Hens, and the other is the

01:17:26  15   Texas Rangers that was owned by the Bush family.

01:17:29  16       Q.  Did you get the space?

01:17:32  17       A.  I did.

01:17:33  18       Q.  Was it finished?

01:17:35  19       A.  It was totally barren.  And it had been sitting

01:17:38  20   there for a year and a half.

01:17:41  21       Q.  You had to finish the inside of the building?

01:17:43  22       A.  Yes.

01:17:43  23       Q.  Whose money was spent to do that?

01:17:45  24       A.  My money.

01:17:47  25       Q.  Now, let me show you a few of the receipts.

01:17:52   1    These are a part of Exhibit 504.

01:18:06   2         This is a receipt, and it's from 2008?

01:18:12   3    A.   Yes, sir.

01:18:13   4    Q.   What's it relate to?

01:18:16   5    A.   This relates to a hotel invoice at the Red Roof

01:18:23   6    for a Mr. Charlie Sturman, who I had brought in to

01:18:26   7    interview to see if he might be interested in becoming a

01:18:29   8    rep for me for Energy Saver Advisors.

01:18:45   9    Q.   Now, what's the date on this?

01:18:47  10    A.   This is -- the invoice date is October 31, 2008.

01:18:53  11    Q.   The one you just saw was September 30, 2008?

01:18:56  12    A.   Right.

01:18:56  13    Q.   What's this one relate to?

01:18:58  14    A.   I had initially looked at opening something in

01:19:04  15    the insurance industry.   You know, when a homeowner has

01:19:08  16    a claim, water, fire damage, the insurance companies

01:19:12  17    come out, and they can be -- they can really take

01:19:16  18    advantage of homeowners, just giving them a check, and

01:19:20  19    the homeowner just takes the money, and there's nowhere

01:19:24  20    near the coverage.   A public adjuster is the medium

01:19:28  21    that -- between you and the insurance company.   And this

01:19:34  22    looked like a very interesting business.   But the more I

01:19:38  23    got into it, I decided to focus more on the energy

01:19:46  24    business.

01:19:47  25              THE COURT:   Same exhibit?   Is this all part

01:19:49    1    of 504?

01:19:51    2                    MR. KERGER:  All of these are part of 504.

01:19:57    3    BY MR. KERGER:

01:19:57    4        Q.  This is for USA Public Adjusters.

01:20:02    5        A.  Right.

01:20:04    6        Q.  And it relates to what?

01:20:08    7        A.  This is, I believe, our -- I think it's a smart

01:20:15    8    board for our conference room.  Wait a second.  What's

01:20:18    9    the company?  Is that to Toledo Sign?  This is the

01:20:25   10    outside sign that is displayed on St. Clair Street.

01:20:27   11        Q.  That was for USA Public Adjusters?

01:20:30   12        A.  Yes.

01:20:31   13        Q.  Is that out there now?

01:20:32   14        A.  No.  The sign is, but it's been changed to

01:20:36   15    Commercial Energy Products.

01:20:38   16        Q.  When did they take place, roughly?

01:20:41   17        A.  Commercial Energy Products?

01:20:42   18        Q.  Right.

01:20:42   19        A.  I think it was in around June or July of 2010.

01:20:59   20        Q.  Again, this is an invoice that you paid?

01:21:03   21        A.  Yes.

01:21:03   22        Q.  This is for Energy Saver Advisors?

01:21:05   23        A.  Yes, it is.

01:21:10   24        Q.  The date is December of 2008?

01:21:11   25        A.  Correct.

01:21:19   1        Q.   This is, again, Energy Saver Solutions.   Did

01:21:23   2   somebody get the name wrong?

01:21:25   3        A.   Yes.

01:21:25   4        Q.   This is December of 2008?

01:21:26   5        A.   Yes.

01:21:27   6        Q.   And it's for about $8,000.  What was it for?

01:21:30   7        A.   Energy Saver Advisors, the idea of that company

01:21:35   8   was two-fold:  to be able to give energy audits to

01:21:40   9   commercial and residential entities, where we would have

01:21:45  10   people go out and tell you exactly what to do in your

01:21:48  11   home or business to save money.  And then, for example,

01:21:53  12   this invoice was for power units, residential and

01:21:58  13   commercial power units that you could put on between the

01:22:03  14   incoming power and your actual power, and it would help

01:22:06  15   you save energy on a continual basis.  So we had various

01:22:13  16   products of energy saving.

01:22:15  17        Q.   And you were serious enough about Energy Saver

01:22:19  18   Advisors you spent $8,000 on that equipment?

01:22:21  19        A.   That's correct.

01:22:22  20        Q.   Your money?

01:22:22  21        A.   My money.

01:22:25  22        Q.   Have you heard of a company called NBS?

01:22:28  23        A.   NBS?  Yes.

01:22:29  24        Q.   What did it do?

01:22:30  25        A.   They were an office design place that actually

01:22:34  1   ended up moving right across the street from us on St.

01:22:39  2   Clair.

01:22:39  3       Q.   And these are three pages of an invoice sent to

01:22:45  4   you?

01:22:45  5       A.   Correct.

01:22:46  6       Q.   What was it for?

01:22:48  7       A.   NBS came in and designed the whole cubicle

01:22:52  8   network system so that I could have utilized the space

01:22:57  9   to the best degree.

01:22:58  10      Q.   What were you going to use the cubicles for?

01:23:03  11      A.   To put representatives.

01:23:04  12      Q.   Of?

01:23:05  13      A.   Of Energy Saver Advisors.

01:23:06  14      Q.   And it's got a charge of $16,000 that you paid?

01:23:09  15      A.   Correct.

01:23:11  16      Q.   Do you know about how much you paid in total?

01:23:14  17      A.   I think for -- I think all in all over $100,000

01:23:18  18   with Energy Saver Advisors getting the offices outfitted

01:23:25  19   and absorbing the losses, trying to get a new business

01:23:29  20   started.

01:23:39  21      Q.   Can you tell us what this is?

01:23:41  22      A.   This is where I went to a job fair out at the

01:23:44  23   Lucas County Rec. Center looking to -- at that time we

01:23:51  24   were looking for people for Energy Saver Advisors and

01:23:56  25   public adjusting.

01:23:57  1       Q.   That's September 17?

01:23:59  2       A.   That's correct.

01:24:00  3       Q.   And that's '08?

01:24:01  4       A.   Yes.

01:24:02  5       Q.   The cancelling date down there.

01:24:06  6            So you're looking at both of those opportunities

01:24:08  7   back in '08?

01:24:09  8       A.   Right.  The one thing I learned with Hardy &

01:24:13  9   Dishner Company, I would vow I would never put all my

01:24:16 10   eggs in one basket again.  I would always have a game

01:24:21 11   plan B.

01:24:27 12       Q.   Tell us what this is.  It's a multipage document.

01:24:31 13       A.   This is a business plan I created for Energy

01:24:33 14   Saver Advisors.

01:24:33 15       Q.   And that's dated '09?

01:24:35 16       A.   Yes.

01:24:37 17       Q.   So we've got the place built, then you're working

01:24:40 18   on getting Energy Saver Advisors going?

01:24:51 19       A.   Correct.

01:24:52 20            THE COURT:  Did you refer to any exhibits

01:24:53 21   other than 504 during that sequence, please?

01:24:58 22            MR. KERGER:  That was the only exhibit.  The

01:25:00 23   other two were just to refresh his recollection.

01:25:03 24            THE COURT:  Thank you.

01:25:07 25   BY MR. KERGER:

01:25:08  1    Q.  Now, in 2009 do you recall approaching Wood

01:25:11  2  County?

01:25:11  3    A.  Yes.

01:25:11  4    Q.  What did you approach Wood County -- how did you

01:25:14  5  come to do that?

01:25:15  6    A.  Well, on the television they were --

01:25:17  7          THE COURT:  Actually, is this a good break?

01:25:21  8  We're going into a new topic?

01:25:23  9          MR. KERGER:  Sure.

01:25:24  10          THE COURT:  Let's take our mid-morning

01:25:26  11  break; 15 minutes, ladies and gentlemen.  Please

01:25:27  12  remember the rules.

01:38:36  13          (Recess taken.)

01:43:55  14          THE COURT:  Counsel may continue with his

01:43:58  15  direct examination.

01:44:10  16  BY MR. KERGER:

01:44:17  17    Q.  As I recall, before the break I was asking if

01:44:20  18  you'd become involved with Wood County?

01:44:23  19    A.  Yes.

01:44:24  20    Q.  In 2009?

01:44:25  21    A.  Yes.

01:44:25  22    Q.  Can you tell the jury how that came about?

01:44:28  23    A.  There was advertising on the television by an

01:44:34  24  entity from Lucas County called One Source.  And it was

01:44:40  25  kind of pleading for business owners to hire people

01:44:45 1  because we were in a depression at that time.  And I had

01:44:51 2  never dealt with a government organization before on any

01:44:55 3  of this type of thing.  But I went down to One Source

01:45:02 4  one morning and saw what was going on down there, and it

01:45:08 5  just totally turned me off.  It was the epitome of

01:45:12 6  government bureaucracy.  And I forgot about it.

01:45:21 7      Then one of my friends was talking about a

01:45:23 8  similar program for Wood County that he had used in

01:45:27 9  hiring people, and he said, you know, you can use Wood

01:45:34 10  County.  So I called Wood County and learned more about

01:45:37 11  their program.

01:45:38 12  Q.  Who did you speak with down there?

01:45:39 13  A.  Mary Dewitt.

01:45:40 14  Q.  Same person who testified here earlier?

01:45:43 15  A.  That is correct.

01:45:45 16  Q.  And what did you talk to her about?

01:45:47 17  A.  I talked to her about my ideas of, you know,

01:45:53 18  Energy Saver Advisors and expanding the business, and I

01:45:57 19  wanted to try to franchise that business on more of a

01:46:00 20  national level.

01:46:01 21  Q.  Do you recall sending her a letter?

01:46:04 22  A.  Yes, I did.

01:46:14 23  Q.  Is this the letter?

01:46:18 24  A.  Yes.

01:46:19 25  Q.  Now, in here you talked about your ESA training

01:46:24  1    facility?

01:46:25  2        A.  Yes.

01:46:25  3        Q.  This is for Energy Saver Advisors?

01:46:27  4        A.  Correct.

01:46:28  5        Q.  But you talk about beautiful Levis Park.

01:46:31  6        A.  Right.  At the time I was under the impression

01:46:35  7    that I had to be in Wood County.  So I had made

01:46:38  8    arrangements with a friend of mine to use his facility

01:46:42  9    to get the people trained.

01:46:49  10       Q.  Is that what you sent in?

01:46:55  11       A.  Yes, it is.

01:46:57  12       Q.  And it lists an address, Wilkinson Way in Wood

01:47:03  13   County.

01:47:03  14       A.  Right.

01:47:03  15       Q.  Is that where your friend had a facility he was

01:47:06  16   going to let you use?

01:47:08  17       A.  Yes.

01:47:08  18       Q.  You had committed enough you were willing to

01:47:11  19   relocate the business to Wood County for the purposes of

01:47:15  20   training?

01:47:15  21       A.  For the purposes of training.

01:47:17  22       Q.  On the second page of the application, it

01:47:23  23   indicates start date of '09, finish date of '10.

01:47:28  24       A.  Correct.

01:47:29  25       Q.  And you were asking for $84,000?

01:47:32   1    A.  Correct.

01:47:33   2    Q.  For six employees?

01:47:35   3    A.  Correct.

01:47:36   4    Q.  And you submitted that application?

01:47:38   5    A.  I did.

01:47:39   6    Q.  Did you ever hear anything about it?

01:47:44   7    A.  Not to my recollection.

01:47:46   8    Q.  Nobody called you and said it had been denied?

01:47:49   9    A.  No.

01:47:49  10    Q.  Nobody called you and said it had been granted?

01:47:52  11    A.  That's correct.

01:47:53  12    Q.  Just silence?

01:47:54  13    A.  Correct.

01:48:07  14    Q.  Energy Saver Advisors didn't go anyplace.

01:48:11  15        You heard of a company call Commercial Energy

01:48:16  16  Products?

01:48:16  17    A.  Correct.

01:48:16  18    Q.  How did you hear about it?

01:48:20  19    A.  A gentleman by the name of Ari Seaman had heard

01:48:23  20  of my marketing capabilities and that I was in the

01:48:26  21  energy business, and he sought me out, actually.

01:48:30  22    Q.  Sought you out to do what?

01:48:32  23    A.  To introduce me to induction lighting.

01:48:37  24    Q.  What was induction lighting?

01:48:41  25    A.  Induction lighting was created a long time ago by

01:48:45   1   Nikola Tesla, Who actually lost out to Thomas Edison in

01:48:50   2   the incandescent light.  But this process was coming

01:48:56   3   back now, and they had a bulb that was a 100,000-hour

01:49:02   4   bulb with a minute amount of the energy requirements of

01:49:07   5   regular lighting.  And the key with it is the quality of

01:49:12   6   light that it gave was far superior to anything on the

01:49:16   7   market.

01:49:17   8       Q.   Did ESA become involved with Commercial Energy

01:49:20   9   Products?

01:49:20   10      A.   Yes, we did.

01:49:24   11           MR. KERGER:  Would you pull up Exhibit 595,

01:49:27   12   please.

01:49:31   13           THE COURT:  Can you see that okay?

01:49:33   14           THE WITNESS:  Yes.

01:49:33   15           MR. KERGER:  Could you enlarge the top two

01:49:35   16   paragraphs, please.

01:49:35   17   BY MR. KERGER:

01:49:41   18      Q.   What does that do?

01:49:43   19      A.   This basically is a marketing and sales agreement

01:49:47   20   that I signed with Mr. Seaman of Commercial Energy

01:49:56   21   Products for Energy Saver Advisors to represent.

01:49:58   22      Q.   What's the date?

01:50:00   23      A.   The 18th of January, 2010.

01:50:04   24      Q.   You can take that down.

01:50:06   25           And did you try to sell induction lighting?

01:50:11  1     A.  I absolutely did.

01:50:12  2     Q.  Where did you go?

01:50:14  3     A.  I went to -- I had quite a bit of success here

01:50:18  4  locally, put a project together with Dana Corporation.

01:50:23  5  But the biggest success I had was up in Detroit with

01:50:28  6  Cobo Hall.  I had gotten wind from a friend of mine that

01:50:33  7  they were in the process of doing an energy saving

01:50:38  8  program on Cobo Hall.  So I made an appointment with the

01:50:41  9  engineer in charge who had Johnson Controls, which is a

01:50:47  10  large national consulting company in that field, as

01:50:51  11  their main contractor.

01:50:55  12     Q.  Did you go up to see them?

01:50:57  13     A.  I did.  It was very interesting.  They had been

01:51:01  14  working on the actual lighting part of this for almost

01:51:05  15  two years, looking out to different companies, different

01:51:10  16  types of lights.  They were within two weeks of signing

01:51:14  17  a contract to go with LED lighting.

01:51:18  18     Q.  Did they stop?

01:51:20  19     A.  We stopped them dead in their tracks.  They had

01:51:24  20  never seen anything like that.  One of our other

01:51:26  21  features was that this was a domestic manufacturing

01:51:30  22  company that was located in Jackson, Michigan; and that

01:51:36  23  is a rare entity in itself to find anything locally

01:51:40  24  that's not made in China or whatever.  And that really

01:51:44  25  gave a lot of credence, too.

01:51:46   1       But the long story short, they stopped their LED.

01:51:55   2   And I went up the next day, took samples.  They put them

01:51:59   3   up in the lighting fixtures.  And the engineers did all

01:52:06   4   of their deal.  And I sent my partner up, who was more

01:52:09   5   of the technical side, to work with Johnson controls.

01:52:12   6   And long story short, they went with induction lighting.

01:52:17   7   As you know, Cobo Hall is the home of the International

01:52:21   8   Auto Show, and color clarity is very important with the

01:52:26   9   cars in that whole exhibit.  And so the induction

01:52:32  10   lighting really appealed to them.

01:52:34  11       Q.  How large was the contract for Commercial Energy

01:52:37  12   Products?

01:52:37  13       A.  It was about a $1 million contract.

01:52:39  14       Q.  Did ESA earn a commission?

01:52:42  15       A.  Yes, they did.

01:52:42  16       Q.  Was it paid?

01:52:43  17       A.  Yes, they did.

01:52:46  18       Q.  Now, other businesses we've heard about, you're

01:52:49  19   100 percent owner?

01:52:50  20       A.  Yes.

01:52:51  21       Q.  Do you own 100 percent of Commercial Energy

01:52:53  22   Products?

01:52:53  23       A.  No.

01:52:53  24       Q.  Did you invest in Commercial Energy Products?

01:52:55  25       A.  Yes, I did.

01:52:56  1    Q.  About how much?

01:52:56  2    A.  I invested about $30,000.

01:53:02  3    Q.  You became a part owner?

01:53:03  4    A.  Yes.

01:53:04  5    Q.  With Mr. Seaman?

01:53:05  6    A.  Yes.

01:53:05  7    Q.  Was there a checking account for Commercial

01:53:08  8    Energy Products?

01:53:08  9    A.  Yes.  Mr. Seaman had opened up the banking

01:53:12  10   account because Commercial Energy Products was actually

01:53:16  11   his company, and I morphed into that as a 50 percent

01:53:23  12   owner.

01:53:23  13   Q.  Did you control the checking account?

01:53:24  14   A.  No, I did not.

01:53:26  15   Q.  Energy Saver Advisors had its own checking

01:53:29  16   account?

01:53:30  17   A.  Yes, we did.

01:53:31  18   Q.  That's one you own 100 percent of?

01:53:33  19   A.  That's correct.

01:53:34  20   Q.  Where was that checking account located both by

01:53:37  21   bank branch and state?

01:53:38  22   A.  Actually, Energy Saver Advisors was opened

01:53:42  23   initially down in Tennessee, where I had a home and

01:53:47  24   quite a bit of real estate.  And I had opened it in

01:53:52  25   Tennessee as Energy Saver Advisors a couple years

01:53:56   1   previous to this.

01:53:58   2       Q.   Now, before I get going on Commercial Energy

01:54:06   3   Products, do you recall holding a meeting in Toledo?

01:54:09   4       A.   Yes.

01:54:12   5            MR. KERGER:   Could I have Exhibit 2, please.

01:54:22   6       Q.   Can you tell the jury what this is?

01:54:24   7       A.   This is the agenda for a meeting on August 10,

01:54:29   8   2010, with various people in attendance to discuss a

01:54:38   9   proposal generator software program.

01:54:42  10       Q.   What's a proposal generator software program?

01:54:45  11       A.   This is where we would have a software program

01:54:49  12   where we could have representatives actually on the

01:54:53  13   phone talking to potential clients, and they give us the

01:54:57  14   amount of square footage, they give us the amount of

01:55:01  15   lights that they have, and then we can determine what

01:55:05  16   kind of fixtures, put all of this information into the

01:55:09  17   software, and actually spit out a proposal for them

01:55:15  18   within hours.

01:55:19  19            MR. KERGER:   Melissa, can you enlarge that

01:55:22  20   portion I highlighted.

01:55:27  21       A.   The reason this --

01:55:30  22            THE COURT:   There's not a question.   Hold

01:55:32  23   on.

01:55:36  24   BY MR. KERGER:

01:55:37  25       Q.   Now, we know who you are.   The second name is Ari

01:55:40  1    Seaman; that's the gentleman that came to you.  Michael

01:55:44  2    Teadt, we know who he is.  Kelly Bland, the jury's heard

01:55:47  3    testify.  Who is Ryan Thompson?

01:55:49  4        A.   Ryan Thompson is one of the individuals that

01:55:54  5    rented a cubicle from me, and he was a graphic artist.

01:55:58  6        Q.   Why was he in the meeting?

01:55:59  7        A.   To use his skills on preparing marketing

01:56:04  8    materials.

01:56:09  9        Q.   Now, the rest of this is outlining what you were

01:56:21  10   going to do to take the business forward?

01:56:23  11       A.   Right.

01:56:24  12       Q.   And this is August 10, 2010?

01:56:26  13       A.   Correct.

01:56:32  14       Q.   Did you get in contact or did they contact you on

01:56:37  15   behalf of Wood County?

01:56:38  16       A.   Repeat the question.

01:56:39  17       Q.   In the summer of 2010 did you reconnect with Wood

01:56:46  18   County?

01:56:46  19       A.   I don't remember, honestly.

01:56:51  20       Q.   Do you remember dealing with Mary Dewitt in 2010?

01:56:55  21       A.   Yeah.

01:56:56  22       Q.   Did you think what you were dealing with was the

01:56:59  23   same thing that started in 2009?

01:57:00  24       A.   Yes, I did.

01:57:01  25       Q.   But with Commercial Energy Products?

01:57:05  1      A.   Correct.

01:57:06  2      Q.   Now, you've got Commercial Energy Products going.

01:57:10  3  The dinar business is starting.  When did you hear about

01:57:13  4  the dinar?

01:57:13  5      A.   I actually heard about the dinar in 2005.  And I

01:57:19  6  did a little research on it.  But the main reason I

01:57:22  7  bought dinar was history usually repeats itself.  And I

01:57:28  8  saw this as an exact example of the Marshall Plan that

01:57:33  9  had occurred in Germany, Japan, Korea, and Vietnam where

01:57:39  10 we go in, bomb the countries, then we rebuild them.  We

01:57:45  11 make money all the way along through the cycle.

01:57:50  12 Currencies are strengthened, and we become allies and

01:57:56  13 have allies after the initial conflict.  And I looked at

01:58:01  14 Iraq, and with all of the resources that they had, and

01:58:05  15 the fact that they were really a critical element in the

01:58:10  16 Middle East, which was where we were getting most of our

01:58:15  17 oil from, there was no doubt in my mind that this

01:58:17  18 scenario was going to happen again, sooner or later.

01:58:21  19     Q.   You thought the dinar would revalue?

01:58:23  20     A.   Yeah, I did.

01:58:24  21     Q.   That's why you bought some?

01:58:26  22     A.   I bought approximately $25,000 worth of dinar,

01:58:30  23 and I put it in my safe and forgot about it.

01:58:34  24     Q.   Now, 2009, did you start hearing rumblings about

01:58:39  25 the dinar again?

01:58:41  1     A.  Yes.  I had a friend, networking friend of mine

01:58:45  2  call me.  He said:  Brad, I got a really hot tip for

01:58:49  3  you.

01:58:49  4         I go:  What is it, Jim?

01:58:51  5         He said:  The dinar.

01:58:52  6         I said:  The dinar?  I bought some five years

01:58:55  7  ago.

01:58:56  8         And he goes:  Well, do you know about the

01:58:59  9  revaluation?

01:59:00  10        I said:  No, I'm not familiar.

01:59:02  11        He said:  Well, check it out.

01:59:04  12        And so I started going back on the net, checking

01:59:07  13  it out, getting any kind of information I could about

01:59:10  14  it.  And I thought possibly that the time was drawing

01:59:16  15  near that we might see some return on this investment.

01:59:21  16    Q.  Did you see the Jim Cramer tape that was played

01:59:24  17  yesterday?

01:59:25  18    A.  Yes, I did.

01:59:26  19    Q.  Did that help influence your decision?

01:59:29  20    A.  Yes.

01:59:31  21           MR. KERGER:  Would you pull up 519, please.

01:59:40  22    Q.  Is that something you saw at about the time you

01:59:42  23  were trying to get an understanding what the dinar was

01:59:45  24  about?

01:59:45  25    A.  I looked at many -- as many articles as I could

01:59:49  1   find, and this was one of them.

01:59:53  2          MR. KERGER:  Can you blow that up, please.

01:59:58  3      Q.  Now, that's from 2005.  Was it still online?

02:00:07  4      A.  I believe so.

02:00:07  5      Q.  And that influenced your thinking about the

02:00:09  6   dinar?

02:00:10  7      A.  All of this was positive affirmation of my

02:00:14  8   original business decision where I was just relying on

02:00:18  9   the fact historical facts usually repeat themselves if

02:00:22  10  there's enough time.

02:00:23  11     Q.  Did you look at a lot of different sites?

02:00:26  12     A.  I did.

02:00:27  13     Q.  Did you listen to the Charlie Rose show at all

02:00:31  14  about the dinar?

02:00:33  15     A.  Charlie Rose is somebody that I listen to

02:00:36  16  religiously.

02:00:38  17     Q.  For those who may not be familiar, who is Charlie

02:00:41  18  Rose?

02:00:41  19     A.  I believe Charlie Rose is the finest journalist

02:00:44  20  on television.  He has a program at 11:00.

02:00:47  21     Q.  Where is he based?

02:00:48  22     A.  Out of New York City.

02:00:49  23     Q.  What's the kind of stuff he talks about?

02:00:52  24     A.  It's very varied topics, but it's usually

02:00:56  25  pertinent to approximately the timeframe of whatever

02:01:01  1    issue he's talking about.

02:01:03  2        Q.  Was he discussing the dinar?

02:01:06  3        A.  There was a lot of discussion about Iraq, and he

02:01:09  4    would have various military people on, people from the

02:01:16  5    administration.  He always has a knack for getting top

02:01:20  6    quality people.

02:01:22  7        Q.  And back in 2009, did you know who Ali Agha

02:01:27  8    is/was?

02:01:28  9        A.  Yes.

02:01:29  10       Q.  How did you know him?

02:01:31  11       A.  Well, in my research I checked a site called

02:01:36  12   Dinar Trade.  And Dinar Trade is a -- I learned was

02:01:43  13   owned by Ali Agha.  And his family was one that profited

02:01:51  14   significantly from the Kuwaiti revaluation.  And Ali ran

02:01:57  15   Dinar Trade.

02:01:58  16       Q.  Did you see an interview on CNBC with Mr. Agha?

02:02:03  17       A.  Yes, I did.

02:02:04  18       Q.  And it's still up on the web?

02:02:07  19       A.  Yes.

02:02:08  20       Q.  Did he talk about what his company did?

02:02:10  21       A.  Yes, he did.

02:02:11  22       Q.  What did he say his company did?

02:02:13  23       A.  He sold dinar.

02:02:15  24       Q.  Sold and bought dinar?

02:02:18  25       A.  Sold and made a market for them.

02:02:22  1        Q.   Do you recall -- and he ultimately began to sell

02:02:25  2   to you?

02:02:25  3        A.   Correct.

02:02:26  4        Q.   What did you have to pay to get your dinar?

02:02:30  5        A.   It was, I believe, around the 900 dinar per

02:02:38  6   million.

02:02:39  7        Q.   You see on the chart that shows when you buy at

02:02:43  8   $685.  Did you ever buy dinar at $685?

02:02:53  9        A.   Never.

02:02:54  10       Q.   After looking at all of these sites that were

02:02:57  11  positive, did you also look at sites that were negative?

02:03:00  12       A.   Absolutely.  And I understand why.

02:03:01  13       Q.   And you accepted the positive view as the one

02:03:04  14  that matched your thinking?

02:03:05  15       A.   Right.

02:03:06  16       Q.   Did you decide to invest?

02:03:08  17       A.   In the dinar?

02:03:09  18       Q.   In the dinar.

02:03:10  19       A.   Yes, I did.

02:03:11  20       Q.   And in the spring of 2010, what did you do?

02:03:14  21       A.   I actually made a larger commitment to the dinar.

02:03:23  22  No traditional bank will give you money for a

02:03:27  23  speculative investment, so I actually had to do a hard

02:03:32  24  money loan, putting up a piece of my real estate to get

02:03:37  25  somebody to loan me the money.

02:03:40   1      Q.   Did you buy dinar?

02:03:43   2      A.   I did.

02:03:43   3      Q.   For resale?

02:03:44   4      A.   Yes.

02:03:44   5      Q.   How much in the spring of 2010?

02:03:47   6      A.   About $200,000.

02:03:49   7      Q.   This is when you're investing $30,000 in CEP?

02:03:53   8      A.   Correct.

02:03:53   9      Q.   You built up the building on St. Clair?

02:03:56  10      A.   Correct.

02:03:56  11      Q.   With your money?

02:03:58  12      A.   With my money.

02:04:02  13      Q.   And did you try to start to sell the dinar?

02:04:06  14      A.   Well, back in -- when I really started

02:04:12  15  understanding the dinar and the talk of the revaluation

02:04:19  16  that was coming, I was very excited about it.  And I

02:04:26  17  thought that if I didn't share this with my friends and

02:04:30  18  family, and this happened, I would not feel good about

02:04:36  19  being selfish with that information.

02:04:41  20      Q.   You know John Miller?

02:04:43  21      A.   I do know John.

02:04:44  22      Q.   Testified here yesterday?

02:04:45  23      A.   Yes.

02:04:46  24      Q.   And you knew him -- Mr. Miller explained how you

02:04:50  25  knew each other.  Is that your understanding of how you

02:04:52  1    knew each other?

02:04:53  2         A.   Exactly.

02:04:54  3         Q.   You met him in August or thereabouts in 2010?

02:04:57  4         A.   Yes.  I met him at a Whitmer reverse raffle.

02:05:01  5         Q.   Did you talk to him about the dinar?

02:05:03  6         A.   I did.

02:05:03  7         Q.   Why?

02:05:04  8         A.   I had a habit of carrying a 25,000 dinar note in

02:05:12  9    my pocket.  And in the network marketing industry, the

02:05:18  10   rule is if anybody gets within ten feet of you, you try

02:05:22  11   to get them to ask about it rather than pouncing on them

02:05:29  12   and hyperventilating about something.  And I wanted

02:05:36  13   people to know about the dinar.  So I had the dinar

02:05:41  14   25,000 note with me.  And I showed John at the raffle.

02:05:45  15   And John -- it's like everybody; I told him, go home,

02:05:51  16   research this.  If it's for you, let me know.

02:05:54  17        Q.   And John ultimately bought some dinar?

02:05:57  18        A.   John did.

02:05:57  19        Q.   When you met and he bought his dinar, did you

02:06:01  20   ever want him to become a salesman for you?

02:06:04  21        A.   Never.

02:06:06  22        Q.   Did you ever compensate him?

02:06:09  23        A.   Never.

02:06:11  24        Q.   Did you have an understanding of why he did it?

02:06:14  25        A.   It was why all of us did it; we wanted to help

02:06:18  1   people.  We wanted them to find out about this because

02:06:22  2   if we didn't, like I said, I would have felt terrible.

02:06:28  3   I think this is the largest macroeconomic event of our

02:06:32  4   lifetime.  And I would tell a waitress, a bus driver,

02:06:38  5   whether it was $100, I didn't care.  I wanted to be able

02:06:44  6   to change a life and leave a thumbprint on their life.

02:06:48  7       Q.  What do you mean by leaving a thumbprint?

02:06:51  8       A.  By leaving a thumbprint I mean telling them about

02:06:55  9   the dinar and them buying, whether it was $100 worth or

02:07:00  10  $10,000 worth.  When that investment would come through,

02:07:05  11  they would never forget who told them about that

02:07:09  12  investment.  And I think it's going to change lives all

02:07:13  13  across this country, and northwest Ohio will be the

02:07:16  14  largest recipient.

02:07:18  15      Q.  When you were selling the dinar, did you

02:07:21  16  understand people could resell them if they wanted to

02:07:24  17  get out of their investment?

02:07:25  18      A.  Absolutely.

02:07:26  19      Q.  They could sell them for the price paid for the

02:07:29  20  transaction?

02:07:29  21      A.  Correct.

02:07:30  22      Q.  Did anybody, when you started selling dinar, ever

02:07:32  23  ask you to buy the dinar back?

02:07:33  24      A.  They did.

02:07:34  25      Q.  Did you buy them back?

02:07:35  1        A.   I absolutely did.

02:07:37  2        Q.   Did you charge them anything for that?

02:07:39  3        A.   I charged them about ten percent.  I had

02:07:43  4    people -- I had a doctor out of Tennessee that had

02:07:47  5    bought $400,000.  He didn't even buy it from me.  But he

02:07:53  6    was a good friend of mine.  He needed to get some money,

02:07:58  7    and he wanted to sell $200,000 worth of dinar back.  And

02:08:03  8    he checked all over the United States to get the best

02:08:07  9    deal.  And I told him I'd do it for ten percent.  And

02:08:11  10    that was the best deal he could find.  So I even

02:08:15  11    exchanged his dinars that I had not even sold him.

02:08:19  12        Q.   So he had spent $200,000, and you gave him

02:08:23  13    $180,000?

02:08:24  14        A.   Correct.  But I only -- I had a handful of people

02:08:30  15    out of tens of thousands of people that I helped that

02:08:33  16    actually ever asked for the dinar -- to sell their dinar

02:08:38  17    back.  And most of those were hardship cases where they

02:08:43  18    needed the money.

02:08:45  19        Q.   Now, you know Charlie Emmenecker?

02:08:47  20        A.   I do.

02:08:48  21        Q.   You heard him talk about a dinner in August of

02:08:53  22    2010 where you and your wives met?

02:08:56  23        A.   That is correct.

02:08:56  24        Q.   You told him about the dinar?

02:08:58  25        A.   Yes.  This was at Highland Meadows at a swim team

02:09:02   1   reunion.  My wife swam for Highland Meadows.  I went

02:09:06   2   there, and I always had my dinar in the pocket.  And I

02:09:08   3   ran into Charlie.  I hadn't seen him in years.  We'd

02:09:12   4   known each other forever.  And I knew Charlie was a

02:09:15   5   networker.  And I explained the dinar to Charlie.

02:09:18   6        Q.  Did he investigate, as far as you know?

02:09:20   7        A.  Yes, he did.

02:09:21   8        Q.  Did he finally by dinar from you?

02:09:24   9        A.  Yes, he did.

02:09:25  10        Q.  Did you two discuss about whether Charlie could

02:09:28  11   pass this on to his team in Xango?

02:09:35  12        A.  I don't know if we talked about it initially, but

02:09:40  13   after a while Charlie indicated that he would like to

02:09:43  14   tell some of his Xango downline and other leaders in

02:09:49  15   Xango about the dinar.

02:09:50  16        Q.  Were you holding conference calls then?

02:09:54  17        A.  I think I held some small calls.  I really wasn't

02:09:59  18   big on conference calls.

02:10:01  19        Q.  Why did you have the conference call?

02:10:03  20        A.  Charlie asked me if I wanted to do a conference

02:10:09  21   call, and I said I'd be glad to.  And he was very adept

02:10:15  22   at doing conference calls.  And so we agreed to have a

02:10:20  23   time to do a conference call.  And he got a lot of the

02:10:24  24   Xango people on the call, and so we initiated the call.

02:10:30  25        Q.  Did that cause growth?

02:10:32  1      A.  It was startling.

02:10:36  2      Q.  Did you anticipate it at all?

02:10:38  3      A.  No, I did not.

02:10:39  4      Q.  How fast did it grow?

02:10:42  5      A.  I've been in businesses for 40-some years, and

02:10:49  6  volatile businesses, traditional and other types of

02:10:52  7  businesses.  I never saw anything like it in my life.

02:10:55  8  And the networking that occurred with people telling

02:11:01  9  people telling people, I mean, we got down four or five

02:11:05  10  generations like that.  And so I was surprised.  And

02:11:10  11  when you have a business, sometimes the biggest thing

02:11:14  12  that you have to worry about that will kill you first is

02:11:17  13  growth, if you don't know how to handle a fast-growing

02:11:22  14  business.

02:11:24  15      Q.  We saw an e-mail yesterday that you sent to Kelly

02:11:28  16  Bland at the end of October, 2010, where you talked

02:11:31  17  about getting slammed with a bunch of dinar orders.  Do

02:11:34  18  you remember that?

02:11:34  19      A.  Correct.

02:11:35  20      Q.  In that you said, "And I managed to get them all

02:11:38  21  out."  Do you remember that?

02:11:39  22      A.  I do.

02:11:39  23      Q.  Was that important to you?  And if so, why?

02:11:42  24      A.  It was everything to me.  I told my team, if we

02:11:47  25  got an order in today, it goes out today, whether we

02:11:52  1    have to stay until 7:00 at night.  We are in the service

02:11:55  2    business, and I want people to trust us.  And when we do

02:12:00  3    a good job, they will -- they will reward us and tell

02:12:05  4    people that we're honorable people to deal with.

02:12:08  5         Q.  They'd given you cash or certified checks or

02:12:12  6    money orders, and you wanted them to get their dinar?

02:12:15  7         A.  Absolutely.

02:12:16  8         Q.  And you did that?

02:12:17  9         A.  Absolutely.

02:12:18  10        Q.  Do you recall in that same e-mail at the end of

02:12:20  11   October, 2010, you also said you stayed to do a film, a

02:12:24  12   video for CEP?

02:12:26  13        A.  Right.

02:12:26  14        Q.  Do you recall what that was about?

02:12:28  15        A.  You know, I really can't recall what the essence

02:12:31  16   of the video was, but -- I can't recall.

02:12:37  17        Q.  In your experience in explosive growth in the

02:12:42  18   dinar business --

02:12:42  19        A.  Yes.

02:12:43  20        Q.  -- and you're still saving time to do a video for

02:12:46  21   CEP?

02:12:47  22        A.  Yes.

02:12:47  23        Q.  You're running both businesses?

02:12:49  24        A.  Yes.

02:12:49  25        Q.  In October, 2010?

02:12:51  1    A.   Right.

02:12:51  2    Q.   Which business is Mike Teadt working for?

02:12:54  3    A.   Mike is helping the Commercial Energy Products

02:12:57  4  because when I saw what happened at Cobo Hall, and I saw

02:13:04  5  what happened at Dana here in the -- or in the Toledo

02:13:08  6  area, and a couple other companies, and the whole fact

02:13:11  7  that the United States was focussing on the energy

02:13:15  8  business, and that here was Johnson Controls, one of the

02:13:18  9  top engineering firms in the United States that had been

02:13:22  10  researching for two years what lighting to put into Cobo

02:13:27  11  Hall, I walk in there, stop the project, and they end up

02:13:35  12  going with induction lighting, as an entrepreneur and a

02:13:40  13  marketing person, the possibilities are endless.

02:13:44  14        And Mike Teadt worked in the aircraft industry.

02:13:47  15  He was working with companies like Sikorsky that had

02:13:53  16  million square foot buildings, and really the potential

02:13:58  17  for that was unlimited.  And it was -- it was the focus

02:14:02  18  of the time, and there was government money if these

02:14:05  19  corporations knew how to do it for energy rebates.

02:14:11  20    Q.   Going back to the dinar, you actually started

02:14:14  21  selling some in 2009?

02:14:16  22    A.   Yes, in 2009 I went to my immediate circle of

02:14:22  23  friends and family.

02:14:24  24    Q.   And you heard Mr. Lewis testify that you hadn't

02:14:29  25  filed a return for 2009 until 2012, I think.

02:14:33   1        A.   Correct.

02:14:33   2        Q.   Was that correct to your understanding?

02:14:35   3        A.   It was not correct to my understanding because --

02:14:41   4   and I will check with Mr. Lewis on this, but I believe

02:14:45   5   we amended that return because I had forgot about the

02:14:49   6   dinar at the end of the year on that December, and

02:14:54   7   that's what we amended the return.

02:14:56   8        Q.   To show this, the income of the dinar?

02:14:59   9        A.   To show the income of the dinar.

02:15:00  10        Q.   It was about $15,000?

02:15:01  11        A.   I can't remember what it was.

02:15:03  12        Q.   And then you continued to make some sales in the

02:15:06  13   first part of 2010?

02:15:07  14        A.   Yes.

02:15:08  15        Q.   Not explosive growth, but just selling some

02:15:13  16   dinar?

02:15:13  17        A.   Right.

02:15:13  18        Q.   Now, when you started becoming more aggressive in

02:15:16  19   selling, did you continue to research and listen to

02:15:22  20   things on the web?

02:15:24  21        A.   Especially --

02:15:25  22        Q.   Is the answer yes?

02:15:26  23        A.   Yes.  Sorry.

02:15:28  24        Q.   Go ahead, explain.

02:15:29  25        A.   Well, especially when we got to the point of

02:15:32  1   doing conference calls.  I had a mantra on all of my

02:15:38  2   calls, and I wouldn't bore you people with all of the

02:15:44  3   calls to all the details, but the mantra was:  This is

02:15:48  4   an investment, not a lottery ticket.  And knowledge is

02:15:51  5   king.  I wanted people to know what was going on about

02:15:56  6   the dinar.  And on a weekly basis, the historic elements

02:16:03  7   that were taking place, especially at the time of the

02:16:07  8   Arab spring -- the Arab spring started off with some --

02:16:13  9   with a fruit stand owner in -- I believe it was Tunisia

02:16:19  10  that set himself on fire talking about freedom.  And

02:16:25  11  then you saw it started exploding in Egypt, and it just

02:16:29  12  started sweeping through the Middle East.  And that's

02:16:33  13  where I finally saw how contagious freedom was.  And at

02:16:39  14  the same time in the Middle East it was not only about

02:16:42  15  the country, the women in the Middle East had been

02:16:48  16  suppressed forever, and this was their chance for their

02:16:52  17  mothers and the grandmothers and mothers came out to

02:16:56  18  support the freedom movement.

02:16:58  19      Q.  You did your research to have information to pass

02:17:01  20  on to all --

02:17:03  21      A.  I did a lot of research every week to make the

02:17:06  22  call interesting and informative.

02:17:08  23      Q.  And you listened to other people who were on

02:17:10  24  other calls?

02:17:11  25      A.  Yes, and I dug into all the dinar sites to see if

02:17:15  1    there was anything.  Most dinar sites were rate and date

02:17:21  2    people.  And that is something that I really did not

02:17:24  3    want to do.  And I told our people that I would bring on

02:17:30  4    guests, and I told them to try to avoid that at all

02:17:33  5    costs.  And the bottom line is that it put people on a

02:17:38  6    roller coaster, emotionally.

02:17:43  7         Q.  What put them on a roller coaster?

02:17:45  8         A.  When people would come out and say:  I think it's

02:17:48  9    going to happen this Monday, or whatever, and it could

02:17:51  10   be at this rate.  And --

02:17:57  11        Q.  About this time did you become aware of a

02:17:59  12   gentleman named Rudy Coenen?

02:18:01  13        A.  Yes, I did.

02:18:02  14        Q.  How did you become aware of him?

02:18:05  15        A.  To find gurus with the dinar, to be invited on

02:18:13  16   our show to give any type of expert testimony, was very

02:18:22  17   difficult.  There weren't that many people out there

02:18:25  18   that really knew what they were talking about.  And a

02:18:28  19   friend of mine here in Toledo, Frank Villa, had a site

02:18:34  20   called KTFM, Keep the Faith, that was the name of the

02:18:41  21   program.  Frank had a huge national entourage of

02:18:47  22   listeners.  And I used to listen to his show to get

02:18:49  23   information.  And all of a sudden one day Rudy Coenen

02:18:54  24   came up, and I'll never forget, he had a nine-point

02:18:58  25   presentation.  And you had to go for nine days in a row.

02:19:04  1  And I'm telling you, it took the whole dinar industry by

02:19:08  2  storm.

02:19:11  3      Q.  He sounded knowledgeable?

02:19:13  4      A.  Absolutely.

02:19:14  5      Q.  Frank had him on the show?

02:19:17  6      A.  Yes, he did.

02:19:18  7      Q.  Did you reach out to him and send him your

02:19:22  8  thoughts on the dinar?

02:19:23  9      A.  I asked Frank if I could have Rudy's number, and

02:19:27  10  he gave me his number, and I called Rudy.

02:19:29  11      Q.  Did you get his e-mail address?

02:19:31  12      A.  Probably did.

02:19:33  13          MR. KERGER:  Pull up 606, please.

02:19:50  14      Q.  This is something you sent to Kelly?

02:19:52  15      A.  Yes.  Kelly Bland was my assistant.

02:19:55  16      Q.  What's the Dinar 101 conference call?

02:19:59  17      A.  That's basically what we called our call, was

02:20:04  18  dinar -- you know, like --

02:20:07  19      Q.  Freshman level class in college, 101?

02:20:10  20      A.  Right.

02:20:11  21          MR. KERGER:  Would you drop down and

02:20:17  22  enlarge.

02:20:21  23      Q.  You asked him to send some materials you'd

02:20:24  24  written to Rudy?

02:20:26  25      A.  Please send this to Rudy, okay.

| | | |
|---|---|---|
| 02:20:28 | 1 | Q.   So as of 9-29-10, you had his address? |
| 02:20:36 | 2 | A.   Okay. |
| 02:20:36 | 3 | Q.   Did you ask him to come on the call? |
| 02:20:38 | 4 | A.   Yes, I did. |
| 02:20:39 | 5 | Q.   Did he give you his background? |
| 02:20:44 | 6 | A.   I don't know when exactly he gave me his |
| 02:20:46 | 7 | background. |
| 02:20:47 | 8 | Q.   What did he tell you his background was? |
| 02:20:50 | 9 | A.   Well, he told me that he had been with JP Morgan |
| 02:20:55 | 10 | as a vice-president and currency trading. |
| 02:20:58 | 11 | Q.   And in talking about currency trading and |
| 02:21:04 | 12 | finance, did what say seem to be consistent with that |
| 02:21:06 | 13 | position? |
| 02:21:07 | 14 | A.   Unequivocally. |
| 02:21:08 | 15 | Q.   Did he tell you anything else about his |
| 02:21:10 | 16 | background? |
| 02:21:11 | 17 | A.   He told me about his military history. |
| 02:21:14 | 18 | Q.   What did he tell you about that? |
| 02:21:15 | 19 | A.   That he had been an Iraqi war vet and that he had |
| 02:21:18 | 20 | taken a bullet in Iraq and that he had had a liver |
| 02:21:31 | 21 | transplant due to hepatitis C from a blood transfusion. |
| 02:21:37 | 22 | Q.   Did you believe what he said? |
| 02:21:39 | 23 | A.   Unequivocally. |
| 02:21:41 | 24 | Q.   Why so unequivocally? |
| 02:21:44 | 25 | A.   I am a military veteran of the Vietnam War.  I |

02:21:49  1   have seen war.  And when a fellow brother veteran tells

02:21:56  2   me he has been in war and took a bullet for this

02:21:59  3   country, why would I ever doubt it?

02:22:05  4       Q.   And you didn't?

02:22:08  5       A.   I didn't.

02:22:09  6       Q.   Did you check his background anyplace?

02:22:12  7       A.   No, not on the military.

02:22:17  8       Q.   Had you ever had anybody lie to you like that, so

02:22:20  9   far as you knew?

02:22:22  10      A.   Never.  And I'm a very trusting person because I

02:22:28  11  don't want to go through life acidic, never believing

02:22:35  12  anybody, but I believe if somebody lies to me, and I

02:22:38  13  find out about it, then they're going to lose a good

02:22:42  14  friend.

02:22:43  15      Q.   Was he being -- did he ultimately come to be on

02:22:48  16  your calls?

02:22:49  17      A.   Yes.

02:22:49  18      Q.   Was he paid to do that?

02:22:50  19      A.   No, he was not.

02:22:51  20      Q.   Did he become your business partner?

02:22:53  21      A.   No.

02:22:53  22      Q.   He was just a voice on the call with Charlie and

02:22:56  23  other people?

02:22:57  24      A.   And after the first call, it was very amazing.  I

02:23:01  25  must have gotten 100 calls in the next few days wanting

02:23:05   1   Rudy on the call.  And I never had that happen with any

02:23:09   2   guest I'd had.

02:23:10   3       Q.   And you had him back?

02:23:13   4       A.   I had him back.

02:23:13   5       Q.   And back again?

02:23:14   6       A.   And back again.

02:23:16   7       Q.   And every time he was on the call and you

02:23:17   8   listened to him, he seemed to carry that same knowledge

02:23:20   9   level as a JP Morgan vice-president in terms of finance?

02:23:24  10       A.   Yes, he did.

02:23:28  11       Q.   We've heard about hedge funds.  When did you

02:23:32  12   first hear the term "hedge fund"?

02:23:38  13       A.   Several months into the calls Rudy said at the

02:23:44  14   end of the call, I remember, he said:  I've gotten

02:23:52  15   requests from some BH Group members to either look at

02:23:58  16   investments or something, and I think coming up with a

02:24:03  17   hedge fund regarding the reconstruction of Iraq would be

02:24:11  18   very exciting.

02:24:12  19       Q.   Did you know anything about hedge funds?

02:24:15  20       A.   My words to Rudy at that time were:  Rudy, I

02:24:18  21   don't know a hedge fund from a hedge hog.

02:24:21  22       Q.   Did he say he did?

02:24:22  23       A.   He said he did.

02:24:23  24       Q.   Did you believe him?

02:24:24  25       A.   I believed him.

02:24:26    1    Q.  After the passage of time, did he introduce the

02:24:32    2    hedge fund to members of the BH Group?

02:24:33    3    A.  It was either a week or two later.  All of a

02:24:39    4    sudden an e-mail went out to Rudy to members of the BH

02:24:47    5    Group.

02:24:47    6    Q.  From Rudy?

02:24:48    7    A.  From Rudy.

02:24:49    8    Q.  Okay.

02:24:50    9    A.  And Rudy, whether it's dyslexic or not, he just

02:25:00   10    couldn't write worth a darn.  I mean, as far as, you

02:25:05   11    know, typing, it was just -- it was just -- and I

02:25:11   12    realize people have certain deficiencies; we're not --

02:25:14   13    like I'm not good at math.

02:25:18   14    Q.  Did he explain to you that he had dyslexia?

02:25:23   15    A.  No, he didn't.  That's the term I used.

02:25:25   16    Q.  It was confused?

02:25:27   17    A.  Right.

02:25:27   18    Q.  Did that cause you any question about whether or

02:25:30   19    not he'd been a vice-president at JP Morgan, the fact

02:25:33   20    that he couldn't write well?

02:25:34   21    A.  No.  In fact, he said he was a currency trader

02:25:37   22    and they kept the -- he was kind of joking, but they

02:25:40   23    kept him in padded cells.

02:25:42   24    Q.  When that happened, what was your response?

02:25:46   25    A.  I said, Rudy, I really don't want communications

02:25:51  1   going out to members of the BH Group with this

02:25:56  2   unprofessional presentation.

02:25:59  3        Q.  Did you make him an offer?

02:26:02  4        A.  You know, I think he said:  Well, would you like

02:26:09  5   to join me, or something like that, would you like to

02:26:14  6   market the hedge funds to the BH Group?   And I said --

02:26:19  7   and then I asked a little bit about what the strategy

02:26:22  8   was.  And he talked about the reconstruction of Iraq.

02:26:25  9   And I had -- I had seen in my research videos of -- I

02:26:36  10  believe it was Hillary Clinton or some other people

02:26:41  11  talking about the reconstruction.  The one I remember

02:26:45  12  mostly is Hillary Clinton.

02:26:47  13       Q.  Is she secretary of state?

02:26:50  14       A.  She was secretary of state at that time.  Begging

02:26:54  15  U.S. companies to get involved in the reconstruction of

02:26:57  16  Iraq because so many foreign countries -- foreign

02:27:01  17  companies were coming in and taking advantage.  And I

02:27:04  18  remember she said in this video that they predict that

02:27:07  19  Iraq would be growing faster than China.

02:27:10  20       Q.  Was what she was saying consistent -- or was

02:27:15  21  Rudy's theory consistent with what she was saying?

02:27:18  22       A.  Yes.

02:27:18  23       Q.  Did that tend to make you believe in the hedge

02:27:22  24  fund concept?

02:27:23  25       A.  Well, this was a total paradox to have a country

02:27:27  1    with all of these natural resources surrounded by these

02:27:33  2    Mideast countries that were like an oasis in the desert,

02:27:38  3    countries like Dubai and Saudi Arabia and Bahrain, et

02:27:44  4    cetera.

02:27:44  5         Q.  They have a lot of money, the countries you

02:27:46  6    just --

02:27:47  7         A.  Yeah.  And they were all modern bustling cities,

02:27:50  8    and here is Iraq stuck in the stone age and just had

02:27:53  9    been bombed to pieces.

02:27:55  10        Q.  And it had more oil than just about anybody else?

02:27:58  11        A.  Exactly.

02:27:58  12        Q.  Did you ask Rudy whether it was all right -- you

02:28:02  13   can take that down.

02:28:03  14        Did you ask Rudy if it was all right for you to

02:28:06  15   market the funds before they were formed?

02:28:12  16        A.  Rudy basically told me that he wanted me to

02:28:17  17   market to the BH Group and that he would give me $100

02:28:21  18   per person for every member that I -- that bought what

02:28:27  19   he felt was the inception investor seat, which would be

02:28:32  20   the position that when the revaluation happened, that

02:28:38  21   that person would have a seat and be able to put the

02:28:43  22   investment down to become a member of the hedge fund.

02:28:47  23        Q.  And he told you -- you asked was it all right for

02:28:51  24   you to do that legally?

02:28:52  25        A.  The first question I ever asked him was:  Rudy,

02:28:55  1  is there any liability for me?   I'm not familiar with

02:28:59  2  stocks or securities marketing.

02:29:01  3       And he said:  I'll check with my lawyer in New

02:29:05  4  York.

02:29:06  5       And he came back to me, because I kept asking

02:29:11  6  him, and he said:  I checked with him.  And he said as

02:29:14  7  long as this is a private group, and that you need a

02:29:20  8  password to get into the internet, you can -- we can

02:29:24  9  market it to your private group.

02:29:28  10      That -- I mean, that kind of made sense to me.

02:29:30  11  Q.  And the BH Group was private in that you had to

02:29:34  12  have a password?

02:29:35  13  A.  Even though you didn't have to pay anything, you

02:29:37  14  had to have a password to be a member.

02:29:41  15  Q.  Did you consider that having the hedge fund would

02:29:45  16  increase dinar sales?

02:29:47  17  A.  That wasn't at all -- I had more dinar business

02:29:51  18  than I knew what to do with.

02:29:58  19  Q.  Now, have you ever recruited anybody to be a

02:30:02  20  salesman for dinar?

02:30:03  21  A.  Absolutely not.

02:30:04  22  Q.  You hired Kelly and Shelby.  They stayed at the

02:30:08  23  office and did the back office functions, if you will?

02:30:10  24  A.  Correct.

02:30:11  25  Q.  They kept the records and the cash, things like

02:30:14  1    that?

02:30:16  2        You had previously formed network marketing

02:30:22  3    companies around the world, teams to work with you?

02:30:24  4        A.  Yes.

02:30:25  5        Q.  Could you have done that here if you wanted to

02:30:27  6    sell dinar?

02:30:28  7        A.  Not a problem.

02:30:30  8        Q.  You didn't do it?

02:30:31  9        A.  I did not do it.

02:30:33  10       Q.  Why not?

02:30:33  11       A.  I initially didn't even look at this as a

02:30:41  12   business.  And when it exploded on me, I was just trying

02:30:45  13   to handle the business and keep up with the growth.  I

02:30:50  14   literally was working about 15 hours a day.  And I had

02:30:55  15   CEP, and I had the BH Group, which was the DBA for

02:31:04  16   Energy Saver Advisors.

02:31:05  17       Q.  When did the BH Group get formed?

02:31:08  18       A.  The BH Group got formed probably in the third

02:31:16  19   quarter of 2010.

02:31:18  20       Q.  To pin down the obvious, BH stands for Bradford

02:31:22  21   Huebner?

02:31:22  22       A.  Right.

02:31:23  23       Q.  And it's just doing business as?

02:31:25  24       A.  And the reason it was formed was that it was very

02:31:28  25   confusing to people when they came to buy dinar or they

02:31:33  1  ordered dinar from afar, and they're buying a currency

02:31:38  2  and sending a check to an energy company.  And so -- and

02:31:44  3  I totally understood that.  I got tired of answering the

02:31:47  4  questions.  So I did what's called a DBA, doing business

02:31:53  5  as, the BH Group.  I filed it with my bank, got the

02:31:58  6  proper paperwork.  Then they were able to write checks

02:32:03  7  to the BH Group.

02:32:04  8      Q.  When Kelly and Shelby took over the

02:32:07  9  administration for the fund, did they straighten out any

02:32:09  10  problems?

02:32:11  11      A.  When Rudy sent out his initial foray, if you

02:32:21  12  will, about the hedge fund and getting a seat, he used a

02:32:28  13  number.  And he used -- I believe it was 127.  And he

02:32:33  14  said if you want a hedge fund seat, it will be number

02:32:40  15  127.  Well, he sent that out to everybody because he

02:32:42  16  didn't -- he wasn't doing the records for administering

02:32:47  17  all the various seats in each fund, starting from one

02:32:51  18  going to 490.

02:32:54  19      Q.  You understood the group was limited?

02:32:56  20      A.  Yes, Rudy had told me that there was only going

02:32:59  21  to be 490 seats.

02:33:02  22      Q.  And you did two funds.  When did the idea of a

02:33:05  23  second fund come?

02:33:06  24      A.  Well, the -- I had -- I don't know, 10,000,

02:33:12  25  15,000 registered members of the BH Group at that time.

02:33:17  1    There was thousands of other people that listened to us,

02:33:20  2    that knew about us.  And when people listened to the

02:33:27  3    rational of the hedge fund opportunity, it all made

02:33:33  4    sense to them.  And for $750 they wanted to have one of

02:33:38  5    those seats.  And it basically -- I told Rudy, I said,

02:33:43  6    you know, these people that I don't even know, I'm going

02:33:46  7    to give a priority to our people that I know that have

02:33:50  8    supported the BH Group first.  I'll give them a two-week

02:33:53  9    head start.

02:33:54  10         Well, I mean, within a couple weeks all the seats

02:33:59  11   in the first hedge fund were pretty much spoken for by

02:34:03  12   the BH Group members.

02:34:04  13   Q.  Why was the second one opened?

02:34:07  14   A.  Because there was still a demand.

02:34:09  15   Q.  Do you think you could have opened a third or

02:34:12  16   fourth one?

02:34:12  17   A.  Absolutely.

02:34:13  18   Q.  You didn't?

02:34:14  19   A.  No.

02:34:17  20   Q.  Let's talk about a different point in just a

02:34:21  21   second.  You heard about a DeLaRue machine?

02:34:28  22   A.  Yes.

02:34:28  23   Q.  What did you understand a DeLaRue machine to be?

02:34:29  24   A.  I understood a DeLaRue machine was the product of

02:34:34  25   the DeLaRue Company that was specialized in the printing

02:34:37  1    of international currency.   And the DeLaRue machine,

02:34:40  2    you could put the currency in that machine, like a money

02:34:43  3    counter, and it would detect the markings of the

02:34:49  4    currency to see whether it was counterfeit or real.  And

02:34:54  5    the Iraqi dinar had about six different markings on it,

02:34:59  6    very sophisticated currency, that had way more security

02:35:09  7    than the U.S. dollar.

02:35:10  8        Q.   You had learned what those little tells were?

02:35:14  9        A.   Right.

02:35:15  10        Q.   What were the sort of things that were on the

02:35:17  11    dinar?

02:35:17  12        A.   Various water marks; a horse's head, that metal

02:35:23  13    stripping.  One of the things, you had to put a black

02:35:27  14    line to see if the marking would show up.  It was very

02:35:33  15    sophisticated.

02:35:35  16        Q.   When you bought from Dinar Trade, would your

02:35:38  17    dinar come with a certificate?

02:35:40  18        A.   Yes.

02:35:41  19        Q.   Go to 540, please.

02:35:50  20            What is that?

02:35:51  21        A.   That is the certificate of authenticity I would

02:35:54  22    get from Dinar Trade.

02:35:57  23        Q.   When you sent your dinar out, would you make a

02:36:01  24    copy of the certificate?

02:36:03  25        A.   We would make a copy of this certificate and send

02:36:07  1    it out.

02:36:07  2        Q.  Did you have any doubt in your mind that they

02:36:10  3    were being authenticated on a DeLaRue machine?

02:36:13  4        A.  I had no doubt that these weren't authentic.

02:36:16  5        Q.  All the millions of dinar that you sold, have any

02:36:18  6    of them, when they were seized by the U.S. Government,

02:36:23  7    been reported to be counterfeit?

02:36:24  8        A.  None.

02:36:29  9        Q.  Pull up Exhibit 534, please.  Can you tell us

02:36:36  10   what 534 is?

02:36:38  11       Can you enlarge the heading on the top?

02:36:48  12       It's sent to Ali Agha?

02:36:51  13       A.  Yes, it is.

02:36:52  14       Q.  And what's it about?

02:36:54  15       A.  Well, apparently from the gist of the letter --

02:37:08  16       Q.  Can you drop down to the first two paragraphs.

02:37:14  17       What's it about?

02:37:15  18       A.  Apparently there's a conflict with Dinar Trade

02:37:18  19   and DeLaRue through their attorneys of some copyright

02:37:23  20   issue.

02:37:23  21       Q.  A trademark issue?

02:37:25  22       A.  Trademark issue.

02:37:26  23       Q.  Did you know anything about this?

02:37:28  24       A.  No idea.

02:37:30  25       Q.  Did you think, as you look back, Ali should have

02:37:33　1　told you about it?

02:37:33　2　　A.　Not really.

02:37:45　3　　Q.　Let's go back to the hedge fund.  Your people are

02:37:48　4　administrating, receiving the forms?

02:37:50　5　　A.　Yes.

02:37:50　6　　Q.　Receiving the checks?

02:37:52　7　　A.　Yes.  In the agreement that I had with Bayshore

02:38:00　8　Capital, we would perform all the administrative work

02:38:05　9　and the seat assignments, keep the -- keep all of the

02:38:09　10　forms correct, send him the checks.  And that was our --

02:38:16　11　the extent of our involvement.

02:38:18　12　　Q.　And you did that?

02:38:19　13　　A.　Yes, we did.

02:38:22　14　　Q.　Did there come a time when you told Rudy you

02:38:25　15　wanted to put your respective biographies up on the

02:38:28　16　website?

02:38:28　17　　A.　Yes.  We arranged, at the request of some of the

02:38:37　18　leaders of dinar in various areas, they wanted to have a

02:38:43　19　chance for their people in various cities to get a seat

02:38:49　20　in the hedge fund and learn about the hedge fund.

02:38:51　21　　Q.　And we've heard some discussion about road shows.

02:38:53　22　　A.　Right.

02:38:54　23　　Q.　Is that what you're talking about?

02:38:55　24　　A.　That's what I'm talking about.

02:38:57　25　　Q.　And you would go to different areas of the

02:38:59   1    country?

02:38:59   2        A.   Yeah.   We had, I believe, five.

02:39:01   3        Q.   One in Toledo?

02:39:02   4        A.   One in Toledo.

02:39:04   5        Q.   Did you ask Rudy for his biography?

02:39:06   6        A.   I did.

02:39:07   7        Q.   Did he give it to you?

02:39:08   8        A.   Initially he didn't.  And finally I pinned him

02:39:15   9    down.  I said, Rudy, I've got a piece of paper here, and

02:39:18  10    I want your biography step by step in an evolutionary

02:39:22  11    process.

02:39:26  12        Q.   Let me show you.  Is that the biography that you

02:39:34  13    wrote for Rudy based on what he told you?

02:39:37  14        A.   Exactly.

02:39:38  15        Q.   Did Rudy ever tell you that any of this was

02:39:42  16    false?

02:39:42  17        A.   No.

02:39:43  18        Q.   You heard that comment he made about the ferry

02:39:47  19    ride back from Delaware when he told you he wasn't a

02:39:50  20    Marine and he wasn't a vice-president.  Is that true?

02:39:52  21        A.   Never happened.

02:39:55  22        Q.   He told you this was his background?

02:39:58  23        A.   Yes.

02:39:58  24        Q.   And you put that on the site on reliance on what

02:40:03  25    he told you?

02:40:03   1      A.   Absolutely.

02:40:04   2      Q.   Did you have any reason to doubt him at that

02:40:07   3   point?

02:40:07   4      A.   No.

02:40:14   5      Q.   Did you buy any seats in the hedge fund?

02:40:17   6      A.   Yes, I did.

02:40:18   7      Q.   How many?

02:40:18   8      A.   I think I bought 12 seats.

02:40:22   9      Q.   So about $9,000?

02:40:24  10      A.   Yes.

02:40:25  11      Q.   Who did you buy them for?

02:40:26  12      A.   I bought --

02:40:28  13      Q.   I assume you bought one for yourself, your

02:40:31  14   family?

02:40:31  15      A.   I bought one for the Huebner family.  Then I

02:40:34  16   bought seats for, like, the Toledo Museum of Art, the

02:40:37  17   Toledo Symphony, Northwest Ohio Hospice, Ronald McDonald

02:40:43  18   House, Toledo Zoo, Washington Local Schools, Toledo

02:40:46  19   Public Schools.  And then I had -- oh, WGTE.

02:40:53  20      Q.   Why did you do that?

02:40:54  21      A.   Because I wanted to give back to the community.

02:40:58  22      Q.   Had you been active in the community on boards?

02:41:02  23      A.   Yes.

02:41:03  24      Q.   Like what?

02:41:03  25      A.   I served on the Toledo Symphony Board for

| | | |
|---|---|---|
| 02:41:06 | 1 | probably five years.  And I'm on the Board of the |
| 00:49:41 | 2 | Blair Museum of Lithophanes at the Toledo Botanical |
| 02:41:15 | 3 | Gardens, which is our family museum. |
| 02:41:18 | 4 | Q.  Going back to the hedge funds, were the BH Group |
| 02:41:23 | 5 | members required to buy dinar in order to get into the |
| 02:41:25 | 6 | hedge fund? |
| 02:41:27 | 7 | A.  Absolutely not. |
| 02:41:27 | 8 | Q.  Was there a time at which the amount of dinar you |
| 02:41:30 | 9 | purchased gave you a pecking order, if you will, in |
| 02:41:33 | 10 | terms of preference for the seats? |
| 02:41:35 | 11 | A.  Not really.  I put that out there to have some |
| 02:41:42 | 12 | essence of giving the BH Group members that two-week |
| 02:41:47 | 13 | notice.  And that's why I did that.  And that I didn't |
| 02:41:55 | 14 | want people that had, like, 500,000 dinar or that I knew |
| 02:42:01 | 15 | didn't have the capabilities once this came through to |
| 02:42:04 | 16 | get involved in a hedge fund when they had no business |
| 02:42:08 | 17 | being involved in it. |
| 02:42:09 | 18 | Q.  And you suggested that they have certain minimum |
| 02:42:13 | 19 | holdings? |
| 02:42:14 | 20 | A.  I did. |
| 02:42:14 | 21 | Q.  Did you do that to pump your sales? |
| 02:42:16 | 22 | A.  No, not at all. |
| 02:42:17 | 23 | Q.  It obviously had a benefit? |
| 02:42:20 | 24 | A.  It would have. |
| 02:42:21 | 25 | Q.  If they bought it from you? |

02:42:22   1     A.   Right.

02:42:23   2     Q.   But if you did that, would it --

02:42:26   3     A.   I bought it to protect them from themselves as

02:42:29   4   far as getting into the hedge fund.

02:42:30   5     Q.   You didn't want them to have too much money in

02:42:33   6   one place?

02:42:33   7     A.   Well, first of all, we didn't know really what it

02:42:36   8   would revalue at.  And I had something on there at if it

02:42:40   9   happened at a dollar, it would be a million-dollar

02:42:43  10   investment.  And if it went backwards, like if it

02:42:47  11   occurred at 50 cents, it would have been a $500,000

02:42:51  12   investment.  And I don't believe anybody should have

02:42:53  13   more than 20 percent of their net worth in any one

02:42:58  14   investment.

02:43:00  15     Q.   June of 2011 was the largest month for your dinar

02:43:06  16   sales?

02:43:09  17     A.   I believe so.

02:43:10  18     Q.   Was that because of the hedge fund sales?

02:43:12  19     A.   No.  There were about four major events that

02:43:17  20   happened in the progression of our growth from -- I say

02:43:23  21   our real growth happened from about July of 2010 to July

02:43:29  22   of 2011.  In that timeframe, the local banks and

02:43:35  23   regional banks quit selling dinar.  My theory on that is

02:43:43  24   they didn't want to put up with what I was putting up

02:43:47  25   with.

02:43:47  1      Q.   Which was what?

02:43:48  2      A.   People coming in wanting to know this, that, and

02:43:51  3  the other thing.  And banks don't want to be a resource.

02:43:55  4  They make a small margin on currency, and that's all

02:43:59  5  they wanted to do.

02:44:00  6          But it was kind of interesting that all these

02:44:02  7  banks around the country, smaller regional banks,

02:44:07  8  stopped selling about the same time.  And they used the

02:44:10  9  excuse that, Oh, we thought these people were buying

02:44:13  10 dinar to go to visit Iraq to have currency in Iraq.

02:44:18  11     Q.   So at some point people could no longer go to

02:44:21  12 Fifth Third or --

02:44:22  13     A.   Huntington.

02:44:23  14     Q.   -- any banks to buy --

02:44:24  15     A.   Correct.

02:44:25  16          The second thing was that when Rudy did come on

02:44:28  17 the calls, no question, people, you know, came there,

02:44:32  18 and they found out about the BH Group.

02:44:35  19          The third event was when Ali Agha, Dinar Trade,

02:44:40  20 actually stopped trading for a certain period of time

02:44:44  21 due to some family problems he had.

02:44:46  22     Q.   He was your supplier?

02:44:48  23     A.   He was my supplier.

02:44:50  24          And the fourth event basically was when we put up

02:44:54  25 a website, and people could go, and they saw my Dinar

02:44:58  1    101.  It became almost like a standard for the industry.

02:45:02  2    I was told that it had over half a million hits.

02:45:07  3        Q.  Now, in the course of developing this hedge fund,

02:45:10  4    did Mr. Coenen tell you he had obtained a manager for

02:45:15  5    the fund?

02:45:15  6        A.  Yes.

02:45:16  7        Q.  And he called Apex?

02:45:19  8        A.  Correct.

02:45:20  9        Q.  Did Apex appear to be properly in a position to

02:45:24  10   do that job?

02:45:24  11       A.  I did check Apex out on the internet, and I was

02:45:27  12   absolutely impressed.  They're big time.

02:45:30  13       Q.  And he told you he got a lawyer too?

02:45:33  14       A.  Right.

02:45:33  15       Q.  Did there come a time after about a month he told

02:45:36  16   you Apex was no longer there?

02:45:40  17       A.  I don't know if it was a month or longer, but

02:45:45  18   eventually he told me Apex withdrew.

02:45:49  19       Q.  And what reason did he give you for Apex

02:45:52  20   withdrawing?

02:45:53  21       A.  Rudy told me that Apex withdrew because all of

02:45:59  22   the members started calling them.  And actually that

02:46:03  23   made total sense with me because I know how it is to get

02:46:08  24   phone calls from people, and they want to know this

02:46:12  25   litany of answers and everything.  And I could only do

```
02:46:15   1   so many myself.

02:46:16   2       Q.   And the BH Group got those calls?

02:46:18   3       A.   We got them ourselves.

02:46:20   4       Q.   It didn't surprise you Apex got them?

02:46:22   5       A.   Right.

02:46:22   6       Q.   So you believed his explanation?

02:46:24   7       A.   Right.

02:46:24   8       Q.   Did you tell him you needed to get another

02:46:27   9   lawyer -- another manager?

02:46:29  10       A.   Absolutely.

02:46:29  11       Q.   Did he finally tell you he had?

02:46:31  12       A.   He did.

02:46:32  13       Q.   Who did he tell you he had hired?

02:46:33  14       A.   Hannah Terhune.

02:46:34  15       Q.   Did you look her up?

02:46:36  16       A.   I did.

02:46:36  17       Q.   What did you think?

02:46:37  18       A.   Sounded outstanding.  And the next thing I told

02:46:41  19   Rudy this time was, I want -- because I had told him I

02:46:45  20   wanted to go to New York City, and I wanted to meet Apex

02:46:48  21   and this lawyer.  But when he told me about Hannah

02:46:54  22   Terhune, I said:  When are we going to go see her?  I

02:46:57  23   want to see her, and I want to look her in the eyes.

02:47:00  24       Q.   When you got to the meeting on the -- let's step

02:47:03  25   back to April.  We heard about the Glimdropper post.
```

| | | |
|---|---|---|
| 02:47:06 | 1 | A.  Correct. |
| 02:47:06 | 2 | Q.  You saw that? |
| 02:47:07 | 3 | A.  Yes. |
| 02:47:08 | 4 | Q.  Did you believe it? |
| 02:47:09 | 5 | A.  No. |
| 02:47:10 | 6 | Q.  Why not? |
| 02:47:11 | 7 | A.  First of all, his moniker was Glimdropper.  There |
| 02:47:17 | 8 | was a picture of Jethro Tull, who for you older people, |
| 02:47:22 | 9 | you might know who Jethro Tull is.  He played the flute, |
| 02:47:26 | 10 | had a beret on, and looked like something out of the |
| 02:47:30 | 11 | '60s, and the guy is stoned.  And the Glimdropper is |
| 02:47:33 | 12 | actually a con game to a degree, as I found out from my |
| 02:47:40 | 13 | attorney here.  But that -- the bottom line is when |
| 02:47:46 | 14 | somebody sends me something from the internet, doesn't |
| 02:47:49 | 15 | tell me their name or who they are, I don't pay much |
| 02:47:52 | 16 | attention to it. |
| 02:47:53 | 17 | Q.  But you nonetheless passed it on to Rudy? |
| 02:47:56 | 18 | A.  Yes.  I think I sent Rudy an e-mail or something |
| 02:48:00 | 19 | saying:  If you've got anything to tell me, tell me now. |
| 02:48:04 | 20 | I want to know about it. |
| 02:48:05 | 21 | Q.  Did Rudy tell you what Glimdropper said was true? |
| 02:48:10 | 22 | A.  No. |
| 02:48:10 | 23 | Q.  He told you it was false? |
| 02:48:12 | 24 | A.  Exactly. |
| 02:48:12 | 25 | Q.  He denied it? |

```
02:48:14   1      A.   Absolutely.

02:48:14   2      Q.   We heard a call yesterday from June 27 in which

02:48:19   3   he makes a vigorous denial and says he's going to go

02:48:23   4   after him; he has his name and phone number, correct?

02:48:26   5      A.   Correct.

02:48:26   6      Q.   Certainly didn't admit it then?

02:48:28   7      A.   Correct.

02:48:29   8      Q.   Did you believe his denial?

02:48:31   9      A.   I did.

02:48:31   10      Q.   Nonetheless, in June you had some direct

02:48:35   11   communication with Glimdropper different than the point

02:48:38   12   about Rudy.  Do you recall that?

02:48:40   13      A.   Correct.

02:48:40   14      Q.   You went to Mr. Varner.  You two were talking

02:48:45   15   about how to respond?

02:48:46   16      A.   Correct.  Mr. Varner and PK, the IT guy, we were

02:48:51   17   working on the Emerging Gains website, and this issue

02:48:56   18   came up.

02:49:02   19          And I really was offended again by Glimdropper

02:49:07   20   making these comments.  And this time he's bringing the

02:49:10   21   BH Group in and saying we were a scam.  And so Mr.

02:49:16   22   Varner helped draft a letter to actually respond to this

02:49:22   23   voice over the internet.

02:49:25   24      Q.   And that was late June?

02:49:27   25      A.   I believe so.
```

02:49:28  1      Q.   The 26th, 27th, something like that?

02:49:31  2      A.   Right.

02:49:32  3      Q.   A month later you're with the FBI talking about

02:49:34  4  Rudy Coenen?

02:49:35  5      A.   Correct.

02:49:36  6      Q.   July 5 you have a meeting in Delaware?

02:49:41  7      A.   Correct.

02:49:41  8      Q.   You, Mr. Coenen, Mr. Brennan, and Ms. Terhune?

02:49:44  9      A.   Correct.

02:49:46  10     Q.   What do you recall about that meeting?

02:49:47  11     A.   A lot.

02:49:48  12     Q.   Tell the jury what you recall.

02:49:51  13     A.   Well, first of all, I met Rudy on the east coast,

02:49:57  14  and we had to take a ferry to go out to this location to

02:50:01  15  meet Hannah Terhune and her associate.  I didn't know

02:50:06  16  who he was at the time.  And so we get there, and we go

02:50:09  17  to this restaurant right at the terminal.  And Hannah

02:50:13  18  and her partner sit down on one side, and Rudy and I are

02:50:16  19  on the other side.  And the first question I asked her,

02:50:22  20  I said:  Hannah, we have taken money from people for

02:50:26  21  inception seats for this hedge fund.  Do we have a

02:50:30  22  problem?  That was the first thing I asked her.

02:50:35  23     Q.   What did she tell you?

02:50:37  24     A.   She looked at Mr. Brennan and said:  Jim, what

02:50:40  25  can we come up with here?  Can we come up with a --

02:50:47  1    what do you call that, a fund or a holding account.

02:50:51  2        Q.  Trust fund?

02:50:52  3        A.  Well, it's where you hold the money.

02:50:54  4        Q.  Escrow?

02:50:55  5        A.  Escrow account.  Can we come up with an escrow

02:50:58  6    account with an L.L.C. that can act as an intermediary

02:51:03  7    before we get this registered?   And I was glad to see

02:51:06  8    she at least was immediately creative.  And so then we

02:51:11  9    had our meeting.  And I think the meeting was at least

02:51:15  10   three hours.   It was until the next ferry was coming

02:51:18  11   over.  And the bottom line then was I told them about

02:51:24  12   Rudy and --

02:51:25  13       Q.  Rudy's right there?

02:51:26  14       A.  Rudy's right there.

02:51:28  15       Q.  Doesn't deny anything you say?

02:51:29  16       A.  He doesn't deny it.  And I didn't want him to

02:51:32  17   have to tell about himself.  So I told Hannah and Jim

02:51:37  18   about his background.  And he doesn't deny anything.

02:51:40  19   And I told them about my background, and learned a lot

02:51:45  20   about her and her company and their involvement in hedge

02:51:51  21   funds.  And I was very impressed.

02:51:53  22       Q.  And they agreed to continue representing you?

02:51:55  23       A.  Yes.

02:51:56  24       Q.  What did Hannah tell you she would do?

02:52:03  25       A.  Hannah, regarding the initial question, which was

02:52:08  1  a big thing for me, said:  I'll get back to you, Brad,

02:52:12  2  on what we can do, if anything.

02:52:15  3      Q.  Why was it such a big thing for you?

02:52:17  4      A.  I didn't -- I didn't know if there -- I had heard

02:52:21  5  something about taking money up front was not allowed or

02:52:26  6  if it was a violation of the SEC.  I'm completely out of

02:52:29  7  my realm.

02:52:30  8      Q.  And so you asked the lawyer?

02:52:31  9      A.  I asked the lawyer who we --

02:52:35  10     Q.  She said she'd get back to you?

02:52:35  11     A.  She said she'd get back to me.

02:52:38  12     Q.  And did she?

02:52:39  13     A.  She did.

02:52:43  14     Q.  About when?

02:52:44  15     A.  She got back about the 14th of that month at

02:52:48  16  about 9:00 at night.

02:52:55  17     Q.  Now, this e-mail doesn't go to you, correct?

02:53:01  18     A.  I don't see my name.

02:53:05  19     Q.  Could you blow that part up, please.

02:53:16  20         Now, in it she said:  I had to tell him today.

02:53:25  21  That's July 14.  That's when she called and told you you

02:53:29  22  had to return the money, right?

02:53:31  23     A.  She called me at approximately 9:00 at night and

02:53:34  24  said:  Brad, I have to tell you this.  You need to put

02:53:40  25  that money into an escrow account, and sooner would be

02:53:47  1   better than later.

02:53:50  2       Q.  Did you ever get a memo from that law firm about

02:53:55  3   that issue that you had to return the money?

02:54:02  4       A.  I don't believe so.

02:54:04  5       Q.  You heard her talk about having Mr. Brennan write

02:54:07  6   you a letter?

02:54:08  7       A.  Right.

02:54:08  8       Q.  Did you ever get a letter from Mr. Brennan?

02:54:11  9       A.  I don't believe so.

02:54:13  10      Q.  What did you do as a result of that phone call?

02:54:16  11      A.  At about 9:05 I called Rudy Coenen.

02:54:20  12      Q.  What did you tell him?

02:54:21  13      A.  I said:  Rudy, I just talked -- I got a phone

02:54:25  14   call from Hannah Terhune, and she told me that we have

02:54:28  15   to put that money for the inception seats into a trust

02:54:32  16   account.

02:54:34  17      Q.  What did Rudy tell you?

02:54:35  18      A.  Rudy said:  I'll get it handled.

02:54:38  19          The next thing I said to him, I said:  Do you

02:54:40  20   want me to send you the check for the $60,000 or

02:54:43  21   whatever it was, my compensation for getting the people

02:54:49  22   assigned for Bayshore Capital.

02:54:51  23          He said:  No, that's not necessary.  You earned

02:54:54  24   that money, and I've got money in a different account.

02:54:57  25   I'll take care of it.

02:54:58  1      I said:  Rudy, you need to take care of this

02:55:01  2   tomorrow.  And I need to get some proof that it's done.

02:55:04  3      Q.  You had been after him for some time to get

02:55:07  4   records of where the funds were?

02:55:09  5      A.  Kelly and Shelby, who were doing all the

02:55:12  6   processing of the paperwork, wanted to make sure that

02:55:17  7   these people were getting -- that this money was going

02:55:21  8   into the account, and they wanted to see the bank

02:55:24  9   statements reflecting how much they had sent.

02:55:27  10      Q.  At one point you held checks?

02:55:31  11      A.  Yes.

02:55:31  12      Q.  Because you wanted to put pressure on him to send

02:55:34  13   you records?

02:55:35  14      A.  Kelly and Shelby were really handling a lot of

02:55:38  15   that.  I knew there was some problem about that, and I

02:55:41  16   probably talked to Rudy and said:  Rudy, give the

02:55:44  17   information to the girls because they need it.

02:55:47  18      Q.  Did you start getting calls from people whose

02:55:50  19   checks were being held about the fact that they had not

02:55:54  20   gone through?

02:55:54  21      A.  That was the problem.  Everybody wanted to know

02:55:57  22   what's their seat number and where is my -- why has my

02:56:03  23   check not been cashed, on and on.

02:56:07  24      Q.  So you eventually sent them down?

02:56:09  25      A.  Yes.

| | | |
|---|---|---|
| 02:56:09 | 1 | Q. You sent all the money to Rudy Coenen? |
| 02:56:11 | 2 | A. That is correct. |
| 02:56:12 | 3 | Q. You sent all of the applications to Rudy Coenen? |
| 02:56:15 | 4 | A. That is correct. |
| 02:56:15 | 5 | Q. They were found in his Jacksonville office? |
| 02:56:18 | 6 | A. That is correct. |
| 02:56:19 | 7 | Q. Now, in late June you also were looking at a |
| 02:56:23 | 8 | different business.  Do you recall that? |
| 02:56:25 | 9 | A. Yes. |
| 02:56:26 | 10 | Q. Pull up Exhibit 587, please.  Can you enlarge the |
| 02:57:01 | 11 | check, please. |
| 02:57:02 | 12 | That's a check from you? |
| 02:57:03 | 13 | A. Yes. |
| 02:57:04 | 14 | Q. To Ari Seaman? |
| 02:57:05 | 15 | A. Correct. |
| 02:57:05 | 16 | Q. From Commercial Energy Products? |
| 02:57:07 | 17 | A. Correct. |
| 02:57:08 | 18 | Q. And it looks like it says three percent grow |
| 02:57:12 | 19 | lights; is that correct? |
| 02:57:12 | 20 | A. That's correct. |
| 02:57:13 | 21 | Q. Can you tell the jury what that's about? |
| 02:57:15 | 22 | A. Ari, who was the exclusive rep for EverLast |
| 02:57:20 | 23 | Manufacturing, EverLast kind of changed the marketing |
| 02:57:27 | 24 | agreement with Ari, and they started taking on other |
| 02:57:32 | 25 | people around the state.  And -- |

```
02:57:35   1      Q.  EverLast is the induction lighting company?
02:57:41   2      A.  Induction lighting company, correct.
02:57:44   3          And I totally understood what the owner was going
02:57:47   4   through.  He was growing so fast, and the faster he
02:57:51   5   grew, the more money he needed.  He needed a traditional
02:57:54   6   plant, equipment, inventory, employees, and all that.
02:57:57   7   So he had to work an arrangement out with financing
02:58:02   8   companies to basically pay for the orders up front.  And
02:58:06   9   so Ari and a couple of his associates went off into a
02:58:12  10   niche market of lighting.  And it's come to pass here
02:58:19  11   quite a bit in the last year versus back then.  And this
02:58:25  12   induction lighting was the lighting that was the most
02:58:29  13   successful in the cannabis industry.
02:58:32  14      Q.  Medical marijuana?
02:58:33  15      A.  Marijuana industry.  And also they had a major
02:58:38  16   player in Sandusky, Ohio, Farmer Jones, who converted
02:58:44  17   his whole operation for vegetables and greenhouse.  And
02:58:51  18   this guy was big time.  He manufactured baby miniature
02:58:57  19   vegetables for the Whitehouse, Ritz-Carlton, a big time
02:59:02  20   guy.
02:59:04  21      Q.  And you started in May of '11.  You put in
02:59:08  22   10,000.
02:59:08  23          Can you pull up 588, please.
02:59:14  24          That's a check that's dated June 24?
02:59:30  25      A.  Right.
```

02:59:31   1        Q.   Another $10,000?

02:59:32   2        A.   Right.

02:59:32   3        Q.   What was that for?

02:59:33   4        A.   The total of this, if you see down in the lower

02:59:37   5   corner, was for 3 percent of the company.  And that came

02:59:42   6   out of Ari Seaman's share.

02:59:44   7        Q.   You paid $20,000?

02:59:46   8        A.   Right.

02:59:49   9             MR. KERGER:  Your Honor, this might be an

02:59:51  10   appropriate time to break.

02:59:52  11             THE COURT:  Are you about to go into a new

02:59:55  12   topic?

02:59:55  13             MR. JACKSON:  Yes.

02:59:56  14             THE COURT:  Okay.  We'll take our lunch

02:59:58  15   break then at this time.  It's almost noon.  One hour,

03:00:02  16   please.  And remember the rules.  We're in recess.

03:56:25  17             (Lunch recess taken.)

03:56:30  18             (The jury is not present; in the courtroom

03:56:39  19   with Juror Number 3.)

03:57:26  20             THE COURT:  Let the record reflect we're in

03:57:28  21   the courtroom with counsel and our parties, and no one

03:57:33  22   else other than the staff.  And we have Juror Number 3

03:57:36  23   here.  And the reason why we've called you in is it's

03:57:39  24   come to my attention that you had a conversation, a

03:57:42  25   brief conversation with a cousin today.

03:57:46  1              THE JUROR:  I was startled to see -- I had

03:57:48  2      walked down there, and I came back out, and I looked,

03:57:51  3      and I thought:  Oh, my gosh, it's my cousin Jack.

03:57:54  4              THE COURT:  What a nice name, too.

03:57:57  5              THE JUROR:  And I said -- and I haven't seen

03:58:01  6      him for ages.  And I said -- normally I never say to

03:58:05  7      somebody:  Remember me?

03:58:06  8              THE COURT:  Let me stop you for a second.

03:58:08  9      Relax.

03:58:11  10             THE JUROR:  Okay.

03:58:12  11             THE COURT:  What I want to inquire first is

03:58:15  12     how close a cousin is he to you?

03:58:17  13             THE JUROR:  He is my first cousin, but I

03:58:18  14     have not talked to him --

03:58:20  15             THE COURT:  In how long?

03:58:22  16             THE JUROR:  I'm going to say the last time I

03:58:24  17     physically saw him is when his mother passed away about

03:58:27  18     seven years ago.

03:58:29  19             THE COURT:  Do you talk on the phone or

03:58:31  20     anything like that?

03:58:32  21             THE JUROR:  No.

03:58:32  22             THE COURT:  So the last time you talked or

03:58:34  23     saw him would have been seven years ago?

03:58:36  24             THE JUROR:   Just about, yes.

03:58:37  25             THE COURT:  Do you know what he does for a

03:58:39  1    living?

03:58:40  2                    THE JUROR:  I just know that -- because

03:58:41  3    we're the same age, I just know that he has a law

03:58:45  4    degree.  But as far as I know, he hasn't practiced,

03:58:50  5    because I know that he and his wife were owners of a

03:58:54  6    travel agency.  And as far as I knew, Jack hadn't been

03:58:58  7    practicing law.

03:59:00  8                    THE COURT:  Do you know why he's in the

03:59:02  9    courthouse, why you saw him today?

03:59:04  10                   THE JUROR:  No.  I just assumed that he was,

03:59:06  11   you know, somebody that was here just watching or

03:59:11  12   whatever.

03:59:14  13                   MR. BOSS:  No questions.

03:59:15  14                   THE COURT:  Does anybody want me to inquire

03:59:16  15   any further?

03:59:18  16                   MR. KERGER:  No, Your Honor.

03:59:19  17                   MR. JACKSON:  No.  Thank you.

03:59:36  18                   (Discussion had off the record.)

03:59:50  19                   THE COURT:  Everyone is fine.  Are you okay?

03:59:52  20                   THE JUROR:  Yes.

03:59:53  21                   THE COURT:  Call in the rest of the jurors,

03:59:56  22   please.

04:01:46  23                   (Jury enters the courtroom).

04:01:49  24                   THE COURT:  Counsel may continue with

04:01:51  25   redirect.

```
04:01:54   1    BY MR. KERGER:
04:02:07   2       Q.  Mr. Huebner, you were developing a website called
04:02:11   3    Emerging Gains?
04:02:12   4       A.  Yes.
04:02:13   5       Q.  Tell the jury how that came about and what it
04:02:17   6    intended to do.
04:02:20   7               THE WITNESS:  Could you speak a little
04:02:21   8    louder, please.
04:02:21   9               THE COURT:  Yes, you're not coming through
04:02:54  10    very clearly.
04:02:54  11       Q.  Emerging Gains, can you tell the jury what the
04:02:57  12    concept was?
04:02:58  13       A.  Yes.  The focus in the dinar world had been rate
04:03:04  14    and date.  And that put people that were investing on
04:03:09  15    the emotional roller coaster, as we called it, the dinar
04:03:13  16    roller coaster.
04:03:17  17               Also, when we were going to be asking people to
04:03:21  18    put $1 million into a hedge fund once the revaluation
04:03:25  19    happened, I thought it was critically important that
04:03:30  20    they understand what was going on in Iraq, to see visual
04:03:36  21    pictures of Iraq.  All you saw in the American media was
04:03:41  22    IED bombs going off, all negative news about the
04:03:47  23    military operations in Iraq and the decimation that it
04:03:51  24    was causing.
04:03:53  25               Simultaneous to this, you had companies like
```

04:03:56  1    General Electric and Seaman and major oil companies that

04:04:02  2    were making huge progress building electrical plants,

04:04:09  3    all types of infrastructure, and yet nobody ever heard

04:04:13  4    any of the positive news about Iraq.  And as I explained

04:04:19  5    before, the rest of the Middle East countries are

04:04:24  6    burgeoning economies and beautiful architectures, and

04:04:28  7    I'm sure some of you have seen Dubai; it's basically

04:04:33  8    Iran and Iraq were left in the stone age.  So Emerging

04:04:39  9    Gains was going to be a website, and I had a little

04:04:43  10   phrase about it:  It's the country, not the currency.

04:04:47  11   We weren't going to talk about the currency whatsoever.

04:04:51  12   We wanted to give people all kinds of journalistic

04:04:54  13   information and pictures about what was truly happening

04:04:58  14   inside Iraq so that they would feel good about their

04:05:03  15   investment.

04:05:05  16       Q.   Who came up with the idea?

04:05:06  17       A.   I actually did and PK.  And they decided, you

04:05:13  18   know, that they --

04:05:14  19       Q.   They, who?

04:05:15  20       A.   PK and Tim Varner, excuse me.

04:05:19  21            They wanted to take it even further and have,

04:05:23  22   like, a news reporting for different countries that were

04:05:28  23   going through this Arab spring.  Each of these

04:05:32  24   countries was fighting for their independence away from

04:05:36  25   the monarchs or dictators that were running these

04:05:40　1　countries.   And what we found was that social media was

04:05:43　2　able to mobilize the people like never before.   And guys

04:05:49　3　like Muammar Gaddafi and Assad and these people, really

04:05:56　4　their days are numbered because now with the thirst for

04:05:59　5　freedom, people are not going to put up with this kind

04:06:03　6　of dictatorship.   And you see what's happened in the

04:06:06　7　ensuing months since the original Arab spring started

04:06:11　8　with the fruit vendor that put himself on fire.   That

04:06:14　9　was the catalyst.

04:06:15　10　　Q.   When did you start this development on Emerging

04:06:22　11　Gains?

04:06:22　12　　A.   I really was very sensitive to this whole rate

04:06:25　13　and date issue, that whole theme of education.   I think

04:06:29　14　the first seed came out in a meeting with PK and I

04:06:34　15　probably in about April/May of 2011.

04:06:39　16　　Q.   When did work begin in earnest in putting the

04:06:43　17　website up?

04:06:44　18　　A.   Well, we decided to have it a fixed date, so we

04:06:50　19　put pressure on ourselves to be able to make sure that

04:06:53　20　we would come through.

04:06:55　21　　Q.   What date did you pick?

04:06:57　22　　A.   We picked July 27, 2011.   And from a marketing

04:07:04　23　point of view, we just started putting little seeds out

04:07:09　24　on our calls that something big was going to happen on

04:07:12　25　July 27th, so stay tuned, you know, just a curiosity

04:07:18  1  point.  But I think in earnest the work -- it was more

04:07:24  2  or less IT work and journalistic work began in May of

04:07:30  3  2011.

04:07:32  4      Q.  Who was doing it?

04:07:33  5      A.  Prakash, PK, was doing all of the IT work, and

04:07:40  6  Tim and I were working on the website.  He was working

04:07:46  7  with journalists, photographers, and I was educating him

04:07:51  8  as to what I thought we should be looking at presenting

04:07:56  9  in this website.

04:07:57  10     Q.  Now, PK and Varner were being paid?

04:08:01  11     A.  Yes, they were.

04:08:02  12     Q.  Who paid them?

04:08:02  13     A.  Rudy Coenen did from Bayshore.

04:08:05  14     Q.  How did that come about?

04:08:06  15     A.  Rudy was actually at a meeting in Toledo, and it

04:08:10  16  was one of our brainstorming meetings, and Rudy got

04:08:21  17  really excited when he understood the full spectrum of

04:08:25  18  the Emerging Gains website; and wanted to know if he

04:08:30  19  paid for it, could he participate in it.  I kind of felt

04:08:37  20  obligated because he had let me become part of the hedge

04:08:40  21  funds, so I said:  Rudy, I have no problem with that.

04:08:43  22     Q.  Now, when did you work?  Would you work during

04:08:48  23  the day?

04:08:49  24     A.  Well, my day was pretty busy.  I mean, I --

04:08:54  25  towards the end we committed to three nights a week, all

04:09:00  1   three of us get together.   Rudy never got together on

04:09:03  2   the project.

04:09:05  3       Q.   He's in Jacksonville?

04:09:06  4       A.   He's in Jacksonville.

04:09:08  5       Q.   The three of you are in Toledo working three

04:09:10  6   nights a week and during the day to hit this July 27th

04:09:14  7   deadline?

04:09:15  8       A.   That is correct.

04:09:16  9       Q.   Were you prepared to hit the deadline?

04:09:18  10      A.   Yes, we were.

04:09:19  11      Q.   Would there have been a fee to view the website?

04:09:21  12      A.   Yes, there was.

04:09:22  13      Q.   What was the fee?

04:09:24  14      A.   At first I had no -- I didn't even think about

04:09:28  15   having it be a subscription site.

04:09:31  16      Q.   Who thought that up?

04:09:32  17      A.   Actually Tim Varner, and then Rudy felt pretty

04:09:39  18   strongly about it as well.

04:09:41  19      Q.   What was the fee?

04:09:43  20      A.   The fee was going to be, like, $9 a month.   And

04:09:52  21   it made perfect sense for me because I'm familiar with

04:09:56  22   other types of subscription sites.   And I knew the dinar

04:10:01  23   community was thirsty for information about Iraq because

04:10:04  24   none of us knew what was really going on in the country

04:10:10  25   and ever see visual pictures of Iraq.

04:10:13    1      Q.  Was the idea that you'd upload the information

04:10:17    2   once, and that would be it?

04:10:18    3      A.  No.  There would be constant adaptations to the

04:10:24    4   site and, you know, and have it be like a daily or

04:10:27    5   weekly site of different things that were going on in

04:10:31    6   Iraq.

04:10:32    7      Q.  All dedicated to Iraq?

04:10:33    8      A.  All dedicated to Iraq.  And the rule we had was

04:10:39    9   that there was not to be any mention of the dinar or the

04:10:42   10   currency.

04:10:44   11      Q.  And you couldn't go on to that site and buy

04:10:46   12   dinar?

04:10:47   13      A.  No.

04:10:49   14      Q.  Did there come a time when you and Rudy had an

04:10:53   15   argument?

04:10:53   16      A.  Yes.

04:10:54   17      Q.  How did that come about?

04:10:55   18      A.  It came about because we were doing the site, Tim

04:11:03   19   and Prakash and I, and this Glimdropper -- second

04:11:12   20   Glimdropper letter came.  And Mr. Varner was dealing

04:11:17   21   with various people in Iraq, and the particular people

04:11:23   22   were the royal family -- representative of the royal

04:11:28   23   family of Kurdistan, which Kurdistan is the northern

04:11:32   24   region of Iraq.  And the gentleman seemed pretty excited

04:11:37   25   about what we were going to do.  And he said:  Well, we

04:11:40  1   will definitely have to check out the management of the

04:11:42  2   company.

04:11:43  3       Q.   What did Tim say to you about that?

04:11:45  4       A.   He said:  We've got a problem with all these

04:11:49  5   rumblings on the internet with Rudy.  What can we do

04:11:54  6   about it?

04:11:55  7       Q.   And whether true or not, you knew those

04:11:59  8   rumblings would stay there on the internet?

04:12:04  9       A.   Yes.

04:12:05  10      Q.   Be publicly available forever, even if proven

04:12:08  11  false?

04:12:08  12      A.   Correct.

04:12:09  13      Q.   Did you believe them to be true?

04:12:10  14      A.   No, I didn't at the time.

04:12:11  15      Q.   Were you hiding that stuff from people from

04:12:13  16  Kurdistan because you were trying to defraud them?

04:12:16  17      A.   No.

04:12:16  18      Q.   What were you trying to do?

04:12:18  19      A.   I was basically just trying to have a clean

04:12:29  20  slate, if you will, showing me as the manager of this

04:12:31  21  fund because I didn't know if there was anything

04:12:34  22  relative to the allegations on the internet.  And if it

04:12:39  23  wasn't true, then I didn't want it to hurt the

04:12:42  24  reputation of Emerging Gains.

04:12:44  25      Q.   Did you have a lot of time to investigate and

04:12:46  1    make changes?

04:12:47  2       A.  No.  Because we were on the time schedule, and we

04:12:51  3    were applying for credit card financial deals.  And I

04:13:01  4    had a business advisor in Las Vegas that did a lot of my

04:13:05  5    L.L.C.s for me, and he needed X amount of time to get it

04:13:10  6    done.  So Tim and PK and I agreed that I would form the

04:13:17  7    L.L.C. myself, and then what I would do is make a

04:13:20  8    separate profit sharing agreement with Rudy.

04:13:25  9       Q.  Rudy was upset with that?

04:13:29  10      A.  Yeah.

04:13:30  11      Q.  Did he yell at you?

04:13:31  12      A.  Yes.

04:13:31  13      Q.  Came back to Toledo and secretly recorded the

04:13:34  14    conversation with you?

04:13:35  15      A.  Yes, he did.

04:13:36  16      Q.  We tried to play that a couple days ago, but the

04:13:39  17    audio was really bad?

04:13:41  18      A.  Correct.

04:13:41  19      Q.  This is after he's supposedly told you he's not a

04:13:44  20    Marine, and he's not a former JP Morgan employee, right?

04:13:48  21      A.  Right.

04:13:49  22          MR. KERGER:  Your Honor, the government has

04:13:50  23    prepared a transcript of that tape, which is better than

04:13:53  24    the tape.  I'd like to read certain excerpts from that.

04:13:59  25          MR. CRAWFORD:  That's fine with us, Your

04:13:59 1 Honor.

04:14:01 2 BY MR. KERGER:

04:14:01 3    Q.  Beginning on page 5, the sentence at line 15.

04:14:06 4      "Mr. Coenen:  So I've taken over the website.  I

04:14:21 5 signed the agreements, the revenue sharing, and I'm

04:14:25 6 giving you the revenue sharing here.  I think it's very

04:14:28 7 admirable.  If you do one million, you're going to get

04:14:31 8 $150,000 to $200,000.  I think that's really cool on my

04:14:34 9 part.  It's sweat equity.  You haven't put any equity

04:14:38 10 into it.  As a matter of fact, all you do is $170,000

04:14:42 11 for over a month and a half."

04:14:44 12      What's he referring to?

04:14:45 13    A.  He was referring to the Bayshore Capital checks

04:14:48 14 for the hedge funds.

04:14:51 15    Q.  "I want to tell you what that caused.  That

04:14:53 16 caused checks to start bouncing in my account because

04:14:56 17 they were written in May, and you held the checks all

04:14:59 18 the way from May for 30 days" --

04:15:06 19        THE COURT:  Whoa.  You're going too fast.

04:15:11 20 You're like a train out of control.

04:15:11 21 BY MR. KERGER:

04:15:16 22    Q.  "You held checks all the way from May for 30

04:15:19 23 days, right upon a check it gets cancelled.  So I've got

04:15:23 24 thousands of dollars bouncing on me, and I've got to

04:15:27 25 contact these clients about -- to tell them to reissue a

04:15:31  1   check.  How in the hell does that work?  Brad, you were

04:15:35  2   [inaudible].

04:15:38  3        "What happened is that you let guys screw with

04:15:41  4   your brain.  For about a month and a half all that

04:15:44  5   happened was you thought he was right, and I was wrong,

04:15:46  6   and you never stood by me."

04:15:48  7        What did you understand that to refer to.

04:15:52  8   A.   I understood that Rudy didn't think that I was

04:15:57  9   standing by him.

04:16:04  10  Q.   "And you know, Brad, that's basically the last

04:16:11  11  month and a half.  And you may not realize it, Brad, but

04:16:14  12  the way you were talking to me, everyday questioning me

04:16:16  13  on accounting, questioning me on where the money was

04:16:19  14  being spent, questioning me on what I was doing; I was,

04:16:23  15  like:  Wait a minute, here.  I'm an investment advisor.

04:16:27  16  And I know ethically what to do with money, so I'm very

04:16:31  17  transparent.  I save -- don't save every receipt, guys.

04:16:36  18  I'm asinine when it comes to receipts and how I place my

04:16:39  19  account, especially monies that I don't need to be

04:16:42  20  applied for a certain project.  But you questioned me.

04:16:44  21  And it didn't become a question of accounting; it was

04:16:46  22  now a question of ethicals.  And you were so adamant

04:16:50  23  about it."

04:16:50  24       Do you recall him saying that?

04:16:51  25  A.   Yes, I do.

04:17:09  1      Q.  "You know what I told you on the ferry.  What do

04:17:12  2  you mean, I'm not on there?  You told me you blew up,

04:17:16  3  and I'm not putting you on there because of this and

04:17:18  4  that.  But, you know, Brad, I would have said:  Hey, my

04:17:21  5  partner, you know what, on the internet you have a bad

04:17:24  6  reputation, but in person, I've met his family, I've

04:17:27  7  been to his home, I've been to his office, I've seen

04:17:30  8  what he's doing.  It's consistent with what he says.

04:17:33  9  You know what the facts are, so he can" -- these are Mr.

04:17:36 10  Coenen's words -- "so he can go fuck himself.  I'm

04:17:39 11  going to stand by my partner.  You know what Marines do?

04:17:42 12  They stand by each other.  I don't give a shit what they

04:17:46 13  do; they stand one by one next to each other through

04:17:48 14  thick and thin, and that's the way I was brought up."

04:17:52 15      Did he tell you that?

04:17:53 16      A.  Yes, he did.

04:17:54 17      Q.  He said he'd been in the Marines, right?

04:17:58 18      A.  Yes.

04:17:59 19      Q.  After he supposedly told you on the ferry boat he

04:18:03 20  wasn't?

04:18:03 21      A.  That is correct.

04:18:11 22      Q.  He stormed out?

04:18:12 23      A.  Yes.

04:18:13 24      Q.  This was about when?

04:18:15 25      A.  It was about 6:00 at night.

| | | |
|---|---|---|
| 04:18:21 | 1 | Q.  No, what day, ballpark? |
| 04:18:23 | 2 | A.  Towards the middle of July, I believe. |
| 04:18:27 | 3 | Q.  Maybe ten days from when the site has to go up? |
| 04:18:30 | 4 | A.  Correct. |
| 04:18:31 | 5 | Q.  And you tried to save the situation? |
| 04:18:32 | 6 | A.  Yes. |
| 04:18:34 | 7 | Q.  You sent him a proposal that we've seen? |
| 04:18:36 | 8 | A.  Yes. |
| 04:18:37 | 9 | Q.  Pull up Exhibit 147, please. |
| 04:19:04 | 10 | You sent him an e-mail dated July 19? |
| 04:19:07 | 11 | A.  I believe so. |
| 04:19:08 | 12 | Q.  And in that you say you're not going to put him |
| 04:19:13 | 13 | in management because of this concern about the |
| 04:19:16 | 14 | internet? |
| 04:19:16 | 15 | A.  Correct. |
| 04:19:25 | 16 | MR. KERGER:  I'm advised it's 146, Your |
| 04:19:30 | 17 | Honor. |
| 04:19:36 | 18 | That's not the right one. |
| 04:19:37 | 19 | I'll go on.  The government showed it to |
| 04:19:42 | 20 | him.  The July 19. |
| 04:19:42 | 21 | BY MR. KERGER: |
| 04:19:44 | 22 | Q.  You remember? |
| 04:19:45 | 23 | A.  Yes. |
| 04:19:46 | 24 | Q.  July 19.  You were trying to stop him from |
| 04:19:49 | 25 | blowing up Emerging Gains? |

04:19:51    1       A.   Correct.

04:19:51    2       Q.   You'd invested money and time in it?

04:19:54    3       A.   A lot.

04:19:55    4       Q.   And you told people it was going to come out on

04:19:57    5   the 27th?

04:19:57    6       A.   Right.  Our credibility was on the line.

04:19:59    7       Q.   Did you know if what Glimdropper was saying was

04:20:03    8   true?

04:20:03    9       A.   No, I did not.

04:20:05   10       Q.   He, in fact, in an argument just days before said

04:20:10   11   Glimdropper was a liar, that you'd been to his home,

04:20:13   12   you'd seen his family, you knew what he was about,

04:20:16   13   didn't he?

04:20:16   14       A.   Yes, he did.

04:20:18   15       Q.   And then you had a phone call late one night.  Do

04:20:23   16   you recall that?

04:20:24   17       A.   Oh, yes.

04:20:25   18       Q.   PK?

04:20:26   19       A.   PK called me.

04:20:27   20       Q.   What did he say when he called you?

04:20:29   21       A.   PK called me about midnight, and I could tell

04:20:33   22   there was something definitely wrong.  His voice was

04:20:37   23   very apprehensive, very shaky.

04:20:40   24            And he said:  I've got to see you.

04:20:44   25            I said:  Well, come on down to the office in the

04:20:47  1   morning.

04:20:47  2         He said:  No, I've got to see you now.

04:20:50  3         I was very startled.  I said:  Well, where are

04:20:53  4   you?

04:20:53  5         He goes:  I'm up in Ann Arbor at whatever hotel.

04:20:57  6         I said:  Okay, I'll be there.

04:21:00  7         So I got in my car and drove up to Ann Arbor.  I

04:21:04  8   arrived there about 1:00.

04:21:06  9   Q.   What was the discussion that ensued?

04:21:08  10  A.   Tim Varner was there and PK, and I was in the

04:21:14  11  lobby, and they came down from their room, and I could

04:21:18  12  tell something was dramatically wrong.  And so I was

04:21:22  13  sitting there.

04:21:23  14        And PK goes -- said something about:  There's

04:21:28  15  something we have to share with you.

04:21:31  16        I go:  What is it?

04:21:33  17        He goes:  Rudy Coenen isn't who he says he is.

04:21:38  18  Q.   What did he say about him?

04:21:40  19  A.   Well, I think he produced a report then from a

04:21:46  20  private investigator that he had hired, and he started

04:21:53  21  going through it, you know, relating different issues.

04:21:57  22  Q.   Did it have bankruptcies?

04:21:59  23  A.   It had bankruptcies.

04:22:02  24  Q.   DUI?

04:22:02  25  A.   Yes.

04:22:06  1      Q.   Domestic violence?

04:22:08  2      A.   Yes.

04:22:08  3      Q.   Say anything about the Marines?

04:22:09  4      A.   No.

04:22:10  5      Q.   Did it say anything about JP Morgan?

04:22:13  6      A.   No.

04:22:13  7      Q.   What was your reaction?

04:22:15  8      A.   There was basically for the first time some

04:22:23  9  physical proof that contradicted a lot of the stuff Rudy

04:22:29  10  had said to me before.

04:22:32  11      Q.   Were you shaken by it?

04:22:34  12      A.   Very shaken.

04:22:35  13      Q.   Did they give you a copy?

04:22:36  14      A.   No, they did not.

04:22:37  15      Q.   What did you do to get a copy?

04:22:39  16      A.   I had to go hire the same private investigator to

04:22:42  17  get the copy.

04:22:43  18      Q.   You read it?

04:22:44  19      A.   Yes.

04:22:45  20      Q.   What did you do?

04:22:46  21      A.   I -- I think I was there on, like, a Wednesday

04:23:00  22  night or something.  And I didn't get the copy, I don't

04:23:04  23  believe, from the private investigator for a few days.

04:23:08  24  I'm not sure about that.  But the next morning -- or no,

04:23:12  25  that night, I believe, I went home and just started

04:23:16  1  reflecting on issues about Rudy and tried to put pros

04:23:21  2  and cons, literally, on the paper of -- to try to make

04:23:27  3  sense of this whole thing.  And then the next morning I

04:23:30  4  called Mike Teadt.

04:23:31  5      Q.  Why did you call Mike?

04:23:32  6      A.  Because I trust Mike.  Mike's a very bright guy.

04:23:36  7  He's a friend.  And he knows Rudy.  And I wanted to get

04:23:40  8  his opinion on what I should do because I really didn't

04:23:46  9  know what to do, who to go to at this time.

04:23:50  10     Q.  What was decided on that call?

04:23:52  11     A.  Well, he said:  Brad, do you remember Marty

04:23:56  12  Torgler from Miami?  He's an FBI guy out of Detroit.

04:24:00  13         I said:  Yeah, I played ball with Marty at Miami.

04:24:05  14  And he was from Toledo Woodward.  So he had apparently

04:24:10  15  called Marty and got his permission for me to call him.

04:24:15  16         And Saturday --

04:24:17  17     Q.  Did you call Marty?

04:24:18  18     A.  Yes, I did.  I called him Saturday morning.  And

04:24:21  19  Marty said:  You're doing absolutely the right thing.

04:24:26  20  And he said:  I'll try to make an appointment with you

04:24:29  21  with the FBI on the first part of the week.

04:24:33  22     Q.  Did you make an appointment?

04:24:35  23     A.  Marty called me back on, I believe, Monday and

04:24:38  24  gave me the name of Tom Pearson and phone number, and I

04:24:43  25  called that day.  And as soon as he could see me was

04:24:48  1   Wednesday, which happened to be July 27th.

04:24:51  2       Q.   The launch date?

04:24:53  3       A.   The launch date of our program.

04:24:57  4       Q.   You went down?

04:24:58  5       A.   I -- I mean, obviously this is something you just

04:25:04  6   don't do is call the FBI and go down there.  I mean,

04:25:07  7   it's a serious deal.  And so I decided I would take an

04:25:12  8   attorney with me to this meeting.

04:25:16  9       Q.   Did you?

04:25:16  10      A.   I did.

04:25:17  11      Q.   Who did you take?

04:25:18  12      A.   Bill Lindsley.

04:25:19  13      Q.   A friend?

04:25:20  14      A.   Friend and attorney.

04:25:24  15      Q.   You went there.  Who did you meet with?

04:25:26  16      A.   I met with Tom Pearson.  And unbeknownst to me,

04:25:30  17   Special Agent Eric Kost was in the meeting.

04:25:33  18      Q.   Did you have any idea you were being

04:25:35  19   investigated?

04:25:36  20      A.   None whatsoever.

04:25:38  21      Q.   Did you go down there because you knew Rudy was a

04:25:41  22   bad guy or because you expected he might be?

04:25:44  23      A.   I expected he might be.

04:25:47  24      Q.   You went down there, and you told them what you

04:25:49  25   knew?

04:25:49  1      A.   Right.

04:25:51  2      Q.   The meeting ended?

04:25:53  3      A.   Yes.  Bill Lindsley had an appointment at about

04:25:58  4  10:30 he had to go to.  We were there from about 9:00

04:26:03  5  to 10:00.  So we went back.  Bill had to go to his

04:26:07  6  appointment.  I went back to my office.

04:26:09  7      Q.   The meeting was shorter than you anticipated?

04:26:11  8      A.   Yes.  I -- honestly, I didn't know how long the

04:26:14  9  meeting would last.

04:26:14  10     Q.   So you go back to your office?

04:26:16  11     A.   I get back to my office about 10:15.

04:26:19  12     Q.   What are you doing?

04:26:21  13     A.   I went into the training room and made a phone

04:26:24  14  call to Ari Seaman, who was my partner on Commercial

04:26:32  15  Energy Products, and my back was to the door.

04:26:34  16     Q.   What happened next?

04:26:36  17     A.   I'll never forget it.  I heard the door slam

04:26:41  18  open, and the next thing I knew, there's two SWAT guys

04:26:47  19  with guns and badges and --

04:26:51  20     Q.   Were there guns?

04:26:53  21     A.   I think they were on their hips, but all I saw

04:26:57  22  were guns and badges and guys yelling at me to put my

04:27:00  23  hands up in the air and get out into the room.

04:27:04  24     Q.   And you did that?

04:27:05  25     A.   I did that.

04:27:05    1        Q.   Were your other employees out there?

04:27:07    2        A.   My other employees were lined up against the

04:27:10    3   wall.

04:27:10    4        Q.   How long were you in the office that day?

04:27:12    5        A.   I sat in my office in a catatonic state of shock

04:27:18    6   for about seven hours while my office was raped.

04:27:22    7        Q.   They took all your money?

04:27:24    8        A.   They took all my money, all my records.  And when

04:27:27    9   I went and had to go to the bathroom, somebody followed

04:27:31   10   me in there to.

04:27:33   11        Q.   They followed you in there?

04:27:36   12        A.   Yeah.

04:27:39   13        Q.   After they left, did you find out your home had

04:27:43   14   been searched too?

04:27:44   15        A.   I think I got a phone call during the process

04:27:47   16   that my home was being raided.  And my 82-year-old

04:27:53   17   mother-in-law who had Parkinson's was living with us,

04:27:56   18   she was there; a first-day cleaning lady; and one of my

04:28:02   19   wife's friends.

04:28:07   20        Q.   They took records, computers, and money from your

04:28:09   21   house?

04:28:10   22        A.   They took records and all of the dinar.

04:28:12   23        Q.   About how many dinar did you have there?

04:28:14   24        A.   I had about 2.5 billion dinar at -- that I was

04:28:22   25   holding in my home.

04:28:23  1        Q.   Did you consider those your dinar?

04:28:25  2        A.   That was my dinar of all the profits from the

04:28:28  3    business.   I reinvested them into dinar.

04:28:34  4        Q.   What happened to Rudy?

04:28:37  5        A.   Nothing.

04:28:39  6        Q.   Nothing happened to him in August?

04:28:41  7        A.   Nothing.

04:28:42  8        Q.   Anything happen to him in September?

04:28:44  9        A.   Nothing.

04:28:44  10       Q.   Anything happen to him until January of 2012?

04:28:47  11       A.   To my -- the best of my knowledge.

04:28:50  12       Q.   Did that confuse you?

04:28:52  13       A.   Yeah.

04:28:53  14       Q.   Why?

04:28:54  15       A.   I go to the FBI to report that I think I'm being

04:28:58  16   conned.   And the next thing I know, I'm stripped of

04:29:02  17   everything I own and treated like a criminal.

04:29:05  18       Q.   What happened to the guy you went in to raise

04:29:09  19   questions about?

04:29:09  20       A.   Nothing.

04:29:14  21       Q.   Let's talk about the specific claims of the

04:29:16  22   government.   They contend that you made false statements

04:29:19  23   about the applicability of Executive Order 13303.

04:29:24  24       A.   Correct.

04:29:25  25       Q.   Did you make those statements?

04:29:26    1    A.  I did.

04:29:27    2    Q.  Did you believe them to be true when you made

04:29:30    3    them?

04:29:30    4    A.  Absolutely made them to be true.

04:29:33    5    Q.  Had you seen other sites on the website

04:29:36    6    referencing Executive Order 13303?

04:29:38    7    A.  Every site.  And actually President Bush, along

04:29:42    8    with our other coalition force, Tony Blair, did an

04:29:46    9    equivalent of the 13303 so the people of Great Britain

04:29:50   10    could buy and be treated as an Iraqi -- have the rights

04:29:55   11    of an Iraqi citizen.

04:29:59   12    Q.  Did you know they were suggesting that you're

04:30:04   13    saying that the DeLaRue machine was not authenticating

04:30:09   14    your money?

04:30:09   15    A.  That?

04:30:10   16    Q.  They contend you say the DeLaRue machine

04:30:14   17    authenticates your money.

04:30:15   18    A.  That's what I was being told.

04:30:16   19    Q.  Did you believe that to be true?

04:30:17   20    A.  I did.

04:30:18   21    Q.  Why did you believe that?

04:30:19   22    A.  I never had a problem at all with any of the

04:30:22   23    money.

04:30:22   24    Q.  And you got a certificate?

04:30:24   25    A.  I got a certificate of authenticity with every

04:30:27  1    shipment.

04:30:27  2        Q.   They claim you made false statements about the

04:30:30  3    availability of insurance for investments in Iraq.

04:30:34  4        A.   That's correct.

04:30:35  5        Q.   Did you see on the other sites saying about

04:30:37  6    insurance being available for investments?

04:30:39  7        A.   Yes, I did.  It wasn't the exact wording that

04:30:42  8    Rudy used, but the whole concept and principle of being

04:30:46  9    able to protect your investments and only have a ten

04:30:50  10   percent exposure was what he was talking about.

04:30:54  11       Q.   They say you said that the U.S. Government holds

04:30:58  12   trillions in dinars.  Did you see that on the internet?

04:31:01  13       A.   Unequivocally, yes.

04:31:03  14       Q.   Is that why you said it?

04:31:04  15       A.   Yes.

04:31:08  16       Q.   They say you said Rudy was a Marine.  You said

04:31:13  17   that?

04:31:13  18       A.   Yes.

04:31:13  19       Q.   Why?

04:31:13  20       A.   Because Rudolph Coenen told me he was a Marine.

04:31:17  21       Q.   Do you remember sitting on the floor with him and

04:31:20  22   having him tell you the story about being shot?

04:31:23  23       A.   I'll never forget it.

04:31:24  24       Q.   And then he showed you the scars?

04:31:26  25       A.   Yes.

04:31:26   1        Q.   On his own body?

04:31:27   2        A.   Yeah.   We were at a hotel in Daytona Beach,

04:31:31   3   Florida for the last hedge fund meeting.   A friend of

04:31:39   4   mine, who actually we were on the same high school team,

04:31:42   5   extremely successful businessman who had been to

04:31:45   6   Coenen's operations and talked to Rudy, pulled the wool

04:31:49   7   over his eyes as well.   But he -- Rudy told Ted Morse

04:31:54   8   [phonetically] and I the story, the true story of how he

04:31:58   9   took a bullet to the point where he was in an armored

04:32:04  10   personnel carrier; he went up in the snow, and he was

04:32:07  11   looking out over the scenery, and all of a sudden he

04:32:10  12   gets hit in the shoulder, and the radio operator and

04:32:13  13   another guy behind him both were killed.   And he had to

04:32:19  14   carry somebody or something.   But he ended up getting a

04:32:22  15   transfusion, and on and on.   But the clincher was that

04:32:27  16   he said:   Every Christmas I go visit the widows of those

04:32:31  17   two men and give them money.

04:32:38  18        Q.   Did you say that he was a former trader for JP

04:32:43  19   Morgan?

04:32:43  20        A.   That's what he told me.

04:32:44  21        Q.   Did you believe that to be true?

04:32:46  22        A.   I didn't have any reason not to believe it to be

04:32:48  23   true.

04:32:48  24        Q.   In every setting which you were with Rudy Coenen

04:32:52  25   and he talked about currency and finance, did he seem

04:32:54  1   believable to you?

04:32:55  2       A.  Yes.  Absolutely.

04:33:00  3       Q.  They say you lied about having a New York office.

04:33:04  4   Did someone open an office with Davinci?

04:33:07  5       A.  Absolutely.

04:33:08  6       Q.  Had an office address?

04:33:09  7       A.  Yes.  It was a virtual office that many people

04:33:12  8   use in business.  It's an economic way to have a very

04:33:20  9   good place that you're going to entertain clients

04:33:22  10  without having constant overhead of the business office.

04:33:30  11      Q.  Now, the hedge fund, they say there were two

04:33:33  12  hedge funds that you talked about.  Did you --

04:33:36  13      A.  Pardon me?

04:33:37  14      Q.  Did you talk about two hedge funds?

04:33:39  15      A.  Yes.

04:33:40  16      Q.  Did you believe what you were saying was true?

04:33:42  17      A.  Absolutely.

04:33:43  18      Q.  Now, Ms. Terhune came on and talked about forming

04:33:49  19  some limited liability company with the hedge fund?

04:33:51  20      A.  Yes.

04:33:52  21      Q.  That was work that was done?

04:33:54  22      A.  Correct.  Somebody had sent me paperwork to sign

04:33:57  23  on that; but I had no, really, idea of the inner

04:34:01  24  workings of forming a hedge fund.

04:34:05  25      Q.  Now, were the members of the BH Group also

04:34:10  1    sending you research they did?

04:34:13  2        A.   I mean, we were inundated with articles and

04:34:19  3    information that people thought they were being helpful

04:34:22  4    to us.  But I had a tremendous team of young ladies that

04:34:27  5    were working non-stop probably nine, ten hours a day,

04:34:32  6    and there was only so much time to -- we had a live chat

04:34:39  7    system, actually, but we couldn't view every e-mail that

04:34:43  8    people sent us.

04:34:46  9        Q.   Now, you registered as a Money Service Business

04:34:49  10   at some point?

04:34:50  11       A.   Correct.

04:34:50  12       Q.   How did you become aware that you had to register

04:34:53  13   as a money service business?

04:34:54  14       A.   Well, for the first quite a few months, I wasn't

04:35:00  15   really -- I never really thought I had a business for

04:35:04  16   the first five or six months.  I was just selling to

04:35:07  17   friends and family.  And when it exploded, I talked to

04:35:12  18   Ali Agha, who was my supplier.  I consider myself, like,

04:35:15  19   a sub rep for Dinar Trade.  And I let everybody know I

04:35:20  20   was getting my dinar from Dinar Trade.

04:35:23  21            And I asked Ali, I said:  Ali, you know, this

04:35:29  22   thing is getting bigger.  Do I have to have some kind of

04:35:32  23   license to sell dinar?

04:35:34  24            He said:  Yeah, all you have to do is register as

04:35:37  25   a money service business.

04:35:39  1          And, you know, and so I sent in some forms and

04:35:45  2    asked him some questions, and he told me what to do, and

04:35:50  3    I actually registered.  And the company was right up in

04:35:53  4    Detroit, Michigan.

04:36:04  5       Q.  Can you tell the jury whose handwriting is on

04:36:07  6    this document?

04:36:08  7       A.  That's mine.

04:36:09  8       Q.  And about when were you putting this handwriting

04:36:12  9    on that document?

04:36:15  10      A.  I think it was probably in November or -- late

04:36:21  11   November, early December of 2010.

04:36:25  12      Q.  That's the date from the internet.

04:36:32  13      A.  Okay.

04:36:33  14      Q.  Does that sound about right?

04:36:34  15      A.  Okay.

04:36:35  16      Q.  Now --

04:36:36  17              MR. BOSS:  What was that date?

04:36:37  18              MR. KERGER:  12-27-10.

04:36:42  19              MR. BOSS:  Thank you.

04:36:43  20   BY MR. KERGER:

04:36:44  21      Q.  The second page, is that a memo you sent Ali?

04:36:49  22      A.  Yes.

04:36:50  23      Q.  You're asking his guidance to see if you're doing

04:36:52  24   things right?

04:36:53  25      A.  Right.

04:36:53  1    Q.  Did he come back and correct you?

04:36:55  2    A.  Yes.  He told me what to do.

04:36:57  3    Q.  And you did?

04:36:58  4    A.  I did.

04:37:00  5    Q.  And as of January you thought you were registered

04:37:04  6    as a money service business?

04:37:05  7    A.  Correct.

04:37:05  8    Q.  Now, as a part of that did you and Ali discuss

04:37:08  9    what would happen at the time of the revaluation?

04:37:11  10   A.  Yes.

04:37:13  11   Q.  What was going to happen at the revaluation?

04:37:15  12   A.  Well, Ali was by far the biggest dinar trader in

04:37:19  13   the world.  And he was doing about $4 million a day in

04:37:26  14   the United States.  And he had decided he was going to

04:37:31  15   open about six locations around the United States where

04:37:36  16   people could go in and cash their dinars.  And Ali and

04:37:41  17   Frank Villa from Toledo, who had the KTFM organization,

04:37:47  18   which, as I mentioned, was a large organization, Ali

04:37:53  19   told Frank that he would put a cashing center in Toledo,

04:37:59  20   Ohio.

04:37:59  21        Well, Ali asked me to go out and find a suitable

04:38:05  22   location for him because he knew I also had an

04:38:09  23   organization, tens of thousands of people in northwest

04:38:13  24   Ohio.  So I went out to the -- where I thought would be

04:38:20  25   the best, most secured professional place to have a

04:38:26  1    cashing center, and I chose the Crown Plaza Hotel in

04:38:31  2    downtown Toledo.  It's been -- originally was the

04:38:35  3    Sofitel, now it's a Best Western or something, but it's

04:38:38  4    the most beautiful hotel, I think, in Toledo.  And I met

04:38:42  5    with managers there.  I went through all of the possible

04:38:47  6    security issues, not that I'm qualified as far as

04:38:52  7    security, but just from a visual point of view; they had

04:38:58  8    valet parking where people could come up and take their

04:39:01  9    dinars and then have the car parked, and they could go

04:39:05  10   right in the hotel, and up on the next level there was

04:39:07  11   three big conference rooms where they could cash in

04:39:11  12   their dinars.  And it seemed like a suitable location.

04:39:15  13   So I had arranged that for Ali, and he was very

04:39:19  14   appreciative of that.

04:39:20  15      Q.   Did Ali tell you about any forms that would have

04:39:22  16   to be turned in by your members at the time of the

04:39:26  17   revaluation?

04:39:26  18      A.   Yes.  We discussed the procedures for what was

04:39:30  19   going to be necessary, you know, when the people came

04:39:35  20   and what they would need as far as identification, and

04:39:38  21   forms, and that type of thing.

04:39:42  22           MR. KERGER:  Bring up Exhibit 62, please.

04:39:52  23   BY MR. KERGER:

04:39:52  24      Q.   What is that?

04:39:53  25      A.   This is a form, a currency transaction report.

04:39:57  1    And what I did was I put what Ali told me as far as what

04:40:05  2    the people would have to do to fill it out because

04:40:08  3    that's what he was going to require to cash in their

04:40:11  4    dinars.

04:40:12  5        Q.   He's telling you this is what the members of the

04:40:15  6    BH Group would have to fill out themselves?

04:40:17  7        A.   That is correct.

04:40:18  8        Q.   To bring in at the time of the revaluation?

04:40:20  9        A.   And that he would have these forms available to

04:40:23  10   them.

04:40:23  11       Q.   You posted those on the web?

04:40:25  12       A.   I posted those in concert with a written set of

04:40:29  13   instructions what the entire cashing procedure would be

04:40:34  14   so that the people would know exactly what to do.

04:40:39  15       Q.   Did you understand this to be the form that the

04:40:42  16   banks filled out when you would make deposits over

04:40:45  17   $10,000?

04:40:46  18       A.   I did not.

04:40:49  19       Q.   Can I have Exhibit 17, please.

04:41:09  20            Can you tell us what that is?

04:41:10  21       A.   This is a form that I filled out for my daughter

04:41:14  22   who was living out of town, and I wanted to have that

04:41:18  23   ready for all my children, and I would cash it out for

04:41:22  24   them.

04:41:23  25       Q.   Could you go down to the third page, please.

04:41:30  1        What's that?

04:41:32  2     A.   That is a letter from my daughter that -- giving

04:41:40  3  me permission to cash in her Iraqi dinar and where to

04:41:47  4  send the money.

04:41:48  5     Q.   We heard about an e-mail from your daughter back

04:41:52  6  when you were starting in the dinar business about the

04:41:55  7  potential of being a scam.  Is that the same daughter?

04:41:58  8     A.   It is my same daughter.

04:42:12  9     Q.   You mentioned a procedure you developed for

04:42:14  10  cashing in dinars?

04:42:15  11     A.   Yes.

04:42:16  12     Q.   Is that --

04:42:16  13     A.   This is it.

04:42:22  14     Q.   You were prepared for the revaluation in December

04:42:26  15  of 2010?

04:42:31  16     A.   Yes.

04:42:36  17     Q.   Now, did there come a time when you were

04:42:39  18  concerned about compliance?

04:42:40  19     A.   Yes, there was.

04:42:41  20     Q.   Money service business regulations?

04:42:43  21     A.   Yes, there was.

04:42:44  22     Q.   About when was that?

04:42:45  23     A.   When -- when Ali exited the business for a while,

04:42:52  24  he was my primary -- he was my supplier of dinar.  And

04:42:58  25  so I had to look for another supplier of dinar.  And a

04:43:03  1  friend of mine put me in touch with Ty Rhame, who is the

04:43:07  2  president of what was called Dinar Banker or Sterling

04:43:12  3  Currency.

04:43:12  4      Q.  And you talked to him about compliance?

04:43:15  5      A.  Well, I called Ty and asked if he would be my

04:43:22  6  supplier.  He asked me what kind of volume I was doing.

04:43:27  7  And I asked him what kind of price would he give me for

04:43:31  8  that kind of volume.  And surprising to me, he gave me a

04:43:36  9  ten percent better price than Ali was giving me.

04:43:40  10      Q.  So you went with him?

04:43:41  11      A.  I went with him.

04:43:43  12      Q.  Did you discuss compliance with him?

04:43:46  13      A.  As the -- as I got to know Ty, and I asked more

04:43:53  14  questions about Sterling Currency, and he started asking

04:43:57  15  me:  Brad, are you doing this?  Are you doing that?

04:44:01  16  And he said, you know, we just went through an audit,

04:44:08  17  and it's very important to have your compliance in

04:44:12  18  order.

04:44:12  19      Q.  Did you talk with him to get some guidance about

04:44:16  20  where to go?

04:44:17  21      A.  Yes, I did.

04:44:17  22      Q.  Pull up Exhibit 65, please.

04:44:27  23          What are these?

04:44:28  24      A.  These are some Post-it notes that I had right on

04:44:31  25  my cubicle in front of me on my -- at my desk.

04:44:41   1      Q.   Could you bring up that one.

04:44:43   2      A.   Yes.

04:44:44   3      Q.   I'm asking Melissa to enlarge that one.

04:44:50   4           What's that relate to?

04:44:53   5      A.   When we were talking about compliance, I really

04:44:58   6   was not aware that I had to fill out forms when people

04:45:02   7   brought money in to the BH Group, and I found out

04:45:07   8   that -- through Ty that if anybody brought in $10,000

04:45:12   9   worth of cash, I had to fill out a CTR for them.

04:45:17  10      Q.   And you have done that, it looks like an org,

04:45:22  11   acams.org?

04:45:23  12      A.   I think it stands for anti-criminal something or

04:45:28  13   another.

04:45:28  14      Q.   What was its purpose?

04:45:30  15      A.   Its purpose was to send me to a site to get some

04:45:36  16   information about compliance.

04:45:38  17      Q.   What's the note at the bottom here?

04:45:42  18      A.   I was going to post an ad in either the local

04:45:49  19   paper or a national paper.  I had talked to Jodi DuFour,

04:45:57  20   the manager of Bank of America, and I asked Jodi about

04:46:00  21   compliance.  I said:  What do the banks do?

04:46:03  22           She said:  Well, we have compliance directors.

04:46:06  23           So I thought, well, maybe one of the best things

04:46:09  24   to do is to try to find a retired compliance guy that

04:46:12  25   would want to come in and do our compliance work for us.

04:46:15  1      Q.   When you talked about CTR, did you understand
04:46:18  2   that that applied to the banks too?
04:46:20  3      A.   I did not.
04:46:21  4      Q.   You thought that was just for the money service
04:46:23  5   business?
04:46:24  6      A.   Right.
04:46:27  7      Q.   Can you go back to the original exhibit.  Enlarge
04:46:30  8   this one.
04:46:34  9           What's that relate to?
04:46:35  10     A.   This is information that I had when I helped Rudy
04:46:42  11  set up the virtual office with Davinci Corporation in
04:46:46  12  New York.
04:46:49  13     Q.   Would you highlight the top right.
04:47:10  14          Can you tell us what that relates to?
04:47:12  15     A.   I'm not sure.  I think maybe Ty had told me or
04:47:16  16  somebody had told me to go to MSB.gov and get the
04:47:22  17  regulations and the pamphlets and the booklets on really
04:47:26  18  starting to get into the whole compliance issue of a
04:47:30  19  money service business.
04:47:36  20     Q.   You can take that down.
04:47:38  21          Now, had you been aware that banks had to fill
04:47:48  22  out a form if you deposit $10,000?
04:47:50  23     A.   I knew there was a form that they had to fill
04:47:53  24  out.
04:47:54  25     Q.   Do you know whose form it was?

04:47:56  1      A.   I thought it was the bank's form.

04:47:58  2      Q.   You went to Key?

04:47:59  3      A.   I went to Key.

04:48:00  4      Q.   Was that the first place you ran into it?

04:48:02  5      A.   It is.

04:48:03  6      Q.   Tell the jury what happened.

04:48:04  7      A.   Well, it actually was one of my first deposits.

04:48:08  8  And you have to understand with my company, Hardy &

04:48:11  9  Dishner, they grew from $2 million to approximately

04:48:14  10  $100 million.  I had full accounting departments and

04:48:18  11  monitors and accountants, but we never dealt in any real

04:48:23  12  cash.  And I was not -- I've never been in business

04:48:28  13  where I've been involved with a cash business.  So I

04:48:31  14  waltz into -- after selling some of my personal dinar to

04:48:35  15  my friends, I had to give them -- I was giving them

04:48:41  16  cash, so if they sent me -- gave me a check, and if it

04:48:44  17  bounced, I was out the cash.  So I was getting cash; I

04:48:48  18  required cash for cash.

04:48:49  19        So the first time I went in to Key Bank, and I

04:48:54  20  didn't have a commercial account there; I had a personal

04:48:58  21  account.  I'd been with Key or its predecessors for 40

04:49:02  22  years.  And everybody knew me there.

04:49:05  23        They said -- I presented $13,000 worth of cash.

04:49:08  24  And they said, Mr. Huebner, you know, we're going to

04:49:11  25  have to fill out a form here for you.

04:49:14  1        And I said:  What's that all about?

04:49:15  2        They said:  It's a bank form, and you've got to

04:49:20  3   let us fill it out.  And she said:  If you put in more

04:49:24  4   than $10,000, you have to fill out this form.  If you

04:49:27  5   put in less than $10,000, you don't have to fill out a

04:49:31  6   form.

04:49:31  7      Q.   Did she tell you there was anything wrong with

04:49:33  8   putting in less than $10,000?

04:49:35  9      A.   No, she did not.

04:49:38  10     Q.   You went to the Bank of America?

04:49:42  11     A.   The reason I went to the Bank of America is we

04:49:44  12  started getting customers all over the United States,

04:49:49  13  and I wanted to have a bank where -- because a lot of

04:49:56  14  these people were asking questions:  Can we just do a

04:49:59  15  bank transfer account-to-account, or can we wire

04:50:01  16  transfer from our Bank of America or whatever bank.  So

04:50:06  17  I didn't actually even know at the time there was two

04:50:09  18  Bank of Americas right over the line in Michigan.

04:50:14  19  Because I knew there weren't any Bank of Americas in

04:50:17  20  northwest Ohio.  So I find out there was a Bank of

04:50:21  21  America up in Lambertville.  I went up there.  I opened

04:50:24  22  a personal account.

04:50:28  23     Q.   And did you ask about this bank policy?

04:50:31  24     A.   I did.  I was wondering, since Key Bank was kind

04:50:36  25  of a regional bank, if the same rule applied up there at

04:50:41  1    a national bank.  I said:  Do you have the $10,000 rule

04:50:45  2    for forms?

04:50:46  3            And they said:  Yes.

04:50:49  4        Q.  And did you make deposits, bring in bundles of

04:50:53  5    money, more than $10,000, and deposit it?

04:50:56  6        A.  I did.  And I said that, you know, I wanted it --

04:51:01  7    have it less than $10,000.  And they gave the money back

04:51:04  8    to me.

04:51:04  9        Q.  They would count it in the machine?

04:51:06  10       A.  Right.

04:51:06  11       Q.  Then just give the cash back to you?

04:51:08  12       A.  Some would count it in the machine, and some

04:51:11  13   would hand count it.

04:51:12  14       Q.  Brenda said she hand counted it?

04:51:15  15       A.  Brenda was old school on that.

04:51:17  16       Q.  Did that happen more than once?

04:51:18  17       A.  Yes.

04:51:19  18       Q.  Did anybody tell you that was a problem, giving

04:51:21  19   money back?

04:51:22  20       A.  No, they didn't.

04:51:26  21       Q.  You had a checking account at Key and one at

04:51:31  22   Huntington.  Why did you open the one at Huntington?

04:51:33  23       A.  I opened the one at Huntington because the one at

04:51:35  24   Key Bank is where I first started doing all my dinar

04:51:38  25   business.  After about three months I get a phone call

04:51:41  1   from a gentleman at Key Bank saying:  Mr. Huebner, why

04:51:44  2   all of a sudden do you have all this cash coming in to

04:51:48  3   your account?

04:51:49  4        I said:  Well, I'm selling Iraqi dinar, and told

04:51:51  5   him the whole story.

04:51:53  6        And he said it sounded interesting.  And I had no

04:51:57  7   idea what he was doing.

04:51:59  8        And about a month later I went in to make a

04:52:02  9   deposit, and the teller said:  You're going to have to

04:52:05  10  see the assistant manager.  So I went over, and she

04:52:08  11  said:  Brad, they closed your account.

04:52:12  12       I said:  What?

04:52:13  13       And they said:  Do you want -- we can write you a

04:52:17  14  check now or send you the money.  So I took the check,

04:52:21  15  and after a 40-year relationship was out the door.

04:52:26  16  Q.   Did you go to Huntington?

04:52:28  17  A.   I went right across the street to Huntington on

04:52:31  18  Executive Parkway near Costco on Central Avenue and

04:52:34  19  opened up an account and deposited that check into my

04:52:37  20  Huntington account because I needed a personal bank

04:52:40  21  account.

04:52:40  22  Q.   What was the purpose of the Key and Huntington

04:52:43  23  Bank accounts?  What kind of bills did you pay?

04:52:46  24  A.   Personal bills, real estate, taxes, bank loans,

04:52:51  25  that type of thing.

04:52:52  1        Q.   Now, before you went to the Bank of America in

04:52:54  2   Michigan, you already had a Bank of America out in

04:52:56  3   Tennessee?

04:52:57  4        A.   Yeah.   I had opened up the Energy Saver Advisors

04:53:02  5   account in Nashville when I was down there, and I really

04:53:12  6   had, quite honestly -- had not forgot about it, but I

04:53:19  7   wasn't focused on my money.   I hadn't been using it;

04:53:24  8   let's put it that way.

04:53:25  9        Q.   You opened two accounts at Bank of America in

04:53:28  10  Michigan?

04:53:28  11       A.   I did.

04:53:29  12       Q.   Why?

04:53:30  13       A.   We got into a situation where people were putting

04:53:35  14  money into our accounts, and Kelly and Shelby were

04:53:43  15  getting calls from people, and let's say somebody

04:53:47  16  wanted --

04:53:47  17       Q.   Brad, one second.   Why were they putting money in

04:53:50  18  your accounts?

04:53:51  19       A.   They wanted to buy dinar, and they wanted it sent

04:53:55  20  immediately.

04:53:56  21            And so what happened was when people put money in

04:54:00  22  your bank account, you don't get real verification for a

04:54:03  23  couple days on that, who it is.   These people wanted

04:54:07  24  their dinar right away.   So what they would do is they'd

04:54:11  25  put the money in their bank, and so that we could see

04:54:15 1    who it was, let's say we had four people buying a

04:54:18 2    million dinar, and it was $1,100.  We had --

04:54:22 3         Q.  All paying the same amount; the wire transfer is

04:54:26 4    the exact same amount of money?

04:54:28 5         A.  Right.  Kelly would tell them, you use $11,000

04:54:31 6    and one penny.  The next one would be $11,000.02.  So we

04:54:35 7    would know who it actually was and we could send the

04:54:37 8    dinar out to that person immediately that day.

04:54:42 9         Q.  Mike Teadt.  When did you meet Mike?

04:54:46 10        A.  I met Mike at Botanical Gardens probably -- I

04:54:51 11   think it was in 2010 in the spring.

04:54:55 12        Q.  What did you meet, what was the occasion?

04:55:01 13        A.  I was going out to visit our family museum there.

04:55:05 14   And there was -- I found out there was a trade show,

04:55:07 15   and --

04:55:09 16        Q.  What kind of trade show?

04:55:10 17        A.  Well, you know, I don't know if it was a trade

04:55:13 18   show or the Toledo artists.

04:55:15 19        Q.  Some event?

04:55:17 20        A.  Huh?

04:55:18 21        Q.  Some event?

04:55:19 22        A.  Some event at Toledo Botanical Gardens.

04:55:23 23        Q.  Why did you stop to talk to Mike?

04:55:24 24        A.  Mike had a booth rented for -- I remember it was

04:55:28 25   wood clad energy saving windows.  And I had just done my

04:55:33  1    daughter's house, and they weren't wood clad, because

04:55:36  2    that would have been real expensive.

04:55:38  3        Q.   Were you interested because you're trying -- you

04:55:43  4    were with Energy Saver Advisors at the time?

04:55:44  5        A.   Yes.

04:55:45  6        Q.   Did you two talk?

04:55:46  7        A.   Yes, we did.

04:55:47  8        Q.   Talk about --

04:55:49  9        A.   We were talking about energy saving products.  I

04:55:52  10   had quite a few different products.   He was kind of

04:55:55  11   interested in what my line of energy saving was versus

04:55:58  12   what he was doing.

04:55:59  13       Q.   Other than that, he's unemployed?

04:56:03  14       A.   Yes.

04:56:04  15       Q.   The window thing?

04:56:05  16       A.   Correct.

04:56:05  17       Q.   Did he talk to you about buying or renting one of

04:56:08  18   your cubicles?

04:56:10  19       A.   Mike indicated that he wanted to have some type

04:56:13  20   of a legitimate office space where he could either bring

04:56:17  21   customers to or operate out of.

04:56:19  22       Q.   And he began renting a cubicle?

04:56:21  23       A.   Yes, he did.

04:56:22  24       Q.   Did you talk to him about Energy Saver Advisors,

04:56:25  25   becoming a part of that?

04:56:27   1        A.   I'm not sure if it was right then that we were

04:56:33   2   going in the transition to CEP or not.  But it was all

04:56:38   3   energy related.

04:56:39   4        Q.   Did you want him involved in CEP?

04:56:43   5        A.   Definitely.

04:56:44   6        Q.   Why?

04:56:44   7        A.   Because he's a very sharp individual, and when I

04:56:48   8   realized what we had with the induction lighting and

04:56:51   9   what I saw with Cobo, the potential was unlimited.  And

04:56:56  10   I wanted somebody that had business acumen that was

04:57:01  11   presentable, articulate.  And, you know, I thought Mike

04:57:07  12   would be a great candidate.

04:57:11  13        Q.   Now, would he occasionally deliver dinar for you?

04:57:15  14        A.   Would Mike deliver dinar?

04:57:17  15        Q.   Right.  To somebody who came --

04:57:20  16        A.   Oh, absolutely.

04:57:21  17        Q.   And would he get paid for that?

04:57:23  18        A.   No.

04:57:24  19        Q.   Did you ever pay him for anything he did with

04:57:27  20   respect to dinar?

04:57:28  21        A.   Absolutely not.

04:57:29  22        Q.   How about the deposits of the money to PNC?  How

04:57:33  23   did that come about?

04:57:35  24        A.   Well, it actually came about as a security issue.

04:57:40  25   You know, we were downtown on St. Clair Street.  There

04:57:43  1   had been some problems with homeless people living in

04:57:50  2   the stairwells there.  And the dichotomy of our

04:57:54  3   customers was from A to Z.  And our girls there started

04:58:02  4   feeling very uncomfortable with the amount of cash.  And

04:58:06  5   Mike offered -- he said, would you like me to take some

04:58:08  6   cash?  I'll walk over to PNC.

04:58:11  7           I said:  That would be great.  Just get it out of

04:58:13  8   here.

04:58:13  9       Q.  Would he do that from time to time?

04:58:16  10      A.  Yes, he would.

04:58:17  11      Q.  Did he get paid to do that?

04:58:19  12      A.  No, he would not.

04:58:20  13      Q.  Did there come a time when you went back to Wood

04:58:24  14  County and Ms. Dewitt?

04:58:28  15      A.  There apparently must have been.  I was so

04:58:33  16  inundated, it's hard for me to remember that.  But I do

04:58:39  17  remember striking up conversations with her again.

04:58:44  18      Q.  Somehow you got involved with Wood County again,

04:58:47  19  this time for two jobs an for Commercial Energy

04:58:50  20  Products?

04:58:50  21      A.  That is correct.

04:58:51  22      Q.  Did you talk to Ms. Dewitt about the training?

04:58:54  23      A.  Yes, I definitely remember that because I'm sure

04:59:02  24  I had to write another business plan, but I had already

04:59:04  25  written a very comprehensive business plan for Energy

04:59:08   1    Saver Advisors that I had submitted back in 2009.  And

04:59:12   2    Commercial Energy Products really wasn't that much

04:59:15   3    different except that we were going to focus on

04:59:17   4    induction lighting.  And she was very laissez-faire

04:59:24   5    about it.  Well, just fill out this or fill out that.

04:59:27   6          And I said:  Well, Mary, as far as this training

04:59:31   7    goes, when I've got two people and limited resources,

04:59:36   8    the only kind of real training we can do is on-the-job

04:59:41   9    training, and that's where you learn everything as you

04:59:43  10    go.

04:59:43  11    Q.  And what did she say?

04:59:45  12    A.  She said:  Of course.

04:59:49  13    Q.  Now, the hours you put in there, did you discuss

04:59:52  14    those with her?

04:59:52  15    A.  Yes, I did.

04:59:53  16    Q.  Before you put them in?

04:59:54  17    A.  Yes.

04:59:55  18    Q.  What did she say about the hours?

04:59:56  19    A.  I said:  We work ten to 12 hours a day here at

05:00:00  20    the BH Group or -- and I said:  I'm just basically going

05:00:05  21    to fill in the hours for every day because that's the

05:00:08  22    on-the-job training.  We will do certain specific

05:00:13  23    training about products or whatever, but the only way

05:00:17  24    these people are going to learn the business is get in

05:00:19  25    and get their feet dirty and learn the business by doing

05:00:23  1   it all day long and see what problems come up during the

05:00:27  2   day.

05:00:28  3       Q.  Did she say that was okay?

05:00:30  4       A.  Yes.

05:00:30  5       Q.  Is that the form you turned in?

05:00:32  6       A.  That's the form I turned in.

05:00:35  7       Q.  Now, did there come a time when she sent you an

05:00:38  8   e-mail about changing that plan?

05:00:40  9       A.  Yes.

05:00:41  10      Q.  253, please.  Can you enlarge at the top.

05:00:55  11          It's from Mary Dewitt to you?

05:00:58  12      A.  Yes.

05:00:59  13      Q.  December 10, 2010?

05:01:01  14      A.  Correct.

05:01:03  15      Q.  And she's talking about Mr. Teadt's original

05:01:06  16  training plan?

05:01:06  17      A.  Correct.

05:01:07  18      Q.  And she wants to go back and change it, right?

05:01:12  19      A.  Correct.

05:01:18  20      Q.  Now, here she wants to do the same thing with

05:01:30  21  Bland's training plan, change it?

05:01:32  22      A.  Right.

05:01:33  23      Q.  And the training is pretty much over at this

05:01:35  24  point?

05:01:35  25      A.  Exactly.

05:01:38  1      Q.  Did you think that was odd?

05:01:39  2      A.  Yes.  But from -- the whole thing was kind of

05:01:45  3  bizarre, and I remember I even invited her, and she

05:01:51  4  brought her boss down to see our facilities and all of

05:01:54  5  that type of thing.  But Mary was always just kind of

05:01:58  6  out there.

05:02:00  7      Q.  Did it seem to you that the records were not all

05:02:03  8  that important?

05:02:04  9      A.  Absolutely.

05:02:06  10     Q.  You can take that down.

05:02:09  11         The Treasury Vault.  After the raid, did you

05:02:12  12  become involved with the Treasury Vault?

05:02:17  13     A.  On the 27th of July, my world changed forever.

05:02:24  14  And I got a phone call the next day from a friend of

05:02:32  15  mine who was called Dinar Daddy.  He was one of the

05:02:36  16  larger dinar sites in the United States.  And he said:

05:02:41  17  Brad, I want to help you.  And he said:  You've got a

05:02:46  18  very fine organization.  What are you going to do?

05:02:52  19         I said:  Roger, I'm still in a state of shock.

05:02:55  20         He said:  Let me send my vice-president out.

05:02:57  21  I'll send my attorney out.  And we've got some ideas.

05:03:01  22     Q.  Did you enter into an arrangement with him or did

05:03:06  23  he have access to the arrangements to supply their

05:03:08  24  dinar?

05:03:08  25     A.  They came out two days the later.  We sat down,

05:03:11 1 and one of the main things that I was really cognizant

05:03:18 2 of, I wanted to make sure that all my people had a

05:03:22 3 supply of dinar going forward.  And they put together a

05:03:26 4 plan where they would give our members a special price

05:03:31 5 even above their members, and I liked that, that our

05:03:37 6 group was going to be compensated special.  And there

05:03:42 7 was a commission for me because they said, look, you put

05:03:47 8 a great organization together; and, quote, honestly your

05:03:52 9 organization is bigger than ours.  And so we came to an

05:03:56 10 agreement and basically didn't miss a heartbeat, and our

05:04:00 11 people started calling the Treasury Vault that next

05:04:05 12 week.

05:04:05 13    Q.  Every month you would get a check?

05:04:08 14    A.  Yes.

05:04:09 15    Q.  Every month there would be a letter with the

05:04:11 16 check?

05:04:11 17    A.  Yes.  Their attorney --

05:04:13 18    Q.  Do you recall who the letter was addressed to?

05:04:15 19    A.  Yes.  It was addressed to Joe Wilson, the

05:04:19 20 prosecuting attorney for two and a half years that

05:04:22 21 retired about a week before this case was going to go --

05:04:26 22    Q.  Disclosing what commission you earned?

05:04:29 23    A.  Yes.  And the attorney from Treasury Vault had

05:04:33 24 spoke to Mr. Wilson about --

05:04:36 25    Q.  Just -- that's fine.

05:04:41　1　　　　　If somebody came and wanted to buy dinar, would

05:04:43　2　you always sell it to them?

05:04:45　3　　　A.　I can remember a couple instances specifically.

05:04:52　4　　　Q.　In which you didn't?

05:04:54　5　　　A.　In which I didn't.

05:04:55　6　　　Q.　Can you tell us what those were?

05:04:56　7　　　A.　I'd like to preface that by saying if I felt

05:05:00　8　somebody was coming in that was buying more than they

05:05:07　9　should, I could pretty much tell.  And I would try and

05:05:10　10　tell them not to buy as much, just feel your way along

05:05:15　11　in this thing.  But the two instances I remember

05:05:18　12　specifically, one was a lady that came in over the lunch

05:05:23　13　hour.  Her husband had told her to go to the bank, go to

05:05:28　14　their savings account, get a certain amount of money

05:05:31　15　out, and go buy dinar.  I'm not sure if she came

05:05:36　16　directly to me or Kelly wanted me to talk to her because

05:05:40　17　Kelly was very observant.  And so I ended up talking to

05:05:44　18　her.  And I said:  Look, you obviously don't have any

05:05:48　19　idea what the dinar is about.  I said:  Why don't you

05:05:53　20　just go home, get on our website, check other websites,

05:06:01　21　talk to your husband about this, and if you're

05:06:04　22　comfortable, you come back in the morning, and you can

05:06:08　23　buy dinar.

05:06:10　24　　　Q.　Do you remember another instance?

05:06:12　25　　　A.　Very well.

05:06:13  1      Q.  Tell us about that.

05:06:15  2      A.  I was talking to, I think, a gentleman that

05:06:20  3  worked on the railroad.  And he wanted to buy 500,000

05:06:24  4  dinar, which is about a $650 purchase.  And I was up on

05:06:31  5  the raised platform.  And there was a guy in a suit

05:06:34  6  standing right there, and he started pulling on my arm.

05:06:39  7          And I just looked at him and I said:  Can I help

05:06:44  8  you?

05:06:45  9          He goes:  I'm an attorney, and I want to buy

05:06:49  10  $50,000 worth of dinar, and I want to buy it now.

05:06:54  11          And I looked at him, and I said:  Excuse me.  I

05:06:57  12  said:  I'm helping this person right here.  You can wait

05:07:00  13  your time.

05:07:01  14          He said:  I don't think you heard me.  I'm an

05:07:03  15  attorney, and I want to buy $50,000 right now.

05:07:08  16          And my old combative athletic came out of me and

05:07:17  17  I -- that was as close as I ever got to manhandling

05:07:21  18  somebody.  I said:  Sir, you can get out of my office.

05:07:25  19  I don't want your business.  And please exit right now.

05:07:34  20      Q.  Now, Rudy Coenen came here and said you used a

05:07:38  21  credit card for --

05:07:39  22      A.  Said what?

05:07:40  23      Q.  Said you used the credit card for Bayshore by

05:07:43  24  using the numbers.

05:07:44  25      A.  I think he gave it to me one time for the New

05:07:48   1    York office.

05:07:50   2        Q.   For the New York office, for the lease from

05:07:55   3    Davinci?

05:07:56   4        A.   I believe so.  But he had told me he was going to

05:07:59   5    send me a credit card for any expenses I had for

05:08:01   6    entertaining relative to securing the members for the --

05:08:08   7        Q.   And he never did?

05:08:09   8        A.   Never did.

05:08:13   9        Q.   You didn't have a payroll system at Commercial

05:08:17  10    Energy Products or the BH Group, right?

05:08:19  11        A.   Did not.

05:08:19  12        Q.   Why not?

05:08:20  13        A.   I had one employee, which was Kelly Bland, and I

05:08:24  14    was paying her with a check out of ESA.  And I basically

05:08:29  15    told her -- Kelly, when she first interviewed to me,

05:08:34  16    indicated that she had an accounting and a marketing

05:08:37  17    degree.  And I said:  That is absolutely perfect.  I'm

05:08:40  18    terrible with accounting, and I can do the marketing,

05:08:44  19    and you can help me do the marketing.  And so when we

05:08:50  20    got overwhelmed, we finally decided that we needed to

05:08:54  21    hire another person.  We didn't know if it was going to

05:08:58  22    be temporary or a full-time person.  So I said:  Kelly,

05:09:02  23    I'm sure you know competent people.  You hire somebody.

05:09:08  24    So she hired Shelby Dement.  And I didn't know if it was

05:09:13  25    going to be for six weeks or, you know.

05:09:19   1       Q.   You had a feeling the RV might occur pretty

05:09:24   2   rapidly?

05:09:24   3       A.   I had a feeling -- that's why I was getting in

05:09:26   4   these other businesses at the time, too.  I really

05:09:30   5   didn't expect the dinar to last as long as it did.

05:09:35   6       Q.   And you took Mike Teadt to the Bank of America?

05:09:38   7       A.   That's correct.

05:09:39   8       Q.   Why?

05:09:39   9       A.   I was going to be out of town, and I wanted to

05:09:43  10   make sure that daily deposit got made.  And so I took

05:09:47  11   Mike out over the lunch hour one time and showed him

05:09:53  12   where the Bank of America was at Temperance.  I wanted

05:09:57  13   the people to know that he would be coming in on my

05:09:59  14   behalf and making a deposit, using my account.

05:10:06  15       Q.   Now, did you know when you went to the Bank of

05:10:09  16   America and pulled money back, a report got filed with

05:10:12  17   the government anyway?

05:10:12  18       A.   I had no idea.

05:10:15  19       Q.   Did you ever see the form they were filling out?

05:10:18  20       A.   No.

05:10:19  21       Q.   When Brenda did the one, she didn't show it to

05:10:22  22   you?

05:10:22  23       A.   No.  I never saw the form.

05:10:25  24       Q.   Now, the Bank of America branch in Lambertville

05:10:31  25   and Temperance, are they open on Saturday?

05:10:34   1        A.   Of course.

05:10:34   2        Q.   Would you occasionally make deposits on Saturday?

05:10:37   3        A.   Absolutely.  I would go in to my office first

05:10:42   4   thing in the morning.  I would go over to the Post

05:10:46   5   Office on Summit Street, I believe, and pick up my mail,

05:10:51   6   come back to the office, open it all up, make copies,

05:10:56   7   and then I would take the checks and drive to the Bank

05:11:00   8   of America and deposit that.

05:11:01   9        Q.   And cash?

05:11:02  10        A.   Yes, and cash.

05:11:04  11        Q.   On Saturday?

05:11:05  12        A.   On Saturday.

05:11:06  13        Q.   Do you know when the bank would record that

05:11:09  14   deposit as having been made?

05:11:11  15        A.   On Monday.

05:11:14  16        Q.   Would you bring up Count 14, please, which I

05:11:18  17   think is Exhibit 232.  Go to page 3.

05:11:34  18             Do you know if May 17 is a Monday?

05:11:37  19        A.   Pardon me?

05:11:37  20        Q.   Do you know if May 17 is a Monday?

05:11:40  21        A.   I do not.

05:11:47  22        Q.   According to my smart phone, May 17 is a Monday.

05:11:53  23   Now, we show two deposits there:  One 10:31, one 10:56,

05:12:02  24   right?  One T, and one says Bank of America in

05:12:05  25   Lambertville, right?

| | | |
|---|---|---|
| 05:12:06 | 1 | A.  Yes. |
| 05:12:10 | 2 | Q.  Could you go to Exhibit 308, page 1.  That's the |
| 05:12:19 | 3 | cash, $4,995.  That's the same as the amount shown on |
| 05:12:23 | 4 | the previous one? |
| 05:12:24 | 5 | A.  Yes, sir. |
| 05:12:24 | 6 | Q.  What's the date of that deposit? |
| 05:12:26 | 7 | A.  5/15. |
| 05:12:30 | 8 | Q.  And that's a Saturday? |
| 05:12:32 | 9 | A.  Correct. |
| 05:12:34 | 10 | Q.  Could you go to Exhibit 232, page 4, please. |
| 05:12:46 | 11 | That shows an $8,000 deposit, $8,190. |
| 05:13:04 | 12 | I'm not the only one who's not seeing a check, |
| 05:13:08 | 13 | right? |
| 05:13:16 | 14 | May 24 -- well, if May 17 was a Monday, then May |
| 05:13:22 | 15 | 24 is a Monday, right? |
| 05:13:23 | 16 | A.  Correct. |
| 05:13:24 | 17 | Q.  You deposited $8,190? |
| 05:13:28 | 18 | A.  Correct. |
| 05:13:29 | 19 | Q.  Could go to Exhibit 309, page 5.  And the date of |
| 05:13:38 | 20 | that deposit of $8,190 is what? |
| 05:13:44 | 21 | A.  That would be Saturday. |
| 05:13:51 | 22 | Q.  Can you go to 232, page 5. |
| 05:14:01 | 23 | It's $9,900 on June 14, which is a Monday. |
| 05:14:07 | 24 | Could you go to 310, page 1. |
| 05:14:15 | 25 | $6,400 on the 12th? |

05:14:19   1        A.   That would be a Saturday.

05:14:28   2        Q.   Can you go to 232, page 7.

05:14:36   3             That's the 26th of July.  And that's a Monday.

05:14:45   4   It's $7,500.

05:14:47   5             Could we go to 312, page 1.  That's a deposit on

05:14:53   6   7/24.  That's a Saturday?

05:14:55   7        A.   Correct.

05:14:55   8        Q.   And that's Bank of America?

05:14:57   9        A.   That is correct.

05:14:59   10       Q.   Can we go to page 232, page 8.  And that's August

05:15:07   11  2, which is a Monday.  We've got three deposits there.

05:15:13   12            Can we go to 313, page 1.  And that's the same

05:15:20   13  deposit.  And that's a Saturday?

05:15:22   14       A.   That's a Saturday also.

05:15:41   15       Q.   Do you still think the revaluation is going to

05:15:46   16  occur?

05:15:46   17       A.   Unequivocally.

05:15:48   18       Q.   Is there anything going on in Iraq that tends to

05:15:50   19  make you believe it?

05:15:51   20       A.   Absolutely.  I studies this -- you heard Mr.

05:15:54   21  Hamstreet yesterday, two hours a day, five days a week.

05:15:57   22  I'm at least that much.  And knowledge is king.  And

05:16:06   23  when you have knowledge, it's power.  And I am more

05:16:10   24  excited than ever.  And the bottom line is how can one

05:16:15   25  of the wealthiest countries of the world have a currency

| 05:16:19 | 1 | worth zero when their neighbor has a dinar in Kuwait |
| 05:16:23 | 2 | worth 3.54 today? |
| 05:16:32 | 3 | MR. KERGER:  One moment, Your Honor. |
| 05:16:34 | 4 | (Discussion had off the record.) |
| 05:17:02 | 5 | MR. KERGER:  Could Your Honor take judicial |
| 05:17:04 | 6 | notice that those days were Saturdays and Mondays? |
| 05:17:07 | 7 | THE COURT:  Well, I haven't checked it, but |
| 05:17:12 | 8 | if counsel want to agree, that's fine. |
| 05:17:14 | 9 | MR. CRAWFORD:  That's fine. |
| 05:17:16 | 10 | MR. KERGER:  That's all I have.  Thank you, |
| 05:17:18 | 11 | Mr. Huebner. |
| 05:17:18 | 12 | - - - |
| 05:17:21 | 13 | MR. NIGHTINGALE:  Nothing here, Your Honor. |
| 05:17:22 | 14 | MR. BOSS:  No questions, thank you. |
| 05:17:24 | 15 | THE COURT:  Let's take a five-minute |
| 05:17:25 | 16 | standing break, please. |
| 05:18:38 | 17 | (Short break taken.) |
| 05:20:03 | 18 | (Whereupon the following discussion was had |
| 05:20:04 | 19 | at the bench outside the hearing of the jury:) |
| 05:20:04 | 20 | MR. CRAWFORD:  Mr. Huebner has now made |
| 05:20:07 | 21 | multiple inconsistent statements with his proffer.  This |
| 05:20:35 | 22 | whole concept of knowledge about the CTR requirements is |
| 05:20:38 | 23 | totally inconsistent with his proffer.  His statement |
| 05:20:41 | 24 | that he put the hedge fund money in a trust fund is |
| 05:20:45 | 25 | inconsistent with his proffer.  And I'm sure there's |

05:20:48   1    quite a bit more.

05:20:49   2              MR. KERGER:  I think he has to show where

05:20:55   3    the specific inconsistencies are.

05:20:58   4              MR. CRAWFORD:  Well, I guess I can ask him a

05:21:01   5    question that contradicts the proffer.  We'll have to

05:21:05   6    have another sidebar.  That's going to happen quite a

05:21:08   7    bit.

05:21:08   8              THE COURT:  Can't we do this in a more

05:21:10   9    efficient manner?  If that means take a break to take at

05:21:14  10    look at your notes and list them or something.  Or

05:21:17  11    again, I'm trying to find out a way to do this without

05:21:21  12    delay.

05:21:28  13              MR. CRAWFORD:  When it becomes a problem, I

05:21:30  14    will have to ask him:  You talked to Agent Kost and told

05:21:32  15    him something different.  Before I say that, stop and

05:21:36  16    see how that goes.

05:21:38  17              THE COURT:  Okay.

05:21:39  18              MR. CRAWFORD:  So I'll ask a question.  If

05:21:40  19    it's inconsistent with the proffer, I'll say:  Let's

05:21:44  20    have a talk.

05:21:44  21              THE COURT:  Okay.  Thank you.

05:21:59  22              (End of sidebar discussion.)

05:22:06  23                          - - -

05:22:06  24              BRADFORD HUEBNER, CROSS-EXAMINATION

05:22:07  25    BY MR. CRAWFORD:

05:22:07   1      Q.   Mr. Huebner, you spoke very proudly about your

05:23:10   2   military service; is that right?

05:23:11   3      A.   That is correct.

05:23:13   4      Q.   Mr. Shepherd and I, we used to be Army officers,

05:23:18   5   and we remember getting efficiency reports.  You got

05:23:20   6   efficiency reports, right?

05:23:22   7      A.   Correct.

05:23:23   8      Q.   And they were terrible, weren't they?

05:23:25   9      A.   I don't know.  I don't think I ever saw them.

05:23:29   10     Q.   Well, Major Conrad wrote in 1971, "He has no

05:23:34   11  motivation and his major concern is not for the benefit

05:23:37   12  of the unit but rather for personal gain."  That's what

05:23:40   13  he wrote about you, right?

05:23:41   14     A.   That is correct, if that's what you're saying.

05:23:43   15     Q.   He wrote that, and you have no clue about that?

05:23:46   16     A.   I don't remember that, sir.  It was 50 years ago

05:23:49   17  or whatever.

05:23:50   18     Q.   You handled classified material?

05:23:51   19     A.   Correct.

05:23:52   20     Q.   It's called ARFCOS material?

05:23:54   21     A.   ARFCOS.

05:23:56   22     Q.   How about this:  Lieutenant Huebner finds it

05:23:58   23  extremely hard to accept any type of constructive

05:24:02   24  criticism on his work.   He was responsible in two known

05:24:05   25  instances on making careless mistakes on handling ARFCOS

05:24:10  1  classified material which could have resulted in a

05:24:11  2  compromise had the errors not been detected by any other

05:24:15  3  person.

05:24:16  4  He told you about that, didn't he?

05:24:18  5  A.  I don't recall that, sir.

05:24:19  6  Q.  You don't recall it?

05:24:20  7  A.  Not really.

05:24:22  8  Q.  How about this:  As one of his additional duties,

05:24:25  9  he has served as the alternate Class A agent for this

05:24:29  10  organization.  During the payment of January 71 pay, he

05:24:32  11  was extremely careless in the handling of pay vouchers

05:24:36  12  which had already been signed resulting in these

05:24:38  13  vouchers being found and turned in to me for safe

05:24:41  14  keeping.  When confronted with this action, he

05:24:43  15  attempted to shift the blame to another officer to whom

05:24:46  16  he had entrusted the vouchers, knowing that he alone was

05:24:49  17  totally responsible for the funds.  Such handling of

05:24:52  18  funds could have well resulted in a loss of funds

05:24:55  19  charged out to him.

05:24:56  20  You remember that incident, don't you?

05:24:57  21  A.  No, sir, I don't.

05:24:59  22  Q.  You're telling me you never saw this report after

05:25:01  23  all these negative things that are written about you?

05:25:04  24  A.  I think is, what, 50 years ago?

05:25:07  25  Q.  Well, you talk very fondly about -- I mean, you

05:25:09   1   didn't tell the jury about these reports, right?  You

05:25:12   2   just told them about the good stuff in your military

05:25:14   3   service, true?

05:25:15   4       A.  I didn't tell them much about my military service

05:25:17   5   except that I served in this elite outfit.

05:25:20   6       Q.  The good stuff, not the bad stuff, right?

05:25:22   7       A.  I said where I served in the elite organization.

05:25:27   8       Q.  How about Lieutenant Bartlett.  Remember him?

05:25:31   9   He said of you:  He has increasingly performed near

05:25:34  10   below the minimum level necessary to complete the

05:25:36  11   mission.  This has caused hardship on other couriers and

05:25:40  12   enlisted men who thus have had to take on extra work and

05:25:44  13   responsibility.  I feel Lieutenant Huebner could be an

05:25:50  14   outstanding officer if he applies himself and if he

05:25:53  15   overcomes his attitude of expecting the Army, his unit,

05:25:56  16   and his coworkers to do everything for him while he

05:25:58  17   gives little in return.  Do you recall that?

05:26:00  18       A.  I do not.

05:26:03  19       Q.  Okay.  The BH Group, there's no Board of

05:26:06  20   Directors for the BH Group; is that true?

05:26:08  21       A.  No, there's not.

05:26:10  22       Q.  Okay.  So this part about you being the Chairman

05:26:15  23   of the Board is just a lie that you and Charlie made up

05:26:18  24   to seem -- make the BH Group seem more than what it

05:26:22  25   really was, right?

05:26:22   1        A.   I think Charlie was just embellishing on the fact

05:26:25   2   that I was the head of the BH Group.

05:26:27   3        Q.   Well, this is your trial.  Explain to the jury

05:26:31   4   how you could be the Chairman a non-existent Board?

05:26:37   5   I mean, you can't get through ten seconds of these phone

05:26:40   6   calls without lying to people; isn't that true?

05:26:42   7        A.   I didn't say I was the Chairman of the BH Group.

05:26:46   8        Q.   You were introduced as the Chairman of the Board

05:26:48   9   of the BH Group on every call, true?

05:26:51  10        A.   Could have been, by Mr. Emmenecker.

05:26:53  11        Q.   You never once corrected him, did you?

05:26:57  12        A.   I guess not.

05:26:59  13        Q.   He was lying, and you didn't correct him; true?

05:27:03  14        A.   About being the Chairman of the BH Group?

05:27:06  15        Q.   Right.

05:27:07  16        A.   I was President of the BH Group.

05:27:09  17        Q.   You were introduced as the Chairman of the Board

05:27:12  18   of the BH Group, true?

05:27:13  19        A.   There is only one Board member, so I guess I was

05:27:15  20   the Chairman of the Board.

05:27:16  21        Q.   There's no Board of Directors for the BH Group.

05:27:19  22   You just said that yourself?

05:27:20  23        A.   Then I'm the Chairman of the Board.

05:27:22  24        Q.   And you think it's accurate to tell people that

05:27:24  25   you're the Chairman of the Board, and you're the only

05:27:26    1    member of the Board?  That's a fair statement to start

05:27:29    2    off these phone calls?

05:27:35    3          You have no answer, Mr. Huebner?

05:27:36    4    A.  I said I'm the only member of the BH Group that

05:27:40    5    was the officer.

05:27:40    6    Q.  Did you ever tell anybody on these calls:  I'm

05:27:43    7    the Chairman of the Board, but, by the way, I'm the only

05:27:47    8    member of the Board?  You never told them that, did

05:27:49    9    you?

05:27:50   10          Okay.  You told the FBI agents that you met Rudy

05:27:54   11    Coenen in February of 2011.  That's what you told Agent

05:27:57   12    Pearson and Agent Kost, true?

05:28:00   13    A.  I'm not sure exactly when I -- if that's when I

05:28:03   14    told them, then I must have met him in -- was it

05:28:07   15    February, you said?

05:28:08   16    Q.  Yeah, February of '11.

05:28:10   17    A.  Is that on the phone or physically?

05:28:12   18    Q.  When you went in on July 27, 2011, and you sat

05:28:16   19    down with them, you told them that you met Rudy Coenen

05:28:19   20    in February of 2011, true?

05:28:21   21    A.  I asked you the question:  Did I meet him on the

05:28:24   22    phone or physically?

05:28:25   23    Q.  And I said:  On July 27, 2011, you met with Agent

05:28:29   24    Pearson and Agent Kost, and you told them you met Rudy

05:28:33   25    Coenen in February, 2011; true?

05:28:35  1       A.  I'm asking you to clarify how I met him.

05:28:37  2       Q.  You don't recall how you met the FBI and Agent

05:28:41  3   Kost on July 27?

05:28:42  4       A.  Of course I do.

05:28:43  5       Q.  Okay.  You met them in person, right?

05:28:45  6       A.  That is correct.

05:28:46  7       Q.  And you told them in person that you met Rudy

05:28:48  8   Coenen -- oh, I understand.  So your point is you first

05:28:56  9   met him in person in February, 2011?

05:29:01  10      A.  I don't know what date you're referring to

05:29:03  11  because you talking about a phone call introduction or

05:29:06  12  physically meeting him?

05:29:06  13      Q.  What did you mean when you told them you met him

05:29:10  14  for the first time in February, 2011?

05:29:12  15      A.  It could have been on the phone or in person.  I

05:29:14  16  don't remember.

05:29:15  17      Q.  But you didn't tell them that you'd known him for

05:29:17  18  months, did you?

05:29:19  19      A.  I don't know -- remember the exact date that I

05:29:22  20  did meet Rudy Coenen.

05:29:24  21      Q.  It was long before February, 2011, wasn't it?

05:29:28  22      A.  I don't remember.

05:29:30  23      Q.  This is Government's Exhibit 44.  This is an

05:29:41  24  e-mail that you wrote from October 5, 2010, that talks

05:29:47  25  about Rudy Coenen, spelled "Conine," on your conference

05:29:50  1    call, isn't it?

05:29:53  2        A.  Okay.

05:29:54  3        Q.  You knew Rudy long before February, 2011; didn't

05:29:59  4    you?

05:30:00  5                MR. KERGER:  I object to the form of the

05:30:02  6    question.  The question was when he met him, I believe.

05:30:05  7                THE COURT:  Overruled.  He may answer.

05:30:09  8        A.  Apparently I met him on the phone in October of

05:30:12  9    2010.

05:30:15  10       Q.  Here's Government's Exhibit 42.  You sure it

05:30:18  11   wasn't earlier than that?

05:30:19  12       A.  I do not know the exact date that I met Rudy

05:30:23  13   Coenen.

05:30:26  14       Q.  This is September 29 of 2010.  You've got his

05:30:29  15   personal e-mail here on Government's Exhibit 42,

05:30:32  16   correct?

05:30:34  17       A.  Yes, I do.

05:30:36  18       Q.  So you at least knew him as early as September

05:30:39  19   29, 2010; isn't that true?

05:30:41  20       A.  That's what this shows.

05:30:42  21       Q.  But you didn't tell Agent Kost and Agent Pearson

05:30:45  22   that you'd known him that long, did you?

05:30:47  23       A.  I don't know if they asked me that question.

05:30:51  24       Q.  Well, you talked to Agent Torgler, right, Marty

05:30:58  25   Torgler?

05:30:58  1      A.   Yes.

05:30:58  2      Q.   And he told you to go talk to the FBI and be

05:31:01  3   completely forthcoming, true?

05:31:03  4      A.   He told me to go to the FBI and tell them what

05:31:05  5   the situation was.

05:31:06  6      Q.   Did he tell you to be completely truthful and

05:31:09  7   forthcoming?

05:31:10  8      A.   Of course.

05:31:10  9      Q.   Why wouldn't you tell them how long you knew Rudy

05:31:14  10  Coenen?

05:31:16  11      The reason you didn't tell them how long you knew

05:31:18  12  Rudy Coenen was because you were trying to mislead them

05:31:22  13  to get out from this fraud; isn't that true?

05:31:23  14      A.   That is absolutely not true.

05:31:25  15      Q.   Well, why didn't you tell them the truth about

05:31:27  16  how long you'd known him?

05:31:29  17      A.   About exact dates of what phone call?

05:31:32  18      Q.   Mr. Huebner, you told them February of 2011,

05:31:37  19  true?

05:31:38  20      A.   I don't know if that's what I said.  If that's on

05:31:41  21  the record, then that's what I said.

05:31:42  22      Q.   And that's untrue?  You knew him a lot longer

05:31:45  23  than February, 2011, if that's on the record?

05:31:48  24      A.   Where does it say that I met him.

05:31:50  25      Q.   In the interview notes of both Agent Kost and

05:31:52  1  both Agent Pearson it says you told them that you met

05:31:56  2  Rudy Coenen February, 2011.

05:31:59  3      A.  Well, then I was mistaken by a few months.

05:32:02  4      Q.  By more than a few, wasn't it?  At least six.

05:32:14  5          There was a search warrant of your office; that's

05:32:15  6  true, right?

05:32:16  7      A.  Yes, sir.

05:32:17  8      Q.  Before then you were having numerous conference

05:32:19  9  calls, correct?

05:32:21  10     A.  Correct.

05:32:21  11     Q.  On those conference calls you would tell people

05:32:24  12  that you aimed for total transparency?

05:32:27  13     A.  Correct.

05:32:27  14     Q.  You had a moral responsibility to educate people.

05:32:30  15  Is that true?

05:32:30  16     A.  That's what we were trying to do.

05:32:33  17     Q.  It said you personally knew these investors.  You

05:32:36  18  had a loyal following.  Is that true?

05:32:39  19     A.  I think our members enjoyed what they heard on

05:32:42  20  our conference calls, and we tried to do the best to

05:32:44  21  educate them.

05:32:52  22     Q.  This is Government's Exhibit 7.  Okay.  The

05:33:01  23  picture on your right is Government's Exhibit 6, page 5.

05:33:04  24  That's your office, right?

05:33:05  25              THE COURT:  Six or seven?

05:33:07  1          MR. CRAWFORD:  Well, it's Government's

05:33:08  2   Exhibit 6, page 5 is what's on the right.

05:33:13  3          THE COURT:  This says 7.

05:33:16  4          MR. CRAWFORD:  Well, the left is Exhibit 7.

05:33:18  5   These are two different exhibits.

05:33:19  6          THE COURT:  I see it.

05:33:21  7   BY MR. CRAWFORD:

05:33:21  8     Q.  The picture on the right is your office, right,

05:33:23  9   Mr. Huebner?

05:33:24  10    A.  No, it's my cubicle.

05:33:25  11    Q.  It's your cubicle.

05:33:28  12         And it's cubicle 13 on the sketch on the left,

05:33:31  13  right?

05:33:32  14    A.  Correct.

05:33:36  15    Q.  Now, during the search several items were taken

05:33:40  16  out of your office, true, or your cubicle?  Correct?

05:33:46  17    A.  Absolutely.

05:33:47  18    Q.  And that search occurred on July 27, 2011, true?

05:33:51  19    A.  Correct.

05:33:53  20    Q.  This is Exhibit 211.  You've seen that before,

05:33:58  21  correct?

05:34:05  22    A.  This is the report that I got from the private

05:34:14  23  investigator that Prakash had hired, and I had to buy a

05:34:21  24  copy of it.

05:34:22  25    Q.  It doesn't say anything in there about JP Morgan

| | | |
|---|---|---|
| 05:34:25 | 1 | and Rudy Coenen, does it? |
| 05:34:27 | 2 | A.  I don't know, sir. |
| 05:34:28 | 3 | Q.  Well, you testified on direct that the report |
| 05:34:29 | 4 | doesn't say anything about JP Morgan; is that right? |
| 05:34:32 | 5 | A.  I can't remember exactly what's all in the |
| 05:34:34 | 6 | report.  I'm sorry. |
| 05:34:36 | 7 | Q.  Please read it.  Take your time to read it.  See |
| 05:34:39 | 8 | if there's any mention in there of JP Morgan.  It was in |
| 05:34:42 | 9 | your desk. |
| 05:37:00 | 10 | A.  There's a reference to JP Morgan Chase as a |
| 05:37:03 | 11 | lienholder here. |
| 05:37:05 | 12 | Q.  As a lienholder? |
| 05:37:07 | 13 | A.  I'm just telling you.  You asked me if it |
| 05:37:10 | 14 | mentioned JP Morgan.  I'm telling you. |
| 05:37:12 | 15 | Q.  Okay.  This was a report on Rudy Coenen, correct? |
| 05:37:26 | 16 | A.  Can I please finish this? |
| 05:37:28 | 17 | Q.  Sure. |
| 05:38:39 | 18 | A.  There's another mention of JP Morgan Chase Bank |
| 05:38:45 | 19 | relative to a title holder on page 12 of 26 relative to |
| 05:38:49 | 20 | one of his vehicles. |
| 05:38:51 | 21 | Q.  Okay. |
| 05:38:56 | 22 | A.  There's an another reference to JP Morgan Chase |
| 05:38:59 | 23 | Bank out of Arlington, Texas as a lienholder on another |
| 05:39:03 | 24 | vehicle. |
| 05:39:09 | 25 | Q.  I'll make it easier, Mr. Huebner.  Why don't you |

05:39:12  1  stop when you come to a reference to Rudy Morgan [sic]

05:39:15  2  as a former employee of JP Morgan.

05:40:39  3      A.   I don't see reference to JP Morgan as far as an

05:40:44  4  employer.

05:40:45  5      Q.   I've just marked what's Government's Exhibit 358.

05:40:48  6  You've seen that letter before, Mr. Huebner?   It's also

05:40:52  7  Government's Exhibit 1 on the computer.

05:40:55  8      A.   I saw it for the first time here in the

05:40:58  9  courtroom.

05:40:58  10     Q.   Well, it was found in your office, right?

05:41:00  11     A.   I know it was.  Was the original copy found in my

05:41:04  12  office?

05:41:04  13     Q.   That photocopy was found in your office.

05:41:06  14     A.   No, it was testified here that the original copy

05:41:09  15  was found in my office, sir.

05:41:11  16     Q.   You signed a stipulation that said this was found

05:41:13  17  in your office, correct?

05:41:15  18     A.   It was on record that the original copy was found

05:41:17  19  in my office.

05:41:20  20     Q.   It's a non-responsive answer, Mr. Huebner.

05:41:23  21          This piece of paper was found in your office,

05:41:26  22  true?

05:41:26  23     A.   I'm not aware of that piece of paper.

05:41:28  24     Q.   You signed a stipulation that this was found in

05:41:32  25  your office, true?

05:41:33    1        A.   I don't remember that.

05:41:39    2             (Discussion had off the record.)

05:41:43    3        Q.   Showing Mr. Huebner a copy of Government's

05:41:47    4   Exhibit 358, which is the piece of paper that is the

05:41:50    5   electronic copy of 351, here's Stipulation Number 6 that

05:42:09    6   says Government's Exhibit 1 was found on or in desk 4 at

05:42:13    7   the BH Group Offices located at 17 North St. Clair

05:42:17    8   Street, Toledo, Ohio.  Is that your signature on there,

05:42:20    9   Mr. Huebner?

05:42:21   10        A.   What I'm saying, Mr. Crawford is --

05:42:24   11        Q.   Could you please answer the question, Mr.

05:42:25   12   Huebner?

05:42:26   13        A.   This is my signature.  What I'm saying is I don't

05:42:29   14   remember seeing this document, and it was presented in

05:42:33   15   the Court that it was the original copy.

05:42:35   16        Q.   My question to you, Mr. Huebner, is that that was

05:42:37   17   found in your office on July 27, true?

05:42:40   18        A.   It may have been.   I wasn't aware of that.

05:42:42   19        Q.   You signed a stipulation that it was found in

05:42:45   20   your office on July 27, 2011, true?

05:42:48   21        A.   Could be.  How many pieces of paper were there?

05:42:52   22        Q.   Your signature is on the stipulation?  That's all

05:42:54   23   I'm asking.

05:42:55   24        A.   Is that a stipulation to a certain document?

05:42:58   25        Q.   To Government's Exhibit 1, that you see on your

05:43:00  1   computer screen, being found in your offices.  True?

05:43:03  2       A.  Was that the original copy?

05:43:06  3       Q.  I'm asking the questions, Mr. Huebner.  You

05:43:08  4   signed the stipulation to Exhibit 1, which is displayed

05:43:10  5   on your computer screen.  Was Exhibit 1 found in your

05:43:14  6   offices?

05:43:14  7            THE COURT:  Can you please answer the

05:43:15  8   question either yes or no or whatever.

05:43:18  9       A.  I don't remember that particular letter.

05:43:20  10      Q.  Government's Exhibit 219.  This was also found in

05:43:24  11  your offices, true?

05:43:28  12      A.  Was this the original copy that was found?

05:43:31  13      Q.  Please answer the question, Mr. Huebner.

05:43:36  14      A.  I'm just trying to ask the question.  Was this

05:43:38  15  the piece that was in my office?  Because this is the

05:43:41  16  original copy, and it's addressed to Rudy Coenen in

05:43:44  17  Jacksonville, Florida with no carbon copy to me.  And I

05:43:53  18  don't know how that --

05:43:54  19      Q.  Look back at the stipulation, Mr. Huebner.  Is

05:43:57  20  Government's Exhibit 219 listed on there?

05:44:00  21      A.  I'm just asking how the original copy would have

05:44:03  22  got to me.

05:44:03  23            THE COURT:  The question, Mr. Huebner, is:

05:44:05  24  Look back at the stipulation.  Is Government's Exhibit

05:44:08  25  219 listed on there?

05:44:14  1          THE WITNESS:  Your Honor, it's listed with
05:44:16  2   about ten or 12 other documents.
05:44:16  3   BY MR. CRAWFORD:
05:44:18  4      Q.  Is Government's Exhibit 32 listed on there?
05:44:20  5      A.  Yes.
05:44:21  6      Q.  And you signed that stipulation?
05:44:27  7          THE COURT:  Is that your signature on the
05:44:30  8   stipulation?
05:44:30  9          THE WITNESS:  On the stipulation it is, Your
05:44:32  10  Honor.
05:44:32  11         THE COURT:  Thank you.
05:44:36  12         THE WITNESS:  I'm just trying to figure out
05:44:38  13  how the original copy --
05:44:40  14         THE COURT:  That's okay.
05:44:43  15  BY MR. CRAWFORD:
05:44:44  16     Q.  Government's Exhibit 359, that was found in your
05:44:47  17  desk on July 27; isn't that true?
05:44:50  18     A.  Okay.
05:45:06  19     Q.  Government's Exhibit 357, the paper copy you have
05:45:10  20  there is electronically Government's Exhibit 10.  Now,
05:45:13  21  what is Government's Exhibit 10 that's on your computer
05:45:17  22  screen there with the paper copy being 359?
05:45:28  23     A.  This is my involvement with Rudy Coenen in
05:45:32  24  chronological order.
05:45:33  25     Q.  Okay.  And this was taken out of your desk on

05:45:36  1    July 27, 2011, true?

05:45:38  2        A.   Okay.   If that's -- this is not an original copy,

05:45:45  3    so I bet it would be.

05:45:46  4        Q.   You wrote this?

05:45:47  5        A.   I wrote this.

05:45:48  6        Q.   No later than July 27, 2011, true?

05:45:54  7        A.   Where does it say the date was --

05:45:56  8        Q.   Well, it was in your desk on July 27.

05:45:59  9        A.   You're saying it was found July 27?

05:46:01  10       Q.   So it had to have been written by then, true?

05:46:04  11       A.   Correct.

05:46:05  12       Q.   Your testimony on direct exam was that Hannah

05:46:07  13   Terhune called you and told you to put the hedge fund in

05:46:10  14   a trust fund, right?

05:46:11  15       A.   On the 14th.

05:46:12  16       Q.   Okay.   That is not true at all, is it?

05:46:15  17       A.   It absolutely is true.

05:46:17  18       Q.   She told you to give the money back to investors,

05:46:21  19   true?

05:46:21  20       A.   That is not true.

05:46:23  21       Q.   In this document you wrote she told you to give

05:46:26  22   the money back to investors.

05:46:29  23       A.   She called me on the 14th and told me that we

05:46:34  24   should put the money back to the investors.   And I

05:46:37  25   called Rudy Coenen immediately and told him that.

05:46:45   1    Q.   Turn to page 3, Mr. Huebner, paragraph 15 that
05:46:48   2    you wrote.
05:46:52   3         It says, your words, "About ten days after we met
05:46:55   4    with Hannah, I got a very alarming call from her where
05:46:59   5    she said," quote, "'You need to get the money back to
05:47:02   6    all investors.'"
05:47:03   7         That's not what you testified on direct
05:47:06   8    examination, is it?
05:47:08   9    A.   About ten days after we met with Hannah I got a
05:47:11  10    very alarming call from her where she said you need to
05:47:14  11    get the money back to all the investors.  That's exactly
05:47:17  12    what I just told --
05:47:18  13    Q.   No, you told them it was okay to put it in a
05:47:22  14    trust fund.
05:47:22  15    A.   That's what she told me.
05:47:24  16    Q.   You wrote here she told you to give all the money
05:47:26  17    back.
05:47:27  18    A.   She basically --
05:47:28  19    Q.   These are your words, Mr. Huebner, aren't they?
05:47:30  20    A.   Well, trust fund or back to the individuals.
05:47:33  21    Q.   Huge difference, Mr. Huebner, isn't it?
05:47:35  22    A.   I don't know.  I don't think so.
05:47:37  23    Q.   No?
05:47:38  24    A.   I think the money is being protected if it's in
05:47:41  25    an escrow account.

05:47:42   1      Q.   You think there's no difference between putting

05:47:44   2    money in a trust fund versus actually giving the checks

05:47:47   3    back to people?

05:47:48   4      A.   In an escrow account.

05:47:50   5      Q.   You were told to give the money back?

05:47:52   6      A.   And I immediately called Rudy Coenen.

05:47:54   7      Q.   And blamed it on him, right?

05:47:56   8      A.   Not blamed it on him.  He had all the money.

05:47:58   9      Q.   You had $65,000, didn't you?

05:48:01  10      A.   I offered Rudy Coenen to send that $65,000 back

05:48:04  11    to him.

05:48:04  12      Q.   Why didn't you send it back?

05:48:06  13      A.   He told me he didn't need it, that he would cover

05:48:09  14    it.

05:48:10  15      Q.   And you trusted him?

05:48:11  16      A.   I did, Mr. Crawford.

05:48:14  17      Q.   Why?

05:48:16  18      A.   When somebody tells me they're a vet, and they

05:48:19  19    took a bullet for the United States, I'm going to

05:48:22  20    believe them, Mr. Crawford.

05:48:23  21      Q.   Mr. Huebner, you're a veteran of the U.S. Army,

05:48:26  22    aren't you?

05:48:27  23      A.   That is correct.

05:48:28  24      Q.   And you were in Vietnam.  Your report said you

05:48:30  25    served under combat conditions.  And you want these

05:48:34  1    people to believe this story about a .50 caliber bullet

05:48:37  2    hitting him in the shoulder?  He would have

05:48:39  3    disintegrated, wouldn't he?

05:48:41  4        A.  I don't know.

05:48:42  5        Q.  You didn't believe that story for one second?

05:48:44  6        A.  I absolutely -- I absolutely --

05:48:45  7        Q.  It's totally absurd, Mr. Huebner.

05:48:47  8        A.  Pardon me?

05:48:48  9        Q.  It's a totally absurd story, and someone with

05:48:51  10   your military background should know to question it.

05:48:55  11   Isn't that true?

05:48:55  12       A.  That is not true.  Absolutely, unequivocally not

05:48:59  13   true.

05:48:59  14       Q.  The documents you have in front of you were found

05:49:01  15   in your office on July 27, 2011.  Isn't that true?

05:49:05  16       A.  Correct.

05:49:08  17       Q.  And we've established that you've written in your

05:49:10  18   own words no later than July 27 that you were told to

05:49:13  19   give the money back, true?

05:49:15  20       A.  True.

05:49:21  21           Paragraph 16:  Rudy then told me that he handled

05:49:23  22   the problem and that he had sent a check for $750,000 to

05:49:26  23   our attorneys to be put in the trust account.

05:49:29  24       Q.  But you weren't told to open a trust account; you

05:49:33  25   were told to give the money back?

05:49:34  1      A.   Whether giving the money back or putting it in an

05:49:37  2  escrow account to me meant the same thing, that the

05:49:40  3  investor would be protected.

05:49:44  4      Q.   You never once told on any conference call:  Hey,

05:49:47  5  we were told to give the money back.  We were told to

05:49:50  6  put it in an escrow account.  You never said that on any

05:49:53  7  conference call, did you?

05:49:54  8      A.   I didn't think it was my place.

05:49:57  9      Q.   You were the exclusive marketing agent of the

05:49:59  10  hedge funds, went you?

05:50:00  11      A.   Rudy was in charge of the hedge fund, and people

05:50:03  12  sent the money to Rudy.

05:50:04  13      Q.   You called yourself a 50/50 partner with Rudy in

05:50:08  14  that secret conversation, didn't you?

05:50:10  15      A.   I was a partner with Rudy.

05:50:15  16      Q.   You wrote an e-mail to Hannah Terhune the day

05:50:18  17  after you met with her on July 5, right?

05:50:25  18      A.   Refresh my memory, please.

05:50:36  19      Q.   Does the e-mail header look familiar?

05:50:39  20      A.   Correct.

05:50:45  21      Q.   It says:  Hannah, I trust you and Jim will do

05:50:47  22  your best to protect us if we unknowingly did something

05:50:50  23  wrong in the premarketing of these inception investor

05:50:54  24  seats.

05:50:56  25           Clearly in that e-mail you are acknowledging that

05:50:59  1   on July 5 Hannah Terhune and Jim Brennan told you you

05:51:03  2   had done something wrong with these hedge funds, true?

05:51:06  3        A.   Clearly that shows that Ms. Terhune lied on the

05:51:10  4   stand yesterday when she said that hypothetically,

05:51:13  5   because I came out and said first thing that we had

05:51:17  6   taken money for the investor hedge seats, and was there

05:51:21  7   anything she could do?  And that's when she had the

05:51:23  8   discussion with Mr. Brennan talking about putting the --

05:51:29  9   them in a trust account with an L.L.C., and she would

05:51:32  10  get back to me to see what could be done.

05:51:38  11           MR. CRAWFORD:   Tracy, could you please read

05:51:38  12  back the question and ask Mr. Huebner to answer it.

05:51:38  13           (Whereupon the previous question was read

05:52:05  14  back by the court reporter.)

05:52:05  15       Q.   True or not true?

05:52:06  16       A.   Not true.

05:52:07  17       Q.   Why on earth would you write this if they didn't

05:52:10  18  tell you you'd done something wrong?

05:52:12  19       A.   Because I had asked her the question.

05:52:15  20       Q.   It says:  I trust you and Jim will do your best

05:52:18  21  to protect us if we unknowingly did something wrong --

05:52:20  22       A.   If we unknowingly.

05:52:21  23       Q.   Please let me finish my question.

05:52:23  24           It says:  I trust you and Jim will do your best

05:52:26  25  to protect us if we unknowingly did something wrong.

05:52:28   1          Why on earth would you write that if you did not

05:52:31   2   have a discussion with her about something being wrong

05:52:33   3   with the hedge funds?

05:52:33   4      A.  I did have a discussion with her.  That's the

05:52:37   5   first question I asked her.

05:52:39   6      Q.  And she told you there was a problem?

05:52:42   7      A.  She said that they would do their best to try and

05:52:45   8   see if there was a problem, to fix it.

05:52:49   9      Q.  You knew there was a problem?

05:52:50  10      A.  I did not know.

05:52:52  11      Q.  Why would she tell you that you may need to fix

05:52:56  12   the problem if there wasn't a problem, Mr. Huebner?

05:52:58  13      A.  She didn't say it at the time.  She said she

05:53:00  14   would get back to me, Mr. Crawford, and let me know what

05:53:04  15   the situation was.   And I heard from her then on the

05:53:07  16   14th of July.

05:53:08  17      Q.  You didn't know if you'd done something wrong?

05:53:10  18      A.  I did not.

05:53:12  19      Q.  But you knew there was a question about whether

05:53:15  20   or not these hedge funds were done properly?

05:53:18  21      A.  I was talking about taking money upfront, not the

05:53:22  22   hedge fund.

05:53:22  23          MR. CRAWFORD:  Could you please read the

05:53:23  24   question back to Mr. Huebner.  I'll ask for an answer.

05:53:33  25          (Whereupon the previous question was read

05:53:33   1   back by the court reporter.)

05:53:40   2       A.  I didn't know if there was a problem with how the

05:53:43   3   hedge funds were being done.

05:53:45   4       Q.  You asked her if you had to give the money back.

05:53:47   5   You must have known there was some kind of question

05:53:50   6   about whether or not that was proper, true?

05:53:51   7       A.  Mr. Crawford.

05:53:52   8       Q.  Please answer the question, Mr. Huebner.

05:53:53   9       A.  I will.  Mr. Crawford, I asked her if there was

05:53:56  10   any --

05:53:56  11            THE COURT:  Can you answer the question yes

05:53:58  12   or no?

05:53:59  13       A.  No.

05:54:00  14            THE COURT:  Or otherwise?

05:54:01  15            THE WITNESS:  Otherwise.  Could I state my

05:54:04  16   answer?

05:54:04  17   BY MR. CRAWFORD:

05:54:12  18       Q.  Government's Exhibit 156-1.  In any event, Mr.

05:54:18  19   Huebner, this July 6 e-mail was written obviously before

05:54:21  20   July 27; is that correct?

05:54:23  21       A.  That is correct.

05:54:29  22       Q.  Take a look at this e-mail for a second.  Does

05:54:32  23   this appear to be an e-mail that you sent to Mr.

05:54:35  24   Coenen --

05:54:39  25       A.  Okay.

05:54:40  1    Q.  -- on May 22, 2011?

05:54:44  2    A.  Correct.

05:54:46  3    Q.  And here at the bottom you write:  And I would

05:54:50  4  like to go to New York to meet with her and our new fund

05:54:54  5  administrator very soon.  From now on we don't tell any

05:54:57  6  of our clients that information until everything is set

05:55:00  7  in stone; otherwise, they will destroy us.

05:55:03  8        You wrote that because you knew Rudy had already

05:55:06  9  been dropped by Apex, true?

05:55:09  10   A.  Yes.

05:55:15  11   Q.  So May 22 you knew that Rudy Coenen had been

05:55:18  12  dropped by Apex?

05:55:19  13   A.  And I did not want a situation like that to

05:55:23  14  happen again.

05:55:39  15   Q.  Then you had your July 27 meeting with the FBI,

05:55:43  16  correct?

05:55:44  17   A.  That is correct.

05:55:45  18   Q.  You talked to them about Rudy Coenen and your

05:55:51  19  concerns, true?

05:55:53  20   A.  That is true.

05:55:54  21   Q.  You thought you were worried about where the

05:55:56  22  money was going with Mr. Coenen, true?

05:56:00  23   A.  A variety of issues.

05:56:02  24   Q.  One of them being you were worried about the

05:56:04  25  money and Mr. Coenen?

05:56:05  1      A.   That is correct.

05:56:06  2      Q.   Then you got on an August 15 phone conference

05:56:11  3  with Rudy Coenen and Charlie Emmenecker, about three

05:56:14  4  weeks later, true?

05:56:14  5      A.   Correct.

05:56:15  6      Q.   And you didn't say one word to anybody about

05:56:17  7  going to the FBI because Rudy Coenen was a fraud, did

05:56:20  8  you?

05:56:20  9      A.   Mr. Crawford --

05:56:21  10     Q.   Please answer the question, Mr. Huebner.

05:56:22  11     A.   I'm going to answer.

05:56:24  12     Q.   I said:  True?

05:56:25  13     A.   Mr. Crawford, I'm going to answer you.

05:56:27  14     Q.   Were you on an August 15 phone call?

05:56:30  15          THE COURT:  Please answer the question.

05:56:31  16     A.   That part of the question is true.

05:56:36  17          MR. CRAWFORD:  Your Honor, we're going to go

05:56:37  18  through the August 15 phone call and play some of the

05:56:40  19  clips.  I'd like to pass out a transcript to the jury.

05:56:43  20          THE COURT:  Why don't we take our

05:56:44  21  midafternoon break at this point.  We'll have the

05:56:47  22  transcripts on your chairs when you return.  Please

05:56:50  23  remember the rules.  We're in recess for 15 minutes.

06:12:42  24          (Recess taken.)

06:13:08  25          THE COURT:  Counsel may continue with cross.

06:13:10  1  BY MR. CRAWFORD:

06:13:11  2      Q.  Mr. Huebner, I'm handing you a transcript of a

06:13:14  3  conference call from August 15, 2011.  Do you remember

06:13:20  4  doing a conference call on August 15, 2011?

06:13:23  5      A.  I believe we heard a clip yesterday.

06:13:25  6      Q.  This was after you come to the FBI, true?

06:13:27  7      A.  Correct.

06:13:33  8      Q.  And this is after those items that we talked

06:13:36  9  about in front of you were found in your office, true?

06:13:39  10      A.  Yes.

06:13:44  11      Q.  We'll listen to about the first 40 seconds of

06:13:47  12  this conference.

06:14:01  13          (Exhibit is played in open court.)

06:14:34  14      Q.  Okay, Mr. Huebner.  So there's no question that

06:14:37  15  you, Charlie, and Rudy are on a phone call after you

06:14:40  16  went to the FBI about Rudy, true?

06:14:42  17      A.  It appears to be that.  I -- I'm not being -- I

06:14:47  18  would like to explain something.

06:14:48  19      Q.  Please.

06:14:49  20      A.  I was shocked that Rudy was on that call.  And

06:14:52  21  you can kind of hear it in the hesitation in my voice,

06:14:56  22  if you'd like to play that back.

06:14:59  23      Q.  Well, you're hesitant because you know Rudy's a

06:15:02  24  fraud, and you're not telling anyone about it, right?

06:15:06  25      A.  I'm hesitant because I didn't know he was going

06:15:08   1    to be on that call.

06:15:09   2       Q.  Why didn't you drop off the call, Mr. Huebner?

06:15:11   3       A.  Charlie already introduced me.

06:15:13   4       Q.  Why didn't you drop off the call, Mr. Huebner?

06:15:16   5       A.  Because Charlie introduced me, and I wanted to

06:15:19   6    stay on the call then.

06:15:19   7       Q.  But you never told anybody:  Hey, folks, here's

06:15:22   8    Rudy Coenen.  I just went to the FBI about him because I

06:15:24   9    think he's a fraudster?

06:15:25   10      A.  The reason I didn't --

06:15:27   11      Q.  Answer my question, please.

06:15:29   12      A.  No, I didn't.

06:15:34   13      Q.  Let's go to 641 of the call.  That's page 8 of

06:15:50   14   the transcript, line 14.

06:16:00   15          You just went through the Accurate report.  It

06:16:05   16   doesn't say a word about Rudy Coenen working at JP

06:16:09   17   Morgan, and yet you're referring all the dinar intel to

06:16:12   18   Rudy.  True?

06:16:14   19      A.  It doesn't say that he wasn't with JP Morgan

06:16:17   20   either.

06:16:17   21      Q.  Well, there's a section in there about employers,

06:16:20   22   isn't there?

06:16:20   23      A.  Yeah, but --

06:16:21   24      Q.  It doesn't say anything about JP Morgan in the

06:16:23   25   section --

06:16:24  1              MR. KERGER:  Objection, Your Honor.  He

06:16:26  2    states what the document says.

06:16:28  3              THE COURT:  Well, I trust that counsel and

06:16:30  4    the witness have both had an opportunity to review the

06:16:33  5    document, and I'll allow the question to continue.

06:16:36  6    Let's go back though and rephrase, please.

06:16:39  7    BY MR. CRAWFORD:

06:16:39  8        Q.  There's a section in the Accurate report,

06:16:42  9    Government's Exhibit 212, that talks about previous

06:16:44  10   employers, true?

06:16:45  11       A.  It does.

06:16:46  12       Q.  It doesn't say anything about JP Morgan, does it?

06:16:48  13       A.  I don't know how inclusive it is.

06:16:50  14       Q.  It doesn't say anything about JP Morgan, does it?

06:16:53  15       A.  Not, in that report.  But at the front of that

06:16:55  16   report it doesn't say that this information is totally

06:16:58  17   accurate.

06:16:58  18       Q.  Did you tell anybody on the conference call:

06:17:01  19   I've got an Accurate report.  I'm looking into it, but I

06:17:04  20   have to tell you, there's nothing in there about Rudy

06:17:06  21   working at JP Morgan?  You never said that, did you?

06:17:10  22       A.  The reason I didn't say anything is because I

06:17:12  23   went to the FBI, and they took everything out of my

06:17:16  24   office and home and did nothing to Rudy, and I wondered

06:17:19  25   what the heck was going on.

06:17:20  1    Q.   How do you know they did nothing to Rudy?

06:17:23  2    A.   I know they did nothing.

06:17:25  3    Q.   How do you know what the FBI was doing the about

06:17:27  4  Rudy?

06:17:28  5    A.   Nothing was being done about Rudy physically at

06:17:30  6  that time and for many months.

06:17:32  7    Q.   Was Rudy under investigation?

06:17:34  8    A.   I don't know, but it didn't come out to anybody

06:17:39  9  anywhere else.

06:17:39  10   Q.   Are you entitled to know what the IRS is

06:17:41  11  investigating?

06:17:42  12   A.   I'm saying, I didn't know how I felt when I went

06:17:45  13  to report Rudy, and I was the one that got slammed, and

06:17:48  14  Rudy -- nothing happened to him.  So I was totally

06:17:51  15  confused of what was going on.

06:17:52  16   Q.   You never made the simple factual statement that

06:17:55  17  you went to the FBI because you were concerned about

06:17:58  18  Rudy Coenen?  You never told anyone that on this phone

06:18:01  19  call, did you?

06:18:02  20   A.   No, because I was confused, and maybe Rudy was

06:18:05  21  doing something right.  He was trying to get the hedge

06:18:08  22  funds going with Hannah Terhune and contracts.

06:18:11  23   Q.   Hannah Terhune told you to give the money back by

06:18:14  24  this time, true?

06:18:15  25   A.   And I told Rudy to do that.

06:18:17  1    Q.  So you just trusted Rudy?  You didn't check up on

06:18:21  2  him?

06:18:21  3    A.  Rudy, Mr. Crawford, had the money.  I didn't have

06:18:23  4  the money.

06:18:24  5    Q.  Why didn't you tell the people on the phone

06:18:26  6  call --

06:18:27  7    A.  Because --

06:18:28  8    Q.  -- who bought millions of dinar from you:  Folks,

06:18:31  9  I've got to tell you, I'm concerned about Rudy.  Why

06:18:34  10  didn't you tell them that?

06:18:35  11    A.  Because Rudy told me that he put the money in a

06:18:38  12  trust account.

06:18:39  13    Q.  Why on earth would you trust Rudy at this point

06:18:42  14  after your offices have been searched, after you knew he

06:18:45  15  had been dropped from Apex, and after you'd been told to

06:18:49  16  give the hedge fund money back?  Why on earth would you

06:18:53  17  trust Rudy at this point?

06:18:54  18    A.  Because nothing had happened to Rudy, and what

06:18:56  19  Rudy told me regarding Apex was that we were dropped

06:18:59  20  because all of a sudden all of these members started

06:19:03  21  calling, and that made sense to me.

06:19:05  22    Q.  That's not what that letter says, is it?

06:19:06  23    A.  I didn't see that letter.

06:19:08  24    Q.  Pick up that Apex letter.

06:19:10  25        It was in your office, wasn't it?

06:19:12  1    A.  It was in my office, but I don't remember seeing

06:19:15  2  this.  That's why I questioned when I heard it on

06:19:17  3  testimony there was an original that was found in my

06:19:20  4  office that would have been addressed to Rudolph Coenen,

06:19:22  5  and I wouldn't have been able to see it.

06:19:24  6    Q.  The truth is you didn't tell anybody about this

06:19:26  7  in the August 15 phone call because, more than anybody

06:19:28  8  else, you're responsible for this fraud, and you

06:19:30  9  couldn't figure a way out of it.  Isn't that true?

06:19:33  10   A.  That is not true.

06:19:34  11   Q.  When you went to the FBI, you were surprised to

06:19:36  12  see Agent Kost there, right?

06:19:38  13   A.  I didn't know who he was from Adam.

06:19:41  14   Q.  Well, you and your attorney asked why the IRS was

06:19:43  15  there, didn't you?

06:19:45  16   A.  I don't believe -- I don't know if I did or not.

06:19:49  17   Q.  You had no idea Agent Kost had been listening to

06:19:52  18  your phone calls for months?

06:19:53  19   A.  I had no idea I was being tapped by the IRS for

06:19:56  20  months.  Totally unknown to me.

06:20:03  21   Q.  Because you thought you could just get away with

06:20:06  22  whatever you wanted to say on these BH Group phone

06:20:09  23  calls, and they would never see the light of day, true?

06:20:12  24   A.  Not at all.

06:20:12  25   Q.  Then why are you concerned about an undercover

06:20:15  1    agent or someone recording your calls or someone calling

06:20:18  2    the IRS and saying:  Hey, you should listen to these

06:20:20  3    calls?

06:20:20  4        A.   Why am I concerned as a U.S. citizen about the

06:20:23  5    U.S. Government tapping your phones?

06:20:25  6        Q.   Your phones were not tapped, Mr. Huebner.  You

06:20:27  7    know that?

06:20:27  8        A.   Then how was he listening?

06:20:29  9        Q.   Because you put the phone calls on the internet

06:20:31  10   for anybody to listen to, true?

06:20:33  11       A.   Whatever.  The government was listening to my

06:20:37  12   calls.

06:20:37  13       Q.   You put them on the internet, Mr. Huebner.

06:20:40  14       A.   The people that wanted to listen to my calls were

06:20:43  15   trying to get information about the dinar, not to accuse

06:20:46  16   me of a criminal activity.

06:20:47  17       Q.   You put them on the internet, true?

06:20:50  18       A.   They were put on the internet.  And I was not

06:20:52  19   trying to hide anything, Mr. Crawford.

06:20:54  20       Q.   Then what's the problem with the IRS listening to

06:20:56  21   your phone calls --

06:20:57  22       A.   Okay.

06:20:58  23       Q.   -- if you're not trying to hide anything?

06:20:59  24       A.   I am not trying to hide anything.

06:21:01  25       Q.   Then you should have nothing to worry about with

06:21:04  1   Agent Kost listening to the phone calls, but you did not

06:21:06  2   know he was listening?

06:21:07  3       A.  I did not know he was listening.

06:21:08  4       Q.  So you thought this was an opportunity to mislead

06:21:11  5   him and Agent Pearson about what was really going on an

06:21:14  6   to throw Rudy under the bus; true?

06:21:17  7       A.  Absolute not.  Why would I have shown up at the

06:21:20  8   Federal Bureau of Investigation.

06:21:22  9       Q.  You didn't tell them the whole truth.

06:21:24  10      A.  What do you mean, the whole truth?

06:21:24  11      Q.  You didn't tell them accurately when you met

06:21:26  12  Rudy.  You didn't tell them about the phone calls.

06:21:29  13      A.  I didn't know the exact date that I met Rudy, and

06:21:32  14  I don't think that is really the substantive part of why

06:21:35  15  I made a visit over there.

06:21:37  16      Q.  Marty Torgler told you to tell everything, true?

06:21:43  17  That was his advice to you?

06:21:44  18      A.  If I misspoke about a date, then I'm sorry about

06:21:47  19  the date.  But the substance of why I went there was

06:21:50  20  explained to the agents.

06:21:53  21      Q.  Okay.  If we go on in the transcript for the

06:21:54  22  August 15 phone call, go on to page 30, line 13.  The

06:22:05  23  intervening pages Rudy is talking about all this dinar,

06:22:08  24  whatnot.  There you are on page 30, line 13, you chime

06:22:14  25  in and talk about the dinar.  Isn't that right?

06:22:18    1    A.  Where are we at.  30, line 16?

06:22:22    2    Q.  Line 13.

06:22:23    3    A.  13.  I'm reporting about what my findings were

06:22:38    4    for the conference call.

06:22:39    5    Q.  Page 32, line 4.  You're interacting with Rudy

06:22:47    6    there.  There is no mention of any problems with the

06:22:57    7    hedge fund, no mention of Rudy's background in there?

06:23:00    8    A.  We're not talking about the hedge fund.

06:23:06    9    Q.  Let's go to page 36, line 7.  This is 32:30.

06:23:26   10        (Exhibit is played in open court.)

06:23:53   11    Q.  Mr. Huebner, you don't interrupt and say:  Oh, by

06:23:56   12    the way, our attorneys told us to give the money back.

06:23:59   13    Did you?

06:24:00   14    A.  Mr. Crawford, I told you what they told me, and I

06:24:04   15    was told to put them in an escrow account, which meant

06:24:07   16    the money would be protected for the investors, and the

06:24:11   17    proceedings with the hedge fund attorneys was moving

06:24:15   18    forward.

06:24:15   19    Q.  Mr. Huebner, the jury has seen what you've

06:24:18   20    written, okay.  So we'll call it whatever you want to

06:24:20   21    call it.  But at this point you know the attorneys told

06:24:24   22    you that the money has to go somewhere, whether it's

06:24:28   23    back or into an escrow account, but you don't say that

06:24:31   24    anywhere in here, do you?

06:24:32   25    A.  I told you that I told Rudy to -- and he told me

06:24:36  1    that he did.

06:24:37  2        Q.  What about the thousands of people that have

06:24:39  3    bought millions of dinar from you and have bought hedge

06:24:42  4    fund seats?  Why don't you want to tell them what the

06:24:44  5    attorneys told you?

06:24:46  6        A.  About what?

06:24:48  7        Q.  You told everybody that you want to be totally

06:24:50  8    transparent, right?

06:24:51  9        A.  At this point --

06:24:52  10       Q.  You told everyone you want to be totally

06:24:54  11   transparent, true?

06:24:56  12       A.  Correct.

06:24:56  13       Q.  What could be more totally transparent than to

06:24:59  14   say:  While we're on the subject of hedge funds, let me

06:25:02  15   tell you what our attorneys told us?

06:25:04  16       A.  Mr. Crawford, I told you that I had gone to the

06:25:07  17   IRS.

06:25:07  18                THE COURT:  Excuse me.  Your attorney will

06:25:09  19   have an opportunity to redirect.  So that we can get

06:25:14  20   through this, I'm going to ask you to please answer the

06:25:16  21   question.  Do you remember the question?

06:25:24  22                THE WITNESS:  No.

06:25:36  23                (The previous question was read back by the

06:25:38  24   court reporter.)

06:25:41  25       A.  What's the question?

06:25:42  1    Q.  What could be more transparent than suggesting to

06:25:46  2  these people on the phone call that actually our

06:25:48  3  attorneys told us we have problems?

06:25:54  4       Why didn't you tell these people, if you want to

06:25:56  5  be totally transparent, what the attorneys told you?

06:25:59  6    A.  Because I was confused about what was happening,

06:26:02  7  what happened to me personally, and what didn't happen

06:26:05  8  to Mr. Coenen.

06:26:06  9    Q.  What does confusion have to do with telling a

06:26:08  10  little bit of truth to the people that bought millions

06:26:11  11  of dinar from you?

06:26:12  12    A.  Because I didn't want to misspeak if something

06:26:14  13  really didn't go down with Rudy Coenen, that the hedge

06:26:19  14  funds were moving forward.

06:26:23  15    Q.  This is 37:29.  Go to page 41.  Start at line 4.

06:26:48  16       (Recording is played in open court.)

06:26:58  17    Q.  Okay.  If we look at line 9, this is Rudy Coenen

06:27:02  18  speaking of the attorneys.

06:27:04  19    A.  Which page now?

06:27:05  20    Q.  Page 41, line 9.

06:27:11  21       They're very comfortable with the way the hedge

06:27:14  22  fund has been set up, and I just want to tell everybody:

06:27:17  23  Rest assured.

06:27:18  24       Total lie.  True?  The attorneys are not

06:27:20  25  comfortable, are they?

06:27:24  1      A.  From my one meeting, Hannah Terhune was lauding

06:27:31  2   the brilliant strategy that Mr. Coenen came up with

06:27:35  3   regarding the Iraqi hedge funds and investing in the ISX

06:27:43  4   and in companies going into Iraq.  She really didn't

06:27:46  5   question anything at that time.  And that's the only

06:27:49  6   meeting I was at, Mr. Crawford.

06:27:50  7      Q.  This is on August 15 of 2011.

06:27:53  8      A.  That is correct.

06:27:54  9      Q.  Before this phone call she called you and told

06:27:57  10  you that you should not have the money?

06:27:59  11     A.  This is regarding the investor seat money that --

06:28:03  12  the question that I asked her on July 5th.

06:28:07  13     Q.  And Rudy is absolutely 100 percent lying when he

06:28:12  14  says the attorneys are comfortable with the way the

06:28:14  15  hedge fund has been set up?

06:28:16  16     A.  With the way the hedge fund has been set up.  I

06:28:20  17  don't think he's talking about -- you know, it could be

06:28:23  18  about the investor seat money.  He's talking about how

06:28:25  19  the hedge fund is being set up.

06:28:27  20     Q.  But you didn't say:  Rudy, let's clarify that.

06:28:29  21  Actually, they do have some concerns?

06:28:32  22     A.  I did not, Mr. Crawford.

06:28:33  23     Q.  No, you didn't.

06:28:35  24     A.  Because I'm still wondering what happened from

06:28:38  25  when I went to the FBI and nothing happened to Mr.

06:28:41  1    Coenen.

06:28:41  2         Q.  Forget about the FBI.  What about Hannah Terhune?

06:28:46  3    She raised questions about the hedge fund, right?

06:28:48  4         A.  When?  Not when I was with her, Mr. Crawford, on

06:28:53  5    July 5th.

06:28:55  6         Q.  She did on the phone on July 16th at the latest?

06:28:58  7         A.  July 14th she told me to have Mr. Coenen give the

06:29:02  8    money back.

06:29:03  9         Q.  A month before this?

06:29:04  10        A.  What?

06:29:05  11        Q.  A month before this?

06:29:06  12        A.  Yeah, she told me to tell Mr. Coenen to put the

06:29:09  13    money in a trust account.

06:29:15  14        Q.  Page 43, line 5.  Charlie asks about Rudy's work

06:29:27  15    at JP Morgan, then Rudy goes on about working at JP

06:29:30  16    Morgan Chase, true?

06:29:37  17        A.  Repeat the question, please.

06:29:38  18        Q.  Starting at line 43, page 5.  Mr. Emmenecker asks

06:29:42  19    about --

06:29:43  20        A.  Page 5?

06:29:44  21        Q.  Line 5.  I'm sorry.  Page 43, line 5.  Charlie

06:29:51  22    Emmenecker asks Rudy about JP Morgan, then Rudy goes on

06:29:55  23    about his false story about working at JP Morgan?

06:30:00  24        A.  And the point being?

06:30:02  25        Q.  You didn't interrupt him and say:  Hey, folks,

06:30:06  1    I've got a private investigator report that doesn't say

06:30:10  2    anything about Rudy working at JP Morgan?

06:30:12  3        A.  Mr. Crawford, I didn't know for sure.  At that

06:30:14  4    point the report that I got said that it wasn't totally

06:30:17  5    accurate and I didn't know if there was anything.

06:30:20  6        Q.  Well, why not just tell the people that?

06:30:23  7        A.  Why --

06:30:23  8        Q.  They've invested millions of dollars.

06:30:26  9        A.  Why alarm the people if I didn't know for sure

06:30:30  10   that he hadn't worked at JP Morgan?

06:30:32  11       Q.  You certainly had good reason to doubt it?

06:30:34  12       A.  I didn't have absolute proof on that.

06:30:44  13       Q.  Well, at the end of this call you talk about you

06:30:46  14   and Rudy being totally in sync.  Do you remember that?

06:30:50  15       A.  I do remember that.

06:30:57  16       Q.  It's, of course, not entirely true because you

06:30:59  17   went to the FBI about him, true?

06:31:01  18       A.  That is correct.  But I had been referring

06:31:05  19   everybody that called in to our office about the hedge

06:31:08  20   funds to Rudolph Coenen.

06:31:10  21       Q.  Because the hedge funds are his fault, right?

06:31:12  22       A.  No.  The hedge funds were his responsibility, and

06:31:15  23   I didn't know exactly where we were at.

06:31:19  24       Q.  This is page 48, line 6.

06:31:25  25           (Exhibit is played in open court.)

06:32:28  1    Q.  No mention there about the doubts you took to the

06:32:32  2  FBI, correct?

06:32:32  3    A.  Once again, Mr. Crawford, I am totally confused

06:32:36  4  at what happened when I got slammed and nothing happened

06:32:40  5  to Rudy, and I was referring everything about the hedge

06:32:48  6  funds directly to Rudy.  You remember I had 12 funds

06:32:51  7  myself.

06:32:52  8    Q.  Well, of course you did.  You couldn't hardly

06:32:54  9  not buy them, could you?

06:32:55  10    A.  What do you mean?

06:32:56  11    Q.  You couldn't sit here in front of these people

06:32:58  12  not having bought any hedge fund seats and tell them

06:33:01  13  that you're not guilty, could you?

06:33:03  14    A.  I don't think that's hardly my motivation when I

06:33:06  15  bought the hedge funds, Mr. Crawford.

06:33:13  16    Q.  Government's Exhibit 22.  Do you recall this

06:33:22  17  e-mail --

06:33:23  18    A.  Yes, I do.

06:33:25  19    Q.  -- your daughter sent you at 10:32 a.m., and

06:33:29  20  seven minutes later you said:  Thanks, honey.

06:33:33  21  Everyone's got their opinion.  Do you recall that?

06:33:34  22    A.  That is correct.

06:33:39  23    Q.  There's a section of this e-mail.  This is

06:33:42  24  Government's Exhibit 22 again.  And the gist of those

06:33:44  25  two paragraphs is that registering as an MSB is a sign

06:33:50  1    of fraud in this dinar trade.  Isn't that true?

06:33:53  2        A.  Registering as an MSB is something that dinar

06:33:58  3    dealers will do to put the appearance of registration

06:34:00  4    and government oversight.  However, the difference

06:34:03  5    between a legitimate MSB and dinar dealers is that a

06:34:07  6    real MSB is not making an investment.  So ask yourself

06:34:10  7    if a business has to lie to get around registration, are

06:34:12  8    they really making a legitimate offer?

06:34:16  9        Q.  About six months later you registered as an MSB,

06:34:20  10   correct?

06:34:20  11       A.  That's correct.  There's a six-month window.

06:34:24  12       Q.  And as part of this investigation you were

06:34:26  13   audited.  Do you remember that?

06:34:28  14       A.  Audited regarding what?

06:34:30  15       Q.  Your MSB compliance.

06:34:32  16       A.  Yes.

06:34:34  17       Q.  Mary Kidwell did the auditing?

06:34:37  18       A.  That is correct.

06:34:39  19       Q.  Some of her conclusions -- and this is defense

06:34:43  20   Exhibit 727, page 13 of the report.  BH Group did not

06:34:48  21   have an anti-money laundering program, a risk evaluation

06:34:51  22   conducted via this examination determined the risk was

06:34:55  23   extremely high for money laundering.  The business did

06:34:58  24   not attempt to establish an AML program before or after

06:35:01  25   registering the business as an MSB.  Is that right?

06:35:05   1       A.   That's what it said.   And we also on your

06:35:08   2   evidence showed that I was in the process of taking

06:35:13   3   action to get in compliance with my business.

06:35:17   4       Q.   Well, this was done in July 29 of '11.

06:35:27   5       A.   Correct.

06:35:27   6       Q.   You've been an MSB for six months by then?

06:35:31   7       A.   Right.

06:35:32   8       Q.   And you've done nothing to comply, true?

06:35:34   9       A.   I told you that I started probably in May to look

06:35:39  10   into hiring a compliance officer or a firm to come in

06:35:43  11   and do what they needed to do to catch me up on

06:35:47  12   compliance issues.

06:35:49  13       Q.   But you never did?

06:35:49  14       A.   No, I was unfortunately raided and put out of

06:35:53  15   business.

06:35:54  16       Q.   Her recommendations say:   Due to the egregious

06:35:59  17   violations, the Bank Secrecy Act examination conducted

06:36:03  18   by the Internal Revenue Service examination for Energy

06:36:05  19   Saver Advisors, L.L.C.; DBA BH Group, should be referred

06:36:08  20   to FinCEN for civil enforcement.

06:36:11  21         The Internal Revenue Service recommends FinCEN

06:36:13  22   assess the maximum civil penalties to Energy Saver

06:36:17  23   Advisors, L.L.C.; DBA BH Group.

06:36:19  24         Do you remember that?

06:36:22  25         This is evidenced by zero compliance ratio before

06:36:25   1   and after registration.

06:36:28   2          Do you recall those recommendations?

06:36:30   3      A.   That I got from FinCEN?

06:36:33   4      Q.   That you got from this MSB audit?

06:36:37   5      A.   When was I audited?

06:36:38   6      Q.   July 29 of 2011.

06:36:42   7      A.   That was two days after I was put out of

06:36:44   8   business.  I told you that in April or May that I was

06:36:48   9   taking actions to get compliant and put in a compliance

06:36:52  10   system.

06:36:53  11      Q.   So -- but you hadn't done anything?

06:36:56  12      A.   You saw the evidence.  You were trying to use

06:36:59  13   that against me.

06:37:00  14      Q.   So this covers the period January 1, 2010 through

06:37:04  15   July 29, 2011.  Do you recall that about this report?

06:37:08  16      A.   I don't recall getting a report two days after I

06:37:12  17   was raided.

06:37:15  18      Q.   You registered as an MSB in January of '11?

06:37:19  19      A.   That is correct.

06:37:20  20      Q.   You did absolutely nothing to even ask about

06:37:22  21   compliance until May.  That's what you just said?

06:37:25  22      A.   I agree that I was lax on compliance.

06:37:27  23      Q.   Other issues to be considered.  This is from the

06:37:30  24   report.

06:37:31  25          Bullet point 1.  The dinar exchange is a scam.

06:37:36  1        Bullet point 2.  Mr. Huebner promoted a possible
06:37:39  2   Ponzi scheme associated with the exchange of dinar.  He
06:37:42  3   received reimbursement for his promotional efforts.
06:37:46  4        Do those conclusions sound familiar to you?
06:37:49  5   A.   What, that the dinar is a scam?
06:37:51  6   Q.   Those are the conclusions of the IRS audit of
06:37:54  7   your MSB business, correct?
06:37:56  8   A.   Then I totally disagree that the dinar is a scam.
06:37:59  9   And what was the second point?
06:38:01  10  Q.   Mr. Huebner promoted a possible Ponzi scheme
06:38:04  11  associated with the exchange of dinar.  He received
06:38:06  12  reimbursement for his promotional efforts.
06:38:09  13  A.   How do you classify the Ponzi scheme, and what
06:38:13  14  was the evidence that I did that?
06:38:14  15  Q.   Mr. Huebner, I'm asking you if you've heard the
06:38:17  16  conclusions of an Internal Revenue audit of your money
06:38:20  17  service business.
06:38:20  18  A.   That's the first I heard of it and I disagree
06:38:23  19  with both of them.
06:39:26  20  Q.   Now, at the BH Group business you sometimes had
06:39:29  21  over $10,000 in currency but didn't take all that money
06:39:32  22  to the bank because you did not want a currency
06:39:36  23  transaction report filed; is that correct?
06:39:40  24  A.   I can't say that is totally correct.
06:39:47  25            MR. CRAWFORD:  Your Honor, could we have a

06:39:48  1    sidebar, please?

06:39:56  2            (Whereupon the following discussion was had

06:40:13  3    at the bench outside the hearing of the jury:)

06:40:13  4            THE COURT:  The record should reflect that

06:40:15  5    government counsel is showing defense counsel the

06:40:23  6    interview from August 5, 2011.

06:40:28  7            MR. KERGER:  Judge, what we don't know is if

06:40:30  8    those were his words or if he was asked about a form or

06:40:35  9    report.  He never adopted this statement.  The agents

06:40:40  10   may have just called it a CTR because they know what it

06:40:43  11   is.  But they may have asked over time:  You just didn't

06:40:47  12   want a form filled out, and they may have called it a

06:40:49  13   CTR.  We don't know that.

06:40:54  14           MR. CRAWFORD:  If that's the standard for

06:40:56  15   deciding whether a proffer agreement stands, there will

06:41:00  16   never be an instance where we could ever say that

06:41:02  17   someone testified inconsistent with the proffer.

06:41:10  18           MR. KERGER:  It would be if you recorded the

06:41:12  19   interview.

06:41:14  20           THE COURT:  The government has --

06:41:16  21           MR. CRAWFORD:  That doesn't relate to this,

06:41:17  22   Your Honor, but I would circle before --

06:41:20  23           THE COURT:  Circle the ones you want to

06:41:23  24   identify.

06:41:35  25           MR. CRAWFORD:  58, 59.

06:41:38  1           THE COURT:  The government has circled

06:41:39  2  paragraphs 58 and 59 from this interview.  I'll allow

06:41:45  3  the questioning.

06:41:46  4           MR. CRAWFORD:  To be clear, the questioning

06:41:48  5  is going to expressly say:  You told Agent Kost on a

06:41:50  6  certain date something contrary to what your testimony

06:41:53  7  is here today?

06:41:54  8           MR. KERGER:  Then Agent Kost is going to

06:41:56  9  come up and verify that?  These are Agent Kost's notes.

06:42:04  10           THE COURT:  He doesn't have to even mention

06:42:06  11  Kost.  He could say:  Isn't it true that on August 5,

06:42:11  12  2011, in an interview with the agents, you said -- and

06:42:19  13  then read what it says in these paragraphs.  What's

06:42:22  14  wrong with that?

06:42:23  15           MR. CRAWFORD:  If you --

06:42:23  16           MR. KERGER:  I'll --

06:42:29  17           THE COURT:  One at a time.  Let's get

06:42:32  18  through this witness.

06:42:33  19           MR. KERGER:  I would like to know why I need

06:42:35  20  to subpoena Agent Kost.  He's been here for eight days.

06:42:39  21           THE COURT:  We're going to get to that

06:42:41  22  later.  Right now he's identified these two paragraphs.

06:42:43  23  I'm hearing nothing from defense counsel that would

06:42:46  24  suggest it would be improper to ask him about those

06:42:48  25  statements.  What you want to do on redirect or with

06:42:52　1　another witness is something we can handle at a later

06:42:56　2　date.

06:42:56　3　　　　　　MR. KERGER:  Well, I would like the

06:42:58　4　opportunity to check the agent's notes to see if those

06:43:01　5　are the words they wrote down from our client, because

06:43:04　6　if we don't have that opportunity, and the question is

06:43:06　7　able to be asked, it's going to be irreparable damage;

06:43:09　8　we can't go back and fix it.  If we can have a few

06:43:13　9　minutes to just check to make sure, then we can avoid

06:43:17　10　the problem.

06:43:22　11　　　　　　THE COURT:  Overruled.  If there are such

06:43:25　12　notes, I'll allow you to have them, and you can use

06:43:29　13　them -- you already have them.

06:43:31　14　　　　　　MR. KERGER:  I just want to check them.

06:43:34　15　　　　　　THE COURT:  Well, check them while the

06:43:36　16　questioning is going on.  Keep it moving.

06:43:41　17　　　　　　(End of sidebar.)

06:43:50　18　BY MR. CRAWFORD:

06:43:50　19　　Q.  You had an interview with Agent Kost on August 5,

06:43:54　20　2011; is that true?

06:43:59　21　　A.  It could be.  I'm not sure of the exact date.

06:44:04　22　　Q.  And you told Agent Kost that sometimes you had

06:44:07　23　over $10,000 in currency but didn't take all the

06:44:10　24　currency to the bank because he did not want the

06:44:13　25　currency transaction report filed -- "he," meaning you,

06:44:17  1    did not want one filed.  That's what you told Agent Kost

06:44:20  2    in August, true?

06:44:21  3        A.  I don't recall that, but I -- I don't recall

06:44:24  4    that.

06:44:25  5        Q.  You also told Agent Kost initially that your main

06:44:30  6    purpose for structuring currency deposits was to save

06:44:34  7    time because you didn't want the form filled out, true?

06:44:38  8        A.  I wasn't trying to structure anything.  I was

06:44:41  9    told that if it was under $10,000 I didn't have to fill

06:44:44  10   out a form.

06:44:45  11       Q.  And then when Agent Kost -- or when you were

06:44:48  12   asked how depositing currency at multiple banks the same

06:44:53  13   day saved time, you finally acknowledged that your

06:44:56  14   intent was actually to structure the deposits to evade a

06:45:01  15   filing requirement.  That's what you told the agent,

06:45:04  16   true?

06:45:05  17       A.  I don't recall that.  But I had personal accounts

06:45:09  18   and a business accounts.

06:45:20  19       Q.  Well, you knew that Key Bank had already filed a

06:45:25  20   CT for you sometime earlier for a large deposit, right?

06:45:29  21       A.  Yes.  I was aware because they said it was a

06:45:32  22   personal account.  If it had been a commercial account,

06:45:35  23   it would not have been a problem.

06:45:36  24       Q.  The answer was:  Right, you knew it, that Key

06:45:40  25   Bank filed a CT on you, true?

06:45:42  1    A.  They filed it on me?   I'm not trying to be --

06:45:47  2  I'm trying to get clarification.

06:45:50  3    Q.  You told John Miller what a CT was because the

06:45:56  4  bank filed one on him after he made a cash deposit for

06:45:59  5  you.  Isn't that true?

06:46:00  6    A.  I didn't tell John Miller what a CT was.

06:46:03  7    Q.  You told him that they will file a report on him

06:46:06  8  if he make as deposit of more than $10,000 into your

06:46:09  9  account, true?

06:46:10  10    A.  I don't think I told John Miller that.  John

06:46:15  11  Miller called me and said he had to fill out a report.

06:46:19  12    Q.  And you told him it was because --

06:46:21  13    A.  No, he told me.

06:46:22  14    Q.  -- he deposited more than $10,000, true?

06:46:25  15    A.  No, he told me that was the reason.

06:46:31  16    Q.  Now, you know that or you knew that Mike Teadt

06:46:39  17  worked for S.S. White in 2010 and 2011?

06:46:43  18    A.  I thought Mike Teadt was a commission salesman

06:46:46  19  for S.S. White.

06:46:49  20    Q.  You knew he worked for S.S. White in 2010 and

06:46:52  21  2011, true?

06:46:54  22    A.  I just gave my answer.

06:46:56  23    Q.  Which is yes?

06:46:57  24    A.  Yes, as a commission salesman.

06:47:00  25    Q.  And you knew he got fired two days after the

06:47:02   1   search warrant on your office?

06:47:04   2       A.  Yes, I did.

06:47:11   3       Q.  And you also admit to this jury that you never

06:47:13   4   did anything to verify Mr. Coenen's credentials before

06:47:17   5   inviting him on to the BH Group conference calls,

06:47:21   6   correct?

06:47:21   7       A.  No, I do not.

06:47:26   8              THE COURT:  You do not admit or you did not

06:47:29   9   do anything?

06:47:29  10              THE WITNESS:  I did not do anything, Your

06:47:31  11   Honor.

06:47:31  12              THE COURT:  Thank you.

06:47:45  13   BY MR. CRAWFORD:

06:47:45  14       Q.  I show you Government's Exhibit 256.  This is a

06:47:50  15   form you filled out for Project Hire; is that correct?

06:47:55  16       A.  Correct.

06:47:58  17       Q.  Here's page 2, page 3.  That's your signature?

06:48:02  18       A.  That is correct.

06:48:10  19       Q.  Paragraph 15 says:  Do you have a payroll system

06:48:16  20   which records all paychecks and amounts?

06:48:19  21              You answered:  Yes.

06:48:20  22              That's a false statement; true?

06:48:21  23       A.  That would be a false statement.

06:48:29  24       Q.  Paragraph 19:  Are any employees on layoff

06:48:34  25   currently?

06:48:35   1          And you said:  Yes.

06:48:36   2          And then you added this portion here about

06:48:42   3   persons identified as the director of business

06:48:44   4   development; that's Mike Teadt, right?  And executive

06:48:48   5   assistant, that's Kelly Bland, right?

06:48:51   6      A.   Yeah.   This -- I thought this went back to when I

06:48:54   7   originally hired Kelly when she was laid off.  And I

06:48:58   8   thought Mike was a commission salesperson.

06:49:00   9      Q.   Well, but you never called anybody at Wood County

06:49:03  10   and said:  Mike Teadt, I think he's a total commission

06:49:06  11   salesman at S.S. White.  He commutes.  Would that

06:49:09  12   disqualify him from being in this program?  You never

06:49:13  13   called anybody and asked them that?

06:49:14  14      A.   I did not call and ask.

06:49:17  15      Q.   But them being employees on layoff permanently?

06:49:21  16          Yes.

06:49:22  17          That's a false statement, isn't it?

06:49:23  18      A.   Kelly was employed with me.

06:49:28  19      Q.   It says the persons identified for director of

06:49:31  20   business development and executive assistant are

06:49:34  21   currently both laid off with no remote possibility of

06:49:37  22   being rehired.  That refers to their past employment,

06:49:41  23   right?

06:49:41  24      A.   Correct.

06:49:41  25      Q.   So that's a false statement that they are laid

06:49:44  1    off from their past employment?

06:49:48  2        A.   It would be, I guess.

06:49:59  3        Q.   You got checks from Wood County at the end of

06:50:03  4    2010 paying for benefits; is that true?

06:50:05  5        A.   Yes.

06:50:24  6        Q.   And is this something that you signed?

06:50:29  7        A.   Yes, that's my signature.

06:50:31  8        Q.   And that's something you sent to Wood County

06:50:33  9    asking for more money; isn't that true?

06:50:45  10       A.   Payment reimbursement schedule.  Where's the

06:50:52  11   amount that I'm asking for?

06:50:53  12       Q.   Total unpaid requested reimbursement.

06:50:56  13       A.   $4,000.  Okay.

06:50:58  14       Q.   You're asking for more money there?

06:51:00  15       A.   Correct, to complete the program and training.

06:51:05  16       Q.   We talked about this recorded conversation that

06:51:08  17   you had with Mr. Coenen.  Mr. Kerger read some

06:51:13  18   transcripts from that, didn't he?

06:51:15  19       A.   I can also answer in addition to that question.

06:51:18  20            I never did receive the money, and I never

06:51:20  21   applied for any more money.

06:51:23  22       Q.   You got some money, didn't you?

06:51:24  23       A.   I got some money, but I never applied for the

06:51:27  24   rest of it.

06:51:30  25       Q.   You knew that Project Hire required your

06:51:32   1   employees to be unemployed, true?

06:51:34   2      A.   That was the point of the original deal that I

06:51:40   3   went into, starting back in 2009.

06:51:43   4      Q.   All right.  This recorded conversation that Mr.

06:51:45   5   Huebner [sic] was reading a transcript from.  On page

06:51:50   6   17, line 15, it's got you in here saying:  Let's talk

06:51:55   7   about the money and the dollar scam.  Let's talk about

06:51:58   8   that.

06:51:59   9         What did you mean by dollar scam?  Do you

06:52:01  10   remember saying that?

06:52:01  11      A.   Where are we at, please?

06:52:04  12      Q.   This is the transcript that Mr. Kerger was

06:52:07  13   reading to you about this recorded conversation you had

06:52:09  14   with Rudy Coenen.  Do you remember referring to a dollar

06:52:12  15   scam?

06:52:12  16              MR. KERGER:  Excuse me.  What page?

06:52:14  17              MR. CRAWFORD:  Page 17, line 15.

06:52:16  18      A.   Dollar scam?  I'm not familiar.

06:52:22  19      Q.   Could it be dollar skin?

06:52:23  20      A.   I'd like to see the context of what this is in

06:52:26  21   because I am totally oblivious to what you're trying to

06:52:29  22   point out.

06:52:42  23         (Document is given to Defendant Huebner.)

06:52:50  24      A.   I have no idea what the dollar scam is.

06:52:54  25      Q.   Well, if the transcript is incorrect, and you're

06:52:57   1   saying something to the effect of dollar skin, does that

06:53:00   2   raise your or refresh your recollection at all?

06:53:02   3       A.  Dollar skin?  No, it does not.  I have no idea

06:53:08   4   what dollar scam is.

06:53:11   5           Read the paragraph before.  Maybe it will have

06:53:14   6   some relevance.

06:53:22   7       Q.  This is from Rudy.  It says:  You [inaudible] in

06:53:25   8   the game.  I've seen it all.  You want to tell me I'm

06:53:29   9   [inaudible].

06:53:30  10           Then you say:  Let's talk about the money and the

06:53:32  11   dollar scam, let's talk about that.

06:53:34  12           Let me play you a portion of the recording and

06:53:36  13   see if that refreshes your recollection as to whether

06:53:39  14   the transcript is correct here or not.

06:53:44  15           (Exhibit is played in open court.)

06:54:10  16       Q.  Any recollection of that, Mr. Huebner?

06:54:12  17       A.  What did it actually say?  Dollar skin?

06:54:17  18       Q.  Can you not understand the recording?

06:54:18  19       A.  I couldn't tell what it said, Mr. Crawford.  But

06:54:22  20   I have no idea what it's talking about dollar skin or

06:54:25  21   dollar scam.

06:54:26  22       Q.  Do you remember telling Rudy during that

06:54:28  23   conversation on page 16, line 20; you asked Rudy:  How

06:54:32  24   many times did I defend you?

06:54:35  25           And then you answered:  All the time.

06:54:38  1          Do you remember telling him that?

06:54:40  2     A.  Yes.  I mean, that had to do with when people

06:54:44  3  questioned his military background and that he worked

06:54:47  4  for JP Morgan.  I did defend him.

06:54:53  5     Q.  Here's page 15, line 1.

06:54:56  6          Mr. Huebner: All right.  The bottom line, I told

06:54:59  7  you why I put myself on as the manager of Emerging

06:55:03  8  Gains, L.L.C., because I admitted with all this bullshit

06:55:08  9  of your reputation, defending it over and over and over

06:55:11  10  okay, and why did we have -- whether it's dignitaries or

06:55:15  11  governments or newspapers that wanted to check out who

06:55:17  12  in the hell we are, you're going to do a background

06:55:20  13  check before they start endorsing us.  Why would we put

06:55:23  14  that out there just to cause initial questions?  Why?

06:55:26  15  There is no reason to.  I told you we were equal

06:55:29  16  partners all the way on this thing, all right.

06:55:31  17          What did you mean by that?

06:55:33  18     A.  Exactly what it said.

06:55:35  19     Q.  Well, if you want to be totally transparent, why

06:55:38  20  do you want to hide Rudy?

06:55:40  21     A.  I didn't know if it was untrue at that point or

06:55:42  22  not.  I hadn't verified that he wasn't with JP Morgan

06:55:46  23  and that he was -- that he basically told me a lie about

06:55:53  24  his whole military career.

06:55:55  25     Q.  Well, you were worried enough to create a Nevada

06:55:59  1    corporation that excluded him and then do a side

06:56:01  2    partnership agreement to hide his interest, true?

06:56:04  3        A.  Mr. Crawford, I told you --

06:56:06  4        Q.  Is the question -- is the answer to my question:

06:56:09  5    True?

06:56:09  6        A.  I'm answering you.  I already told you that the

06:56:12  7    question with Mr. Varner -- or maybe my attorney was

06:56:15  8    saying:  Mr. Varner, PK, and I were concerned about

06:56:20  9    having Rudy on the management because of the rumors on

06:56:23  10   the internet.  So I didn't put him on originally, but I

06:56:27  11   made a separate profit sharing agreement.

06:56:29  12       Q.  Why not take the time to just vet that all out

06:56:32  13   and inform yourself about who Rudy really is?

06:56:35  14       A.  Can I answer the question?

06:56:36  15       Q.  Sure.

06:56:36  16       A.  Okay.  This is in -- what was the date, Mr.

06:56:39  17   Crawford?

06:56:40  18       Q.  On what?

06:56:41  19       A.  On what you just read.

06:56:45  20       Q.  We don't know the date for when this conversation

06:56:47  21   took place.

06:56:48  22       A.  I think it was in June or July, Your Honor.  And

06:56:53  23   I was doing -- you admitted that June was my biggest

06:56:57  24   month for the dinar.  And we were getting ready; we were

06:57:00  25   working three nights a week doing the preparation for

06:57:03  1  the Emerging Gains project.  And that is why -- I was

06:57:11  2  working 16 hours a day.

06:57:22  3      Q.  Do you recognize this e-mail?

06:57:28  4      A.  Yes.

06:57:35  5      Q.  You talk in your direct testimony about how you

06:57:38  6  never talked about rate and date on your phone calls,

06:57:41  7  right?

06:57:43  8      A.  What's this now?   What paragraph are you at?

06:57:46  9      Q.  I'm asking you about your direct testimony.  You

06:57:49  10  testified on your direct testimony that you avoided

06:57:52  11  talking about the rate and date on your conference

06:57:54  12  calls, right?

06:57:55  13      A.  I would say 95 percent of our calls never mention

06:57:59  14  rate and date.

06:58:00  15      Q.  But you did talk about it, true?

06:58:02  16      A.  The -- I want to interject something here, if I

06:58:07  17  may, to help answer your question.  At the beginning of

06:58:10  18  each call I would have the people that were on the call,

06:58:14  19  and I would -- which would be Charlie Emmenecker, Rudy,

06:58:18  20  and our guest.  And my standard was to tell Charlie not

06:58:24  21  to bring in political preferences and to limit any Xango

06:58:31  22  information; and I would tell Rudy not to express his

06:58:34  23  religious preferences and not to talk about the rate and

06:58:39  24  date.  I said that at every beginning of each conference

06:58:42  25  call.

06:58:42  1    Q.   Okay.   The first part I've highlighted here talks

06:58:45  2    about pumping the site, true?

06:58:47  3    A.   Pumping is a marketing term.

06:58:50  4    Q.   Well, it's a marketing term that means promoting

06:58:56  5    the site and making it sound more important than what it

06:58:59  6    is; isn't that what pumping means?

06:59:01  7    A.   No, it isn't.

06:59:02  8    Q.   What is pumping?

06:59:03  9    A.   Pumping is marketing and doing it exuberantly.

06:59:06  10   Q.   And you want Rudy to market exuberantly so that

06:59:13  11   he can do it without anyone knowing that he owns the

06:59:16  12   website, right?

06:59:21  13   A.   This had nothing to do with dinar.   This site had

06:59:26  14   nothing to do with dinar whatsoever.

06:59:28  15   Q.   "I believe this is a good tactic as you can then

06:59:31  16   chime in with Scooter, Tony, and Roger to help promote

06:59:34  17   the website and not look like you are an owner pumping

06:59:37  18   the site."   You wrote that, true?

06:59:39  19   A.   That is correct.   There is nothing wrong with

06:59:43  20   talking about marketing the site.

06:59:46  21   Q.   Is it wrong to hide the true ownership so that

06:59:49  22   people don't know who's promoting the site?

06:59:52  23   A.   We were trying to basically have a clean

06:59:56  24   management so that until we found out what the situation

07:00:00  25   really was, we didn't want to put it on there.

07:00:07   1        Q.   The second part I've highlighted there it says:

07:00:10   2   With Emerging Gains, I'm the natural one to lead this

07:00:13   3   entity, and it complements helping the BH Group members

07:00:17   4   and others to make the transition from rate and date to

07:00:20   5   "it's the country, not the currency."  So BH Group

07:00:23   6   members and others are currently in this rate and date

07:00:29   7   mode is what you're writing; isn't that right?

07:00:32   8        A.   I'm talking about everybody on the internet.  We

07:00:35   9   weren't just going to market this to BH Group members.

07:00:38  10   We were marketing it to all dinar recipients.  And

07:00:41  11   that's why I held the dinar Summit and invited the top

07:00:45  12   dinar leaders to introduce them to Emerging Gains.

07:00:50  13        Q.   This is Government's Exhibit 187.

07:00:53  14             (Exhibit is played in open court.)

07:01:17  15        Q.   That is you specifically asking Scooter to talk

07:01:19  16   about the rate and date, isn't it?

07:01:21  17        A.   Can you put the paragraph before that, because I

07:01:24  18   reference it.

07:01:32  19             (Exhibit is played in court.)

07:01:35  20        Q.   You mean the paragraph before this?

07:01:36  21        A.   Yes.

07:01:37  22        Q.   You can't comment on this paragraph?

07:01:39  23        A.   I want to know what this is relative to because

07:01:41  24   it's out of context, and you take clips, and it can be

07:01:44  25   totally misconstrued.

07:01:46   1     Q.   You've had a chance to review all the conference

07:01:48   2   calls, haven't you?

07:01:49   3     A.   There is hundreds.

07:01:51   4     Q.   You've had the Government's exhibits for six

07:01:53   5   months, haven't you, Mr. Huebner?

07:01:54   6     A.   There are hundreds of calls.  I'm just asking

07:01:57   7   you, Mr. Crawford, to please play me the part before

07:01:59   8   that so I can put context into giving you an honest

07:02:03   9   answer.

07:02:03  10     Q.   Well, you have the chance to play these calls

07:02:05  11   yourself, don't you, Mr. Huebner?

07:02:08  12     A.   No comment.

07:02:11  13          THE COURT:  Please answer the question.

07:02:12  14     A.   Yes.

07:02:15  15     Q.   But you didn't play any of them on your direct

07:02:18  16   testimony, did you?

07:02:19  17     A.   Play any of what?

07:02:21  18     Q.   The conference calls.

07:02:22  19     A.   Which conference calls?

07:02:24  20     Q.   Any.

07:02:24  21     A.   I did.

07:02:26  22     Q.   On the direct testimony that you gave this

07:02:28  23   morning?

07:02:29  24     A.   Now I'm confused.  What testimony, and what

07:02:33  25   calls?

07:02:33   1      Q.   You testified for the better part of today with

07:02:36   2   Mr. Kerger asking you questions, true?

07:02:38   3      A.   That is correct.

07:02:39   4      Q.   You did not play any conference calls during the

07:02:41   5   time Mr. Kerger was asking you questions; is that true?

07:02:44   6      A.   Mr. Kerger did not play any calls.

07:03:15   7      Q.   You mentioned a Jim first told you about RV and

07:03:18   8   the dinar.  Who is Jim?

07:03:20   9      A.   A friend of mine, Jim Brown, who's a networker.

07:03:24  10      Q.   What does he network?

07:03:25  11      A.   Right now he's networking a video e-mail program.

07:03:37  12   He's one of the best networkers in the world.

07:03:39  13      Q.   And what is his expertise on the dinar RV?

07:03:43  14      A.   I didn't say he had any expertise in it.  He just

07:03:47  15   called me to tell me about the dinar.

07:03:50  16      Q.   What is his expertise on the dinar RV?

07:03:53  17      A.   I don't think he has any expertise.  He just told

07:03:57  18   me that there was a revaluation being mentioned.

07:04:00  19      Q.   And you believed him?

07:04:01  20      A.   I certainly went and looked at it myself.

07:04:07  21      Q.   You mentioned Ali having some family problems in

07:04:12  22   2009 that caused him to shut down.  What were those

07:04:15  23   family problems?

07:04:16  24      A.   Well, what Ali told me was that there was a gang

07:04:19  25   that was -- the FBI had come to him and told him that

07:04:25  1   there was a gang looking at trying to move in on his

07:04:30  2   family members or -- and his wife had been in an

07:04:36  3   automobile accident when this gang was trying to abduct

07:04:40  4   her for ransom.

07:04:41  5       Q.  Okay.  Did the gang ever get them?

07:04:44  6       A.  Did the gang ever get who?

07:04:46  7       Q.  Ali's wife?

07:04:47  8       A.  She was in an automobile accident and injured,

07:04:50  9   according to what Ali told me.

07:04:53  10      Q.  Did you ever read any news reports or anything on

07:04:55  11  that?

07:04:55  12      A.  I did not.

07:04:57  13      Q.  But you shared that story on your BH Group calls?

07:05:00  14      A.  That's what Ali told me.

07:05:02  15      Q.  And Ali was very much an expert for you, right?

07:05:05  16      A.  Well, he was the largest dinar dealer in the

07:05:08  17  world.

07:05:08  18      Q.  You had a very close relationship with him?

07:05:10  19      A.  I mean, I was a customer of his.  Ali would tell

07:05:14  20  me certain things that I don't think he told other

07:05:17  21  people.

07:05:17  22      Q.  Well, you told BH Group listeners that as soon as

07:05:20  23  the RV happened, you'd get an immediate phone call from

07:05:24  24  Ali?

07:05:24  25      A.  That is correct.  That is what he told me.

07:05:26   1    Q.   And Ali came on the conference calls in March of

07:05:30   2    2011 and told you that an instantaneous RV was never

07:05:35   3    going to happen.  Is that right?

07:05:37   4    A.   It could -- you know, RVs can come in several

07:05:41   5    forms.  It could start out as a float.  But when the

07:05:44   6    first movement of the price of the dinar happened, he

07:05:49   7    was going to call me.

07:05:50   8    Q.   But, Mr. Huebner, that's not what you were

07:05:52   9    talking about on your phone calls.  You were talking

07:05:55  10    about an instantaneous RV, true?

07:05:57  11    A.   I was talking about Ali calling me when he got

07:06:00  12    any information about the increase in the dinar.

07:06:03  13    Q.   And the RV that you were promoting was an

07:06:07  14    instantaneous massive increase in the price of the

07:06:09  15    dinar, true?

07:06:10  16    A.   Nobody knew for sure, Mr. Crawford.

07:06:13  17    Q.   That's not what you were promoting?

07:06:14  18    A.   Nobody knew for sure.

07:06:15  19    Q.   That's not what you were promoting?

07:06:17  20    A.   I always said:  Treat this as an investment, not

07:06:21  21    a lottery ticket.  Knowledge is king.  You'll never find

07:06:25  22    where I said a date or rate.

07:06:27  23    Q.   Your guests did, didn't they?

07:06:30  24    A.   A couple of them did.  And I had warned them in

07:06:33  25    the beginning of the statement -- of the call not to do

07:06:36  1    that.  But for the most part, if you go to any of the

07:06:39  2    other calls, they're all talking about date and rates.

07:06:43  3    We were very sensitive towards that.

07:06:45  4       Q.  So other people were doing it wrong; you were

07:06:48  5    doing it right?

07:06:48  6       A.  We were trying to.  Nobody was giving them the

07:06:51  7    education that we were.  You heard some of our

07:06:53  8    witnesses.

07:06:58  9       Q.  Frank Villa, he was how you met Rudy Coenen?

07:07:01  10      A.  Frank is a local friend of mine here in Toledo.

07:07:04  11      Q.  He came to your dinar summit?

07:07:06  12      A.  Yes, he did.

07:07:06  13      Q.  Wearing a purple velvet suit?

07:07:09  14      A.  So?

07:07:09  15      Q.  He was wearing a purple velvet suit; is that

07:07:13  16   true?

07:07:13  17      A.  Yes, he was.

07:07:14  18      Q.  With matching purple shoes?

07:07:15  19      A.  Really, Mr. Crawford?

07:07:17  20      Q.  Did he?

07:07:17  21      A.  I didn't know -- I didn't see his purple shoes.

07:07:20  22      Q.  He had a purple suit on?

07:07:22  23      A.  Yes, he did.

07:07:22  24      Q.  And he was one of your dinar experts?

07:07:24  25      A.  Yes, he is.

| | | |
|---|---|---|
| 07:07:25 | 1 | Q.  With Scooter? |
| 07:07:26 | 2 | A.  That's his moniker. |
| 07:07:28 | 3 | Q.  What's his real name? |
| 07:07:30 | 4 | A.  Scott Pemba [phonetically]. |
| 07:07:32 | 5 | Q.  Was that put out over the internet conference |
| 07:07:34 | 6 | calls? |
| 07:07:35 | 7 | A.  Most of these people all used a -- |
| 07:07:38 | 8 | THE COURT:  Yes or no? |
| 07:07:39 | 9 | A.  No. |
| 07:07:40 | 10 | THE DEFENDANT:  No, Your Honor. |
| 07:07:40 | 11 | Q.  How about Tony Breitling.  That's not his real |
| 07:07:43 | 12 | name, is it? |
| 07:07:44 | 13 | A.  No, it's Tony Elder. |
| 07:07:46 | 14 | Q.  And his real name was not put out over the |
| 07:07:49 | 15 | internet, was it? |
| 07:07:49 | 16 | A.  No.  I think I was one of the only people who put |
| 07:07:53 | 17 | my real name out over the internet. |
| 07:07:55 | 18 | Q.  Now, Frank Villa told Rudy Coenen that God told |
| 07:07:59 | 19 | him that the dinar would RV at $3.  Did frank Villa tell |
| 07:08:04 | 20 | you that? |
| 07:08:05 | 21 | A.  No, he did not. |
| 07:08:19 | 22 | Q.  Pretty soon after you met with Rudy -- well, let |
| 07:08:23 | 23 | me strike that. |
| 07:08:24 | 24 | Shortly after talking -- strike that too. |
| 07:08:28 | 25 | Shortly after Rudy suggested doing these hedge |

07:08:33  1    funds, you mentioned that he sent out an e-mail that had

07:08:36  2    a lot of grammatical errors in it; is that correct?

07:08:39  3        A.   Rudy had difficulty in composing a grammatically

07:08:45  4    correct communication.

07:08:47  5        Q.   You didn't see that as a red flag for someone who

07:08:50  6    was supposed to be a vice-president of JP Morgan?

07:08:52  7        A.   A lot of brilliant people can't write correctly.

07:08:57  8        Q.   Rudy sold seat 127 about 80-some-odd times; isn't

07:09:02  9    that right?

07:09:03  10       A.   I explained that earlier in my testimony, but

07:09:05  11   that's the one number he used to ask people if they were

07:09:10  12   interested, and then when we finally had an arrangement

07:09:15  13   where I was going to take over the administrative part

07:09:19  14   of the hedge funds, my girls straightened everything out

07:09:24  15   and gave, if there was 80 seats, they gave them 80

07:09:28  16   different numbers.   That one seat wasn't sold 80 times.

07:09:32  17       Q.   But Rudy's disorganization, that didn't raise a

07:09:35  18   red flag to you about who you were dealing with?

07:09:37  19       A.   Some of the most brilliant people have problems

07:09:40  20   with organization or spelling.

07:09:54  21       Q.   These hedge funds you bought for charities like

07:09:57  22   the Toledo Museum of Art, did you contact them about

07:10:00  23   those hedge fund seats?

07:10:01  24       A.   No, I did not.

07:10:02  25       Q.   Who was going to source the dinar once the

07:10:06  1   revaluation happened to fund their hedge fund seat?

07:10:11  2   Where was the dinar going to come from?

07:10:12  3       A.   From me as a gift.  I went and had notarized

07:10:18  4   gifting letters to all of those charities.  And they're

07:10:21  5   in your possession when you took all my materials from

07:10:24  6   my office.

07:10:27  7       Q.   No need to send them out because the RV hasn't

07:10:29  8   happened, true?

07:10:30  9       A.   That is correct.  I don't have them anymore.

07:10:36  10  Unfortunately, those charities are going to miss out.

07:10:54  11      Q.   Apex, you said you checked out Apex on the

07:10:57  12  internet?

07:10:58  13      A.   Yes, I did.

07:10:58  14      Q.   Never called them, did you?

07:11:00  15      A.   No, I did not.

07:11:03  16      Q.   You heard the story from Rudy that Apex dropped

07:11:07  17  them supposedly because they received so many phone

07:11:10  18  calls, true?

07:11:10  19      A.   Yes.

07:11:11  20      Q.   And they received so many phone calls because on

07:11:14  21  one of the phone calls they were told:  Call Apex,

07:11:21  22  they'll talk to you?

07:11:22  23      A.   When Rudy said that, I just cringed because I

07:11:25  24  know how networkers are.  You tell networkers to go

07:11:28  25  ahead and call, they'll call.

07:11:30  1      Q.  Because they want to know what's going on with

07:11:33  2  Apex, true?

07:11:34  3      A.  They want to verify everything.

07:11:36  4      Q.  But not you, because you didn't call Apex, did

07:11:38  5  you?

07:11:39  6      A.  I didn't.  I went on the internet and saw how

07:11:43  7  substantial a company they were, which was very

07:11:46  8  impressive.

07:12:12  9      Q.  You mentioned that Michael Teadt knows Rudy.  How

07:12:15  10  do you know that?

07:12:16  11      A.  Michael Teadt met Rudy when Rudy came to Toledo.

07:12:20  12      Q.  And what was the extent of their interaction?

07:12:23  13      A.  Not much.

07:12:41  14      Q.  You were asked about statements made on the

07:12:44  15  conference calls about private insurance that could be

07:12:47  16  purchased for dinar.  Do you recall that question?

07:12:52  17      A.  No, not dinar.

07:12:54  18      Q.  Or investments.  Do you recall Mr. Kerger asking

07:12:58  19  you a question about private insurance for investments?

07:13:02  20      A.  Yes.

07:13:03  21      Q.  That was not what was put out on the conference

07:13:05  22  call, was it?

07:13:06  23      A.  As I mentioned in my testimony to Mr. Kerger,

07:13:08  24  there is a government agency that does exactly what Rudy

07:13:14  25  mentioned, but it wasn't the exact same name.  It had

07:13:17  1    parts of it, and he probably misconstrued it.

07:13:21  2        Q.  Rudy never told anyone that they had to buy

07:13:23  3    insurance, did he?

07:13:25  4        A.  He never said they didn't have to, either.

07:13:28  5        Q.  Rudy told people that your investment is covered

07:13:33  6    90 percent by the government and said nothing about

07:13:36  7    insurance, true?

07:13:37  8        A.  That could be true.  But Bayshore could be buying

07:13:40  9    the insurance, and the investors wouldn't even know it.

07:13:44  10       Q.  What if Bayshore didn't buy the insurance?

07:13:46  11       A.  What if they didn't?

07:13:47  12       Q.  Well, then people would be expecting to get 90

07:13:51  13   percent back, and it would be a lie?

07:13:52  14       A.  Why wouldn't Bayshore buy the insurance to get

07:13:55  15   the 90 percent?  That would seem to be a great risk

07:13:58  16   value.  I certainly would have.

07:14:03  17       Q.  No one was told that insurance had to be

07:14:05  18   purchased, right?

07:14:07  19       A.  All that was told was that insurance was

07:14:10  20   available to protect the investments.

07:14:13  21       Q.  When did you ever hear Rudy Coenen tell anyone

07:14:16  22   that insurance was available?

07:14:18  23       A.  He said that a lot on the conference calls.

07:14:21  24       Q.  Which one?

07:14:22  25       A.  When talking about the Overseas Protection Act or

07:14:26  1   whatever.  I know he said it at the Toledo conference,

07:14:32  2   he was mentioning it.

07:14:33  3       Q.  He mentioned a 90 percent guarantee and said

07:14:36  4   nothing about insurance, true?

07:14:38  5       A.  He mentioned a 90 percent guarantee, but he -- if

07:14:42  6   the insurance was part of that and he didn't say it, and

07:14:45  7   it was still guaranteed, then I don't see the relevance.

07:14:52  8   I think we're talking semantics.

07:14:56  9       Q.  So leaving out the part about actually having to

07:14:59 10   purchase an insurance policy before you're covered 90

07:15:02 11   percent, that's semantics to you?

07:15:04 12       A.  No, the individual investor was not going to have

07:15:07 13   to purchase the insurance.  Bayshore or whoever was

07:15:10 14   running the hedge fund would buy the insurance to

07:15:13 15   protect the investments.

07:15:26 16       Q.  You mentioned having a flurry of activity at some

07:15:33 17   point filling orders because people wanted their dinar

07:15:35 18   right away.  Those people wanted their dinar right away

07:15:39 19   because they were being told that they had to get it

07:15:42 20   right now because the revaluation could be tomorrow,

07:15:46 21   true?

07:15:46 22       A.  What date and time are you talking about this

07:15:52 23   happening?

07:15:53 24              THE COURT:  Whatever.  Whenever.  True?

07:15:56 25       A.  It could be.  Nobody knew when the RV was going

07:16:06  1    to happen or -- so I don't know about the question.

07:16:25  2          (Discussion had off the record.)

07:16:40  3    BY MR. CRAWFORD:

07:16:41  4      Q.  Mr. Huebner you listened to Luyen Tran's

07:16:44  5    testimony; is that true?

07:16:45  6      A.  I certainly did.

07:16:46  7      Q.  Do you believe he actually worked at the Treasury

07:16:49  8    Department at some point?

07:16:50  9      A.  I don't know.  He doesn't work there now.

07:16:53  10     Q.  So he may be an imposter; is that your thought?

07:16:55  11     A.  I have no idea who the man is.  I heard he had a

07:16:59  12    Harvard graduate degree.

07:17:06  13     Q.  His testimony about this insurance program that

07:17:13  14    you referred to -- well, strike that.

07:17:15  15          His testimony about Executive Order 13303 having

07:17:18  16    nothing to do with the dinar; do you believe that

07:17:22  17    testimony by him?

07:17:22  18     A.  I was appalled.  I could not believe what he was

07:17:27  19    talking about.

07:17:29  20     Q.  Well, Executive Order 13303, the word "dinar"

07:17:32  21    does not appear in there anywhere, does it?

07:17:34  22     A.  You're right.  Financial instruments is referred

07:17:38  23    to in there, and a currency is a financial instrument.

07:17:42  24     Q.  Based on what, your personal definition?

07:17:44  25     A.  Financial instruments.  It could be bonds; they

07:17:48  1    could be stocks; they could be currency.

07:17:52  2        Q.   Where do you get that from, Mr. Huebner?

07:17:57  3        A.   Financial instruments is an all-encompassing

07:18:01  4    term.

07:18:01  5        Q.   That's your opinion?

07:18:02  6        A.   That is my opinion.

07:18:04  7        Q.   What about the 3.7 trillion dinar that the

07:18:07  8    government is supposed to hold.  Do you believe Luyen

07:18:11  9    Tran's testimony on that?

07:18:12  10       A.   I absolutely don't.

07:18:13  11       Q.   Is there a secret account somewhere where there

07:18:16  12   are some dinar?

07:18:17  13       A.   Luyen Tran testified that he had a clearance, and

07:18:20  14   I imagine it was about a mid-level clearance, and those

07:18:23  15   people in the U.S. Treasury Department, who is the main

07:18:27  16   entity regarding this whole revaluation and global

07:18:31  17   currency reset, is the U.S. Treasury.  And I doubt that

07:18:34  18   it would be going -- information to a mid-level manager.

07:18:38  19       Q.   So Scooter has got the inside scoop on the 3.7

07:18:44  20   trillion dinar, but not Luyen Tran?

07:18:46  21       A.   Scooter has a lot of information.  But do you

07:18:49  22   honestly think the U.S. government --

07:18:51  23       Q.   You or not asking questions, Mr. Huebner.

07:18:54  24       A.   All right.

07:18:54  25       Q.   Do you think Scooter has the inside scoop on 3.7

07:18:58   1    trillian dinar that Luyen Tran does not?

07:19:02   2        A.  I just --

07:19:04   3             THE COURT:  Can you answer yes or no?

07:19:05   4        A.  Possibly.

07:19:07   5             MR. CRAWFORD:  I have no other questions,

07:19:09   6    Your Honor.

07:19:29   7                        -  -  -

07:19:29   8             BRADFORD HUEBNER, REDIRECT EXAMINATION

07:19:31   9    BY  MR. KERGER:

07:19:31  10        Q.  Mr. Huebner, this is my iPad.  I pulled up on

07:19:35  11    there the official website for the U.S. Treasury.

07:19:40  12        A.  This goes back to Mr. Crawford?

07:19:42  13        Q.  That's the official website for the U.S.

07:19:44  14    Treasury.  Does it have a search field?

07:19:48  15        A.  Yes.

07:19:49  16        Q.  Do you see it?

07:19:50  17        A.  Yes, I do.

07:19:50  18        Q.  Type in the words "dinar" and "Iraq" on the U.S.

07:19:54  19    Treasury website.  What's the second document pulled up

07:20:03  20    by the U.S. Treasury in response to that search?

07:20:08  21        A.  Hold on just a second.  I didn't put a space

07:20:13  22    there.

07:20:23  23             Actually, the third document is 13303, U.S.

07:20:41  24    Department of Treasury.

07:20:46  25        Q.  What is that?

07:20:47  1      A.   That is the Presidential Order from George W.

07:20:51  2   Bush 13303.

07:20:52  3      Q.   The second document pulled up on the U.S.

07:20:56  4   Treasury website, Executive Order 13303, does relate, in

07:21:02  5   fact, to Executive Order 13303?

07:21:04  6      A.   That is correct.

07:21:05  7      Q.   And that's the U.S. Treasury Department?

07:21:06  8      A.   That is correct.

07:21:09  9      Q.   When you were interviewed by Agent Kost on August

07:21:14 10   5.  Did you ever use the term CTR?

07:21:16 11      A.   I don't believe so.

07:21:17 12      Q.   You've heard Frank Sinatra referred to as the

07:21:23 13   Chairman of the Board?

07:21:24 14      A.   Correct.

07:21:26 15      Q.   Sort of an all-encompassing --

07:21:27 16      A.   Yes.

07:21:28 17      Q.   Is that the way you understood Charlie was

07:21:30 18   referring to you?

07:21:31 19      A.   That's Charlie.

07:21:31 20      Q.   What do you mean by that?

07:21:33 21      A.   That's just the way he is.

07:21:34 22      Q.   Let's talk about your military career.  When you

07:21:37 23   came in, you started as a second lieutenant?

07:21:39 24      A.   That is correct.

07:21:39 25      Q.   You're in there for two years?

07:21:41  1      A.   That is correct.

07:21:42  2      Q.   You were promoted?

07:21:42  3      A.   That is correct.

07:21:43  4      Q.   To a first lieutenant?

07:21:45  5      A.   That is correct.

07:21:45  6      Q.   And that's as far as you could have gone in two

07:21:48  7  years?

07:21:48  8      A.   And that's as far as I wanted to go in two years.

07:21:53  9      Q.   Now, in Vietnam there were some problems with

07:21:57  10  college guys coming into the military and serving with

07:22:00  11  old school military officers?

07:22:03  12      A.   I can definitely relate to that with my

07:22:06  13  commanding officer.

07:22:07  14      Q.   He didn't like you because he thought you were a

07:22:10  15  cocky young punk?

07:22:11  16      A.   He didn't like me because I called him out

07:22:14  17  because he was an alcoholic lifer that was about 50

07:22:17  18  years old and still a major in a combat zone.  And I did

07:22:21  19  not respect him.

07:22:25  20      Q.   Mr. Crawford asked you repeatedly about an

07:22:28  21  interview with the FBI on July 27, and you were asked

07:22:33  22  when you met Mr. Coenen.

07:22:34  23      A.   Yes, sir.

07:22:35  24      Q.   When is the first time you physically touched

07:22:38  25  skin with Rudy Coenen?

07:22:40  1      A.  It could have been about that date.

07:22:42  2      Q.  You knew of him back in September of '10?

07:22:46  3      A.  Yes.

07:22:46  4      Q.  You had him on calls?

07:22:48  5      A.  Right.

07:22:48  6      Q.  But you'd never met until February?

07:22:50  7      A.  That's true.

07:22:53  8      Q.  As far as what you said to the agents, nobody

07:23:04  9  recorded that conversation with Agent Kost?

07:23:07  10     A.  I don't -- I don't know when I was being recorded

07:23:11  11 with Agent Kost.

07:23:11  12     Q.  You didn't see him --

07:23:13  13     A.  I didn't see any recording.

07:23:14  14     Q.  You've never seen a transcript of any of your

07:23:18  15 interviews?

07:23:18  16     A.  No.

07:23:19  17     Q.  Was that your decision or theirs?

07:23:20  18     A.  That's theirs.

07:23:22  19     Q.  We don't know what they asked?

07:23:23  20     A.  That's correct.

07:23:23  21     Q.  And we don't know what you said except the way

07:23:26  22 they took it down?

07:23:26  23     A.  Correct.

07:23:27  24     Q.  After they had been investigating you for several

07:23:29  25 months?

07:23:30   1      A.   Correct.

07:23:31   2      Q.   When you were there, did Agent Kost say anything

07:23:35   3   about Rudy Coenen not working for JP Morgan?

07:23:39   4      A.   No, he did not.

07:23:40   5      Q.   Did he say anything about Rudy Coenen not having

07:23:42   6   been in the Marine Corps?

07:23:44   7      A.   No, he did not.

07:23:51   8      Q.   Could you pull up 146, please.

07:24:20   9           Can you enlarge -- this is the e-mail of the

07:24:26  10   14th.

07:24:26  11      A.   Okay.

07:24:32  12      Q.   And she said:  I had to tell him today.

07:24:36  13      A.   Right.

07:24:37  14      Q.   It doesn't say:  As I have told him repeatedly?

07:24:40  15      A.   That is correct.

07:24:43  16      Q.   Scroll to the second page.  This is an e-mail you

07:24:54  17   wrote on the 6th, right?

07:24:56  18      A.   That is correct.

07:25:02  19      Q.   Can you highlight this paragraph?  The one just

07:25:11  20   above it.

07:25:17  21           There's an interesting word in there.  And you

07:25:22  22   asked her:  If we unknowingly had done something wrong.

07:25:27  23   Isn't that right?

07:25:28  24      A.   That is correct.

07:25:29  25      Q.   You didn't know?

07:25:30  1      A.   That is why I asked her.

07:25:32  2      Q.   Because she didn't tell you at that meeting?

07:25:34  3      A.   That is correct.

07:25:40  4           MR. KERGER:  One moment, Your Honor.

07:25:47  5           (Discussion had off the record.)

07:25:51  6           MR. KERGER:  That's all I have, Your Honor.

07:25:53  7           THE COURT:  Defendants?

07:25:54  8           MR. BOSS:  No, thank you, Judge.

07:25:55  9           MR. JACKSON:  No, Your Honor.

07:25:59  10                         - - -

07:25:59  11          BRADFORD HUEBNER, RECROSS-EXAMINATION

07:26:00  12  BY MR. CRAWFORD:

07:26:00  13     Q.   Mr. Huebner, the word "extraordinary," does the

07:26:05  14  word "dinar" appear in the word "extraordinary"?

07:26:11  15     A.   I would have to see them laid out to --

07:26:14  16     Q.   Well, e-x-t-r-a-o-r-d-i-n-a-r-y.  So the word

07:26:25  17  "dinar" is in "extraordinary"?

07:26:26  18     A.   That's the first time I've ever heard that.

07:26:29  19     Q.   So if the word "extraordinary" shows up in

07:26:33  20  Executive Order 13303, and someone does an internet

07:26:37  21  search for dinar, and that word appears in the bigger

07:26:39  22  word "extraordinary," that would explain why Executive

07:26:43  23  Order 13303 comes up when you search for "dinar," right?

07:26:46  24          MR. KERGER:  Your Honor, I object.  There's

07:26:47  25  no basis for it.

1762

07:26:48   1                THE COURT:  I'll allow it.  He can answer if

07:26:50   2   he knows.    If he doesn't know --

07:26:55   3        A.  I don't know, but I think that's a stretch.

07:26:59   4        Q.  Okay.  You mentioned that Major Charles Conrad

07:27:03   5   was an alcoholic who you had a problem with.  Is that

07:27:06   6   right?

07:27:06   7        A.  Absolutely.

07:27:07   8        Q.  How about Lieutenant Bartlett?  Was he an

07:27:09   9   alcoholic that you had a problem with?

07:27:11  10        A.  No, John was an academic.

07:27:15  11        Q.  Okay.  So you've got no problem?

07:27:17  12        A.  John -- excuse me.  I just want to say John was a

07:27:20  13   lifer, and we -- I was not a lifer.

07:27:24  14        Q.  Okay.  So you've got no problem with his

07:27:26  15   evaluation that says:  Based upon this current

07:27:29  16   performance and attitude, I recommend that Lieutenant

07:27:32  17   Huebner not be assigned to a sensitive or responsible

07:27:34  18   position.  I also recommend that consideration be given

07:27:37  19   to Lieutenant Huebner's retention of his U.S. Army

07:27:40  20   commission and that he be allowed to retain it only if

07:27:44  21   he shows evidence of deserving it.

07:27:45  22             That's what he said about you, right?

07:27:50  23        A.  Mr. Crawford, that is the first time I've ever

07:27:53  24   heard that.  I've never seen my 47-year-old military

07:27:56  25   records, something I don't review very often.

07:28:01   1              MR. CRAWFORD:  No other questions, Your

07:28:01   2   Honor.

07:28:01   3                        - - -

07:28:01   4       BRADFORD HUEBNER, FURTHER REDIRECT EXAMINATION

07:28:01   5   BY MR. KERGER:

07:28:04   6       Q.  And you retained your rank and your position?

07:28:06   7       A.  And an honorable discharge and got out of the

07:28:09   8   Army.

07:28:10   9              MR. KERGER:  Thank you, Your Honor.

07:28:12  10              THE COURT:  You may step down.

07:28:12  11                        - - -

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

07:28:22  1          MR. BOSS:  Your Honor, I believe that's all

07:28:23  2   the witnesses that we have scheduled for today.  Our

07:28:26  3   next is scheduled for tomorrow morning.

07:28:40  4          (Discussion had off the record.)

07:28:41  5          THE COURT:  Ladies and gentlemen, we've

07:28:42  6   concluded for the day, it appears, so we'll start at the

07:28:47  7   same time tomorrow, which is 9:00.  And just so you're

07:28:51  8   not totally shocked, the doughnuts will be different

07:28:57  9   tomorrow morning, and the cookies.  So please,

07:29:01  10  seriously, remember all the rules.  All be safe.

07:30:05  11          (Jury exits the courtroom.)

07:30:06  12          MR. HARTMAN:  Your Honor, I was incorrect

07:30:09  13  earlier about the notes that we have.  We had the notes

07:30:14  14  from the July 27th interview.  We don't have the notes

07:30:18  15  from the August 5th interview.  Since he was

07:30:21  16  cross-examined with those statements, I think it's

07:30:24  17  appropriate that the government produce those.

07:30:29  18          MR. CRAWFORD:  We'll look into it, Your

07:30:31  19  Honor.  We'll get in the office and look into it.

07:30:35  20          THE COURT:  Next?  Anything else for the

07:30:37  21  record?

          22          (Adjourned at 4:29 p.m.)

          23                  - - -

          24

          25

1

**C E R T I F I C A T E**

2

3      I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled

5   matter.

6

7   /s/ Tracy L. Spore _____            ___12/31/14 ___

8   Tracy L. Spore, RMR, CRR                   Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2     Examinations                                      Page

3

4     RICHARD GREEN, DIRECT EXAMINATION                 1511

5     BY MR. BOSS:

6     RICHARD GREEN, CROSS-EXAMINATION                  1524

7     BY MR. HARTMAN:

8     MARTIN TORGLER, DIRECT EXAMINATION                1532

9     BY MR. BOSS:

10    MARTIN TORGLER, CROSS-EXAMINATION                 1537

11    BY MR. KERGER:

12    MARTIN TORGLER, CROSS-EXAMINATION                 1538

13    BY MR. CRAWFORD:

14    FLINT HEIDLEBAUGH, DIRECT EXAMINATION             1540

15    BY MR. KERGER:

16    BRADFORD HUEBNER, DIRECT EXAMINATION              1544

17    BY MR. KERGER:

18    BRADFORD HUEBNER, CROSS-EXAMINATION               1683

19    BY MR. CRAWFORD:

20    BRADFORD HUEBNER, REDIRECT EXAMINATION            1756

21    BY  MR. KERGER:

22    BRADFORD HUEBNER, RECROSS-EXAMINATION             1761

23    BY MR. CRAWFORD:

24    BRADFORD HUEBNER, FURTHER REDIRECT EXAMINATION    1763

25    BY MR. KERGER: